**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
**Arvind Lagas on 10/26/2021**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION


CASE NO. 1:20-cv-23463-XXXX


MARIA PEREZ-SERA,

        Plaintiff,

vs.

CARNIVAL CORPORATION,
a Panamanian Corporation,
The owner and operator of the Trademark
CARNIVAL CRUISE LINE,

        Defendant.

_____/


VIDEOTAPED
VIDEO TELECONFERENCE
DEPOSITION OF:     ARVIND LAGAS.

DATE:          Tuesday, October 26th, 2021

TIME           9:00 a.m. - 10:39 a.m.

LOCATION:      All parties appeared remotely
               via Zoom video teleconference
               from their respective locations


STENOGRAPHICALLY
REPORTED BY:      LISA SELBY-BROOD, RMR,
               Registered Merit Reporter and
               Notary Public,
               State of Florida at large.

APPEARANCES


DEBORAH J. GANDER, ESQ.
Colson Hicks Eidson
255 Alahambra Circle, PH
Coral Gables, FL  33134
Deborah@colson.com
(305) 476-7400

              Counsel for the Plaintiff




COOPER JARNAGIN, ESQ.
Gray Robinson, P.A.
515 North Flagler Drive
Suite 1425
West Palm Beach, FL  33401
Cooper.Jarnagin@gray-robinson.com
(561) 268-5727

              Counsel for the Defendant




ALSO PRESENT:

Roosevelt Harrison, Videographer

INDEX

Tuesday, October 26th, 2021

DEPOSITION OF:      Arvind Lagas

                                                              PAGE

     Direct Examination by Ms. Gander                         4
     (No Cross Examination)


ERRATA SHEET                                                  66
CERTIFICATE OF OATH                                          67
CERTIFICATE OF THE REPORTER                                  68

                              - - -

                  E  X  H  I  B  I  T  S

Plaintiff's 1                                                 24
(Passenger Injury Statement)

Plaintiff's 2                                                 32
(Ship's passenger photo, Maria Perez Sera)

Plaintiff's 3                                                 32
(Ships passenger photo, Eileen Smith)

Plaintiff's 4                                                 35
(Large diagram of ship)

Plaintiff's 5                                                 35
(Close-up diagram of ship)

Plaintiff's 6                                                 38
(Photos (2)

Plaintiff's 7                                                 45
(Photos (4)

Plaintiff's 8                                                 65
(Photo ID of Deponent)

(9:03 a.m., on the record.)

Formalities for videotape; not reported.)

(Standard stipulations regarding remote video

teleconferencing of the deposition, and the

administration of the oath remotely.)

THE REPORTER:  Counsel, do you so stipulate?

MS. GANDER:  Yes.

MR. JARNAGIN:  Yes.

MS. GANDER:  Yes.  Before we begin, does the

Videographer have the witness on spotlight?

THE VIDEOGRAPHER:  I have him pinned.  He's on

my screen.

ARVIND LAGAS,

the witness herein, being first duly sworn, was examined

and testified as follows:

DIRECT EXAMINATION

BY MS. GANDER:

Q     Good morning Mr. -- how do you pronounce it?

A     Lagas.

Q     Lagas?  Okay.  And could you please give us

your first name and your last name, and spell them both

for the record.

A     Okay.  My name is Arvind -- A-R-V-I-N-D;

Arvind -- Lagas.  L-A-G-A-S.

Q    Did you say B as in Boy, or V, as in Victor?

A    V; Victor.  R-V --

Q    Okay.  Where are at you today?

A    I'm on ship.  Carnival Sunshine.

Q    All right.  I'm going to ask you to say that one more time.

A    Carnival Sunshine.

Q    Carnival Sunshine.  Okay.

Where is the Carnival Sunshine located presently?

A    In Spain.  Cádiz.

Q    Are you at port?

A    Yes.  We are on drydock.

Q    I'm correct that you still work for Carnival?

A    Yes, I do.

Q    Do you have any intent to leave Carnival?

A    No.

Q    How long have you been with Carnival?

A    Since December 2016, I'm working with Carnival.

Q    Do you intend for Carnival to be your career?

A    Yes.  Obviously, ma'am.

Q    Are you aware that Carnival is a defendant in this lawsuit?

A    Yes.

Q      Were you furloughed at all during Covid?

A      I'm sorry; what?  I beg your pardon?

Q      Sure.  During the time when most of the world was in quarantine or shut down because of Covid -- so around March 2020 through later in 2020 -- were you furloughed at all during that time?

A      Yeah.  I was on board that time.

Q      You were still on board the ship?

A      Yes.  Yeah; I was on board.

Q      Were the ships continuing to sail, even without passengers?

A      No.  We were docked.  I did two contracts.
I was contracted six months, and it was not sailing.

Q      But you were still employed by Carnival, and still living aboard the ship?

A      Yes.  After finishing my contract I went home, and after five months again I came back.

Q      Okay.  During the time that you were home for five months, were you in regular contact with Carnival, such that they could reach you if they needed to speak to you?

A      Regarding only assignments.  They were sending us e-mails if any schedule available.

Q      Okay.  Where is home for you?

A    I'm living in India.  Mumbai.

Q    And what is your native language?

A    Marathi.

Q    How long have you been speaking English?

A    Since -- my schooltime.

I mean -- we have English language subject.

Q    Okay.  Are you talking about high school?

A    Yes.  Before high school also we have English subjects.  We are learning that.

Q    Do you speak Spanish at all?

A    No.

Q    What -- I'm going to talk a little bit about your background.

What is your highest level of education?

A    I did high secondary schools, and that I -- Yeah.  Higher secondary.

Q    Is there an equivalent of that in the United States, if you know?

A    I don't know.

Q    Is it closer to high school or college, or a technical degree?

A    It's not a technical degree; it's normal schooling.  High school.  Higher secondary school.

Q    Okay.  Let's take the point that you finished -- well, did you have a particular major or

area of focus in high secondary school?

A    No.  We had six subjects, like math, Indian and English, and normal other optional subjects, like geography and English and math.  Something.

Q    Okay.  Roughly what age were you when you finished that school?

A    I was -- 19 I finished higher secondary.

Q    Once you finished high secondary, what did you do from that point on?

Did you continue further education, did you get a job, or did you take a break?

A    I did.  I did education as well, but the last year in India I could not finish it.

It was 3-year degree course, and that is BA, Bachelor of Arts, and I could not finish the last year. I failed in one subject.  So as I was working also at that time, I started working in 2008 in the airport, and by the time I was learning as well.

Q    Okay.  When did you first start working in any capacity in the maritime industry?

A    In maritime, 2016 I started working.

Q    Okay.  So Carnival was your first job in the maritime industry?

A    Yes.  My maritime industry.

Q    All right.  When -- what year roughly did you

finish high secondary school?

A    Come again, ma'am?

Q    What year, what calendar year did you finish -- you said high secondary school?

A    2006 -- yeah.  2006.

Q    So between the 10 years where you finished high secondary school in 2006 and when you started working for Carnival in 2016, what were you doing during those 10 years?

A    Eight years I was working the airlines, and I left the airline in 2016, and I joined Carnival.

2008 I started working for airline in India.

(Loudspeaker announcements on ship.)

Q    What was your job title when you were working for the airlines?

A    I joined as a ramp security assistant in the airlines.

Q    Did you have any security training or education before being hired to work security for the airlines?

A    They give on-duty training in the airline.

Q    Okay.  Give me one second.

When you started working for Carnival in 2016, what was your job title?

A    Security Officer.

Q    Was it the same job that you hold today?

A    Yes, ma'am.

Q    What ship was it on in 2016?

A    Come again, ma'am?

Q    What was the name of the ship or the vessel that you first worked on for Carnival in 2016?

A    It was Carnival Victory, which is renamed now.
     It's Carnival Radiance.

Q    Did the Carnival Sunshine have a name before it was the Sunshine?

A    I don't know about it; no.

Q    Was there a time -- say it again?

A    No; nothing.

Q    Was there a time when you worked on the Carnival Horizon?

A    Carnival Horizon -- what, ma'am?

Q    Did you ever work on the Carnival Horizon?

A    Yes, I did.

Q    When did you work on the Carnival Horizon?

A    I signed on April 2019, and signed off on -- yeah. October 2019.  Six months I was on board.

Q    Was that your only contract on the Carnival Horizon?

A    Yes.

Q    What was your job title or function when you

worked on the Carnival Horizon?

A   My job title was the same; Security Officer, and investigation and accident incidents and patrolling. Watching people.

Q   Do you mean watching to sort of catch suspicious things before they become problems?

A   Yes.  Like, patrolling in crowded places, making sure everything is all right.  And when the ship is docked, we work in the gangways.  We screen the luggages, the belongings.

Access point.  Access control.

Q   All right.  Would you do sort of crowd control if things were getting out of hand with the flow of walking and movement aboard the ship?

A   Yes.

Q   All right.  And have you ever had occasion to inform a person who was operating a scooter on board a ship to slow down or to watch for pedestrians?

A   No.

Q   Have you ever seen people operating scooters on board any Carnival ship, driving in a manner that you thought was too fast?

A   No.

Q   Have you ever had occasion when -- to see a person operating a scooter on board a Carnival ship

where you thought the person was operating the scooter too close to pedestrians who were walking?

A    No.

Q    Have you ever seen any behavior from a person operating a scooter aboard any Carnival ship where you thought it created a dangerous or potentially dangerous condition for other people?

MR. JARNAGIN:  Objection.  Form.

THE WITNESS:  No.

BY MS. GANDER:

Q    Do you make a lot more money on Carnival than you could make in India?

A    Not lot more, but it's little -- good difference.

Q    A good difference?  Okay.

And do you have a family that relies on you --

A    Yes, I do --

Q    -- for support?

A    I do have.

Q    Okay.  Are you married?

A    Yes, ma'am.

Q    Do you have children?

A    Yes.

Q    Do your wife and children rely on you for financial support?

A     Yes.

Q     Do you also support your parents, or other members of your family?

A     I have only Mom --

Q     Your mother --

A     -- I'm supporting.

Q     Okay.  You're a good son.

Did you get any training from Carnival about how to investigate accidents on board their ships, or the causes of any injuries that occurred on board their ships?

A     Yes.

Q     Tell me what you were trained to do.

A     Gathering all the information, interviewing the person, collecting the information, timings, area, and if any witnesses, interviewing them, getting facts, and documenting the issues.

Q     And do you document all of that information in the form of an incident report?

A     Yes, we do.

Q     Is that a standard form that you fill out, category by category?

A     Yes, we have.

Q     Do you take photographs?

A     Yes, ma'am.

Q    And do you include those photographs along with the incident report in that file?

A    Yes.

Q    Do you take video?

A    We don't take videos.

If the incident or accident is covered by the video -- the cameras -- then we get a chance to record that.

Q    So you're talking about if there are cameras that are placed on the ship that have surveillance and if those cameras happen to capture something that occurs on the ship, you have the opportunity to review that film.  Correct?

A    Yes.

Q    All right.  Do you save and preserve that film after you review it?

A    Yes, we do.

Q    Where are the cameras located on Carnival ships?

A    All the ships don't have the same, but some of the important locations have the cameras.

Not all the ships has the same layout of the cameras.

Q    Okay.  For the Carnival Horizon, did the Carnival Horizon have cameras in the hallways, outside

of cabins?

A    Yes.

Q    Did the Carnival Horizon have surveillance cameras inside the medical clinic?

A    I don't remember, ma'am.

Q    Did the Carnival Horizon have surveillance cameras in the hallway outside the medical clinic?

A    Yes.

Q    Did the Carnival Horizon have cameras inside the restaurants or dining areas?

A    I don't remember.

Q    What about inside or outside of the lounge, or any bars?

A    Yes.  Horizon has.

Q    You said "Yes; Horizon has."

Are you saying that other ships don't, or did the other ships as well?

A    Other ships, I haven't worked.

And those ships I have worked, all of them don't have the cameras all over.

Q    Okay.  Does -- or when you were on it, did the Horizon have surveillance cameras in the casinos?

A    Yes.  Horizon has.

Q    All right.  And would it capture people moving around the casino, or would it only capture what the

dealers were doing at the tables?

A    Both.

Q    Did the Carnival Horizon have surveillance cameras at The Atrium?

A    Yes.

Q    You said that you would speak to witnesses -- first of all, I believe you said you would gather the names of eyewitnesses, and then you would speak to the witnesses.  Did I understand that?

A    Yes.

Q    Okay.  You nodded for a few seconds before you said yes, and even though I was looking at you nod and I knew you were saying yes, you always have to verbalize your answer, because Lisa is not allowed -- our court reporter is not allowed to interpret your bodily gestures.

So please use words that she can type down when you answer my questions.  Okay?

A    Okay.

Q    All right.  When you would interview witnesses as part of your investigation, did you typically summarize the content of what they told you into your incident report?

A    Yes.

Q    Did you typically ask the witness to fill out

a statement in their own handwriting, describing what occurred?

A    Yes, ma'am.

Q    And would that be contained within the incident report file that you created for that investigation?

A    Yes.

Q    Do you remember a woman named Maria Perez-Sera -- or any woman -- being struck by a scooter on the Horizon when you were on that voyage?

A    Yes.

Q    Do you remember how you first became aware that something had occurred?

A    Yes.

Q    Could you please describe that for me.

A    When I was on Horizon in August we got a call from the Medical Center for an accident report -- an injury.

So I went to the Medical Center, and that's the time I met Maria Perez.

Q    So you were not an eyewitness to what occurred.

A    Yes.

Q    You were not an eyewitness to what occurred.

A    I'm not the eyewitness.

When this happened, I was not present at the time of the accident --

Q    Okay --

A    -- at the area.

Q    And you did not escort Miss Perez-Sera from the area of the accident to the medical bay.

A    No.

Q    When you first arrived at the medical bay, the medical clinic, was she still there?

A    Not on the same day.

Next day she ordered to the Medical Center. That time I met her, she was there at the Medical Center.

Q    Okay.  Are you saying that the Medical Center did not call you the day of the incident; they called you the day after the incident when she was a patient there?

A    Yes.

Q    Were you unaware that she went to the Medical Center the night that it happened?

A    I don't know that.

Q    When you got there, what information were you given, and by whom were you given the information?

A    On duty nurse guided me towards -- directed me toward the injured guest -- which was Maria -- and then

I met her and I inquired of her that what happened, and she provided me all the details or information; what happened to her one day prior, and she told me that she was hit by another person, who was driving a motor scooter.

Q    Did she have any visible injuries?

A    That I don't remember, ma'am.

Q    Was she walking independently, or was she using some type of a device, such as a crutch or a walker, or a wheelchair?

A    That I don't remember.

Q    Did she give you the name of the person who hit her?

A    No.

Q    At some point during your investigation did you learn the name of the person who hit her?

A    Yes.  After I initiated an investigation.

Q    After you what?

A    After I started the investigation of the accident then I recognize her, and then I came to know her name.

Q    Did you recognize her from video that you saw?

A    Yes.

Q    And was the video of the actual collision?

A    Yes.

Q    How did you look at the video and put the person you saw in the video with the name of the passenger?

A    When I investigated I didn't get the name at that time, but from the description, from the appearance and the information I gathered that the person was hit by the scooter.  And that time I went through my on-board guest list and photographs, and that's how I recognized her, and then I came to know her name.

Q    Okay.  So was there a master list of who on board had a scooter, so that you could look through the passengers you knew had a scooter and compare the photographs in the database with the person you saw in the video?

A    Not exactly by the list -- by the appearance, by the -- look, time when this happened.  Then I followed her to the video camera, which was in the lobby area -- elevator lobby.  And from the clear picture I went through the whole list, and by the age category and the gender and the look of that guest, I recognized her in that list, and then I contacted her.

Q    Was this list ship wide, or was it specific to people who had scooters?

A    It was ship wide.

All person were showing in that.

Q     So basically any woman of that rough age, you looked at their photograph and matched it to the woman you had seen on the video.

A     Detail, and -- again, I conformed with her, and she admitted that she's the one.

Q     Okay.  Did you save the video that shows that person hitting Miss Perez that you had viewed, as part of your investigation?

A     Yes, I did.

When I was on Horizon, I saved that video.

Q     And would that video be in an investigation file?

A     It was saved in the Security office.

Q     What does that mean; "Saved in the Security office?"

I've never worked on board a ship, and I certainly never worked in security on board a ship, so what do you mean by, "I saved it in the Security office"?

A     We have certain folders, accident folders in the Security office computers, and we clear the folder, and we give the accident name, number, and all the documents.

We upload them, and we save the video in that file.

Q    And do you do that in the course of your investigation because you believe that this injury may ultimately result in litigation?

A    That's the procedure.

We have to save that for future references.

Q    Do you save it just because it's part of your job duty as a Security officer to save the video, just -- whatever you see you save it, if it documents an accident or an injury?

MR. JARNAGIN:  Objection.  Form.

You can answer.

THE WITNESS:  Yeah.  We save it.

Any discrepancy, on board.

BY MS. GANDER:

Q    Okay.  You were trying to do this as part of your daily duties.  Correct?

A    Yes.

Q    Okay.  When is the last time you saw the video?

A    When -- when I was on board that ship in August.

Q    Did you -- did you review it to refresh your memory before your deposition here?

A    No.  I don't have that video with me.

Q    Did you review --

A    It's on board.

Q    Okay.  I didn't mean to interrupt you.

Did you say it's on board?

A    Yes.  On Carnival Horizon.

That video is on Carnival Horizon.

Q    Did you review any portion of the investigation file to refresh your memory to prepare you to testify here today?

A    The documents shared by my lawyer.

Q    Okay.  I'm not asking about any conversations that you had with Mr. Jarnagin or anyone at the law firm, or any in-house attorneys for Carnival, but what documents did you look at?

Did you look at the statement that was by a family member of Miss Perez-Sera?

A    No.

Q    Did you look at a statement that was by the scooter driver, Miss Eileen Smith?

A    No.

Q    Did you look at your own summary written into the incident report?

A    No.

Q    What document --

A    Yes --

Q    You looked at your --

A     Only passengers -- Passenger Injury Statement --

Q     Okay --

A     -- to refresh.  To recollect.

Q     Okay.  Whose handwriting was on the Passenger Injury Statement?

A     That I don't remember, ma'am.

Q     Okay.  I am going to mark what I believe you're referring to -- and if I'm wrong, please tell me.

Do you have a screen that if I share screen, you can see what I'm doing?

A     Yeah, I can.

Q     Okay.  Give me one second; make sure I have everything else closed down before I do that.

MS. GANDER:  Mr. Jarnagin smiles; he's been in that situation, too.

MR. JARNAGIN:  I've been caught doing that; yes.

(Plaintiff's Exhibit 1 marked for identification.)

BY MS. GANDER:

Q     Mr. Lagas, can you see what I've shared?

A     Yes, I can see.

Q     So I'm going to mark as Exhibit 1 to your deposition, Page 2157 -- this is the Bates number by my office -- and it's titled at the top, "Passenger Injury

Statement." Do you see that?

A    Yes.

Q    Is this the document you are referring to?

A    Yes.

Q    Okay.  Now, I'm going to blow it up and make it larger so we can see it more easily, but if there's any time you want me to pull out and make it smaller so you can see more of the page at one time, just say so; okay?  Okay?

A    Yes.

Q    All right.  Is this your handwriting?

A    No.

Q    All right.  This number at the top, HZ 808242019, that appears --

A    That is my --

Q    Say it again?

A    That is my handwriting.
     Only the number given is my handwriting.

Q    Okay.  What does that number indicate?
     What is it?

A    HZ for Horizon, the ship, 8 is the 8-days cruise, 08 is the month.  24 is the cruise -- cruise starts, and 2019 is the year.
     So it was an 8-days cruise from 24th of August.

Q    Is this the Incident Report Number, or is that just information that in short form would tell you what ship it occurred on, and what voyage it occurred on?

A    That is only voyage.  Voyage.  This is voyage.

Q    Is there any information on this piece of paper that would tell us what the incident number or the investigation file number for this incident was?

A    On top of CCLHZH is the accident number.

Q    Okay.  I'm going to ask you to read that in very slowly to make sure that we have the correct information.

Actually, I'll read it in, and if I misread something, stop me.  Okay?  It looks like --

A    Okay.

Q    CCLHZH -- and then I'm not sure if that's an E, or something else.

A    E.

Q    E as in Edward?

A    Yeah; E as in Edward.

Q    Okay.  Then A as in apple, 201900211 -- and then I'm not sure if that's a V, or a check mark.

A    V.  It's a V.

Q    V as in Victor.  Okay.

And is that the Investigation File Number for this incident?

A    Yes.

Q    So should all of the documentation that you gathered -- and anyone at Carnival gathered -- related to this incident be filed under that investigation number?

MR. JARNAGIN:  Objection.  Form.

You can answer, Arvind.

THE WITNESS:  Can you repeat your question, ma'am.

BY MS. GANDER:

Q    Sure.  And just let me tell you up front if you weren't advised of this beforehand, during the course of the day, Mr. Jarnagin may make objections that are legal objections that we may need to argue with a judge, or may prompt me to rephrase the way that I ask a question.

But unless he instructs you not to answer, you are always supposed to answer my question.

And if there's ever a time when you are not supposed to answer the question, Mr. Jarnagin will jump in and tell you, don't answer the question.  Okay?

All right.  So my question to you is, is all of the information and data and statements and all that that was gathered related to this incident filed under that CCLHZ Investigation Number that I just read into

the record?

A    Yes.

Q    Okay.  Do you know whose handwriting this in blue is?

A    I don't remember, but it was -- one of -- I don't remember.

Q    Okay.  That's fine.  Do you see where it says, "Date of accident" is August 24th, 2019?

A    Yes; I can see that.

Q    All right.  And do you see where it says, "Date reported" is August 24th, 2019, in the p.m.?

A    Yes.

Q    Okay.  But you told me earlier that you didn't see her until the following day, so whoever took the first report was not you.  Is that fair to say?

A    Yes.

Q    Okay.  And whoever filled this out indicated that Miss Perez-Sera had hurt her right knee, and her right arm.  Correct?

A    Yes.

Q    And it indicates that there were at least three witnesses; Lucy Garcia, Jorge Perez and Elizabeth Perez.  Correct?

A    Yes.

Q    And it indicates that Lucy Garcia was actually

with Miss Maria Perez-Sera at the time of the accident; correct?

A    Yes.

Q    It states that Miss Perez-Sera was walking?

A    Yes.

Q    Okay.  And it states -- when the form says, "Please state in detail what happened at the time of the accident," the handwriting that follows reads, "I was walking, and a motor scooter hit from behind.  Fell forward, and landed on my knees.  Scratch right arm, with scooter."

Then -- it looks like parenthesis -- "No --" and I can't read that; I don't know if you can.

Do you know what that -- let me see if I blow it up if we can read it better.

Do you see where this -- I'm showing my cursor.  Do you understand what this reads?

A    Yeah.

Q    What does it say; do you know?

A    Yes, ma'am.  When I was at the Medical Center, that form was given to me.

It's part of my investigation.  So --

Q    Okay --

A    -- I offered -- I offered Maria Perez that if you want to -- if you want any -- if you need any

assistance to go -- for press charges, like if you want to speak to any local authorities when we arrive at the home port we can assist you.

But she said no, she don't want to press any charges against anyone -- that person who hit her.

So it says, "No pressing charges."

Q    To the lady -- does it say, "No pressing charge to the lady"?

A    Yeah.

Q    Okay.

A    Yes.

Q    All right.  All right.  Then, "State in detail the location of the exact accident," and it reads, "4th floor, in front of --"

A    Invicta Shop.  They have watches.

Q    Okay.  And then, "What do you believe caused the accident."

Response in handwriting, "The person driving scooter was going fast and hit me --" and there's some stuff scribbled out along the way, but those are the words that are left.

Then, "What equipment, if any, was involved in the accident," and the handwritten response reads, "Motor scooter."  Correct?

A    Yes.

Q    Okay.  And then, "Please state what you could have done to avoid the accident."

And then it handwriting it states, "Can't, since I didn't see the person from behind, since I was walking forward, and she hit me from behind."

Did I read that correctly?

A    Yes, ma'am.

Q    Okay.  And it is signed Maria del Carmen Perez; right?

A    Yes.

Q    Okay.  And the date of this is August 25th, 2019.  Do you see that on the form?

A    Yes; I can see that.

Q    And that is consistent with your having told us earlier that your first encounter with Miss Perez-Sera was the day after the incident actually happened; correct?

A    Yes.

Q    And you were unaware that she had been to the -- I'm going to take down the screen share.

You were unaware that she had been to the medical clinic the day before as well; correct?

A    Yes; I was not aware.

Q    Okay.  Is it unusual that a person reports to the clinic for an injury that occurred such as this did

by being hit by a scooter, and Security is not called the first time they show up?

          MR. JARNAGIN:  Objection.  Form.

BY MS. GANDER:

     Q    Did you understand my question?

     A    Come again, Ma'am?

     Q    Sure.  Is it unusual that a person would be injured on board -- such as Miss Perez-Sera was injured -- and Security is not called the first time they report to the infirmary?

     A    Yes; it is unusual.

     Q    Okay.  I'm going to show you two more documents, and I'm going to see if you remember these.

          MS. GANDER:  And so Exhibit 2, I'm going -- Bates Number 1969 by my office, and Exhibit 3 is Bates Number 1994 by my office.

          (Plaintiff's Exhibits 2 and 3 marked for
                          identification.)

BY MS. GANDER:

     Q    So Mr.~Lagas, please let me know when you can see these.

          Can you see my screen?

     A    Yes; I can see it.

     Q    Do you recognize the person whose photograph we're looking at?

A    Yes.  This is injured guest, Maria Perez.

Miss Maria Perez.

Q    If you weren't reading the information on the piece of paper that includes her name and the fact that she was the injured guest, would you have recognized her simply by her appearance?

A    No.

Q    All right.

Now I'm going to move to Exhibit 3, which again is Bates Number 1994.

Do you recognize this person?

A    She's the -- driving scooter -- she was driving scooter.  But -- yeah.

Q    Okay.  And according to what this lists, her name is Eileen Smith; correct?

A    Umm-hmm.  Yes.

Q    Okay.  Do you -- is this the photograph that you were looking at that you matched with the video of the actual collision?

A    Yes.

Q    Okay.  And then after you tracked her down, you had a conversation with her.  Correct?

A    Yes.

Q    And you memorialized -- did you memorialize the conversation in writing, or did she fill out a

statement in her own handwriting?

A    No; she did not fill any statement.

When I offered her -- when I asked her to write a statement, she denied.

She said -- but she admitted --

Q    Okay --

A    Yeah.  But she admitted that she was the one.

Q    **What did she tell you about what had happened?**

A    She told me that she was riding a scooter, and suddenly she took the right turn and -- she wanted to take the right turn.

And there was another guest, and accidentally she collided with the guest who was walking in front of her, and that guest fell down.  Forward.

Q    **Did you have the impression that she was not driving straight, but that she had made a turn and then after she made a blind turn Miss Perez-Sera was there, and she collided with her, or did she see her, but just was not able to stop?**

A    No.  Actually, she just took the right turn, and Miss Maria was at the side -- at the corner, and she directly took the right turn, and that's when it happened.

Q    Okay.  All right.  I'm going to show you what we'll mark as Exhibit 4.

MS. GANDER:  All right.  And these are not Bates numbers, but I'm going to say Exhibit 4 is large diagram, and Exhibit 5 is close-up diagram.

(Plaintiff's Exhibits 4 and 5 marked for identification.)

BY MS. GANDER:

Q    Okay.  So tell me when you can see my screen, sir.

A    Okay.

Q    Okay.  And forgive my scroll, I apologize, but I just have to make sure that we're on the same page.

Does this look like the deck plan for the Carnival Horizon?

A    Actually, it's too far, so I cannot --

Q    That's fine; let me bring it up for you.

Okay.  So this would be the bow of the ship with the liquid lounge closer to the bow, then backing up we have elevators, the Atrium, the Casino, the Sky Box Sports Bar and Club 02 and Art Gallery, another lounge, an aft restaurant, and then we're at the stern. Does that look familiar?

A    Yes.

Q    Okay.

MS. GANDER:  And that is Exhibit 4.

BY MS. GANDER:

Q    Based upon this deck plan, can you describe for me or tell me where to put my cursor, where your investigation revealed the collision occurred between Miss Perez-Sera as a pedestrian and Miss Smith, who was riding a scooter on board the Carnival Horizon.

A    She was -- she was going to the starboard side.  So Maria Perez was here -- can you see my cursor?

MS. GANDER:  No; I can't see your curser.

THE WITNESS:  Okay.  The shop -- the two shops written -- before the Horizon Atrium -- down.

BY MS. GANDER:

Q    Okay.  So there -- can you see my cursor --
     Okay.  Let's do this --

A    Yeah, yeah --

Q    Let's do this.  I'm going to switch to Exhibit 5.  Does this make it better?

A    Yes.

Q    Okay.  So Exhibit 5 is the close up.
     Based on this close up, do we have the location of the collision in this close up?

A    Yes.

Q    Okay.  All right.  Can you see my cursor -- can you see me cursor?

A    Yes; I can see that.  Yes.

Q    All right.  I'm going to start in the casino, and I'm going to move forward.  Tell me when I reach the point of the collision where to stop.  Okay?

A    Okay.

Q    So I'm moving forward.  I'm going through a walkway.  I'm going between the shops.  Now I'm at the point where it's a walkway.

Do I keep going forward, or do I go left or right?

A    No; you just need to come little back, and right side.  Right side.  Little forward.  Little forward, and more right side.

Yeah; here -- little back.  Little back.

More.

Q    Right there?

A    No.  Little -- more backward.  Yeah.  That's it.  That's it.  Sorry about that.

Little forward.  Yeah, yeah.  That's --

Q    All right.  Where I've got it yellow; is that it?

A    Yes, yes, yes.

Q    Okay.  So what I'm going to do is change it to red so that we can actually see it in comparison to everything else.

Does that look to be approximate -- correct

approximation of what your investigation revealed was the point of impact?

A    Yes.

Q    Okay. All right. I'm going to take this down, but if at any point you want me to put it back up, let me know. Okay?

All right. So did you take photographs as part of your investigation?

A    Yes, I did.

Q    Okay. Let me go to what we'll mark as Exhibit 6 to this deposition.

(Plaintiff's Exhibit 6 marked for identification.

(Photos.)

BY MS. GANDER:

Q    And they are photos which I believe are yours, because I did get them from Carnival.

Okay. So I'm going to screen share again.

Does this appear to be one of the photographs that you took?

A    Yes.

Q    All right. And we see over here "Horizon Casino" is over the open archway that leads into, like, a hallway-type area. Correct?

A    Yes.

Q    All right. So my understanding is

Miss Perez-Sera was coming from the direction of the casino, was coming -- the casino, was coming into this open area of the Atrium, and had taken a little bit towards the right, toward the Invicta Gift Shop.

Correct?

A    She came from the casino, but at very -- hardly -- she didn't go forward.  Very early she took the right turn.

Q    Okay.  So she came and went more in this path that I've just drawn --

A    Yes.  Yes --

Q    -- I stopped my cursor.  Is that about where you believe the collision happened, or was it further back?

A    Yes.

Q    Is it where I stopped my cursor, or was it farther back?

A    Yeah.  There only, the collision.

Q    Okay.  All right.  So if we make this her path, and this the point of collision, is that what you your investigation revealed?

A    Yes, ma'am.

Q    Okay.  And did your investigation reveal from which area or direction Miss Smith was coming when she was driving the scooter?

A     She was coming from the casino.

Q     Okay.  So they were coming from the same direction, Miss Perez-Sera was walking, and turned toward the right in front of the gift shop, and Miss Smith was driving a scooter and turned toward the right, in front of the same gift shop.  Correct?

MR. JARNAGIN:  Objection.  Form.

THE WITNESS:  Miss -- Perez was not coming from the casino; she was coming from the Invicta.  She came out of the Invicta.  I saw her standing in the -- in front of the Invicta, facing forward.

BY MS. GANDER:

Q     Okay.  Is it -- did you see surveillance footage that showed Miss Perez-Sera had actually entered the gift shop?

A     I don't remember, ma'am.

Q     Did Miss Perez or anyone associated with her who you spoke with tell you that Miss Perez-Sera had actually entered the gift shop?

A     No.  She told me, but -- she was coming -- she -- actually, I don't remember that, but she was in front of the Invicta shop.

Q     So what you do have a memory of, based on having viewed video of the actual collision, is that at the point of impact, Miss Perez-Sera was facing towards

the gift shop looking in, and Miss Smith came from the direction of the casino forward, took the right hand corner and impacted Miss Perez-Sera, where she was standing.

A    She was facing backwards.

      She was watching the other side -- yeah. You're right.

Q    Wait --

A    And Miss Smith, she came from behind.

Q    Okay. When you say she was facing the back, you're talking about Miss Perez-Sera; correct?

A    Correct.

Q    Okay. Was her face towards the gift shop, was it in the opposite direction from where Miss Smith was coming, or was it facing out over the Atrium?

A    Opposite side of the -- Smith.

Q    Okay.

A    Miss Smith.

Q    So was Miss Perez Sera's right side of her body facing toward the gift shop?

A    Yes.

Q    Okay. And was she in motion when she was hit, or was she standing at a stop?

A    She was standing. And she -- she was standing. Miss Maria was standing.

Q   Okay.  You're saying she was not actively walking at the moment.

A   That, I don't remember.

Q   Okay.  All right.  Now, I'm going to have to switch the view.  And this is Bates Number 17 -- I'm sorry; 1976.

And again, is this one of the photographs you took?

A   Yes.

Q   Okay.  In looking at what we're looking at, tell us -- tell me, if you don't mind, what perspective direction and everything else we're looking at here.

A   The guest is standing, she's -- she's facing back -- her back side is the casino; Horizon Casino in that picture.

Q   Okay.  How -- so she's walking in the general direction that Miss Smith was driving the scooter.

Is that correct?

A   Yes.  Yes.

Q   Okay.  How far in front of her white shoe did -- in this photograph -- did the collision between Miss Smith on the scooter and Miss Perez' back occur?

A   That I don't remember.

(Loudspeaker announcement.)

A   Sorry about that.

Q    That's not a problem.

Okay.  So was it roughly in this area that I'm circling, or is it somewhere else?

And if you don't know, don't guess, but I'm assuming you took this photograph for a specific reason.

A    Yes, yes.  A little -- inside.  Where you start -- a little inside.

Q    Just smaller?  Are you saying smaller; like this?

A    Yeah.

Q    Does that look about right?

A    Can we zoom out that picture?

Q    Yes, I can.  But if I zoom more, you're going to lose the perspective of the people in it, so just keep that in mind.

And it looks like -- I don't know if you can see here -- on the brown, it looks like this may have to do with the doorway of the gift shop?

A    Yes.  Yes.

Q    If that gives you any information --

A    So a little back -- the red circle, a little inside -- little -- near back.

Q    Closer to the door?

A    Closer -- yeah.

Q    Closer to the floor area?

A     I mean -- down.  Down side.  I mean -- that is -- front of that.

Q     Wait; let me see.  Kind of like this; maybe move it closer?  Is that what you're saying?

You're saying move it closer to the brown?

A     The named victim, Perez-Sera, on that picture, a little above of that name.

Q     So put it closer over here?

A     Yes, yes, yes.

Q     Okay; so let me try this.  Closer over here?

A     Yes.

Q     Does that look good to you?

A     Yes.

Q     Okay.  So where I've marked it in red?

Where I've marked it in red, sir?

A     It was informed by Miss Maria that this was the location.  She told me; this is the location where it happened.

Q     Is what she told you consistent with what you saw on the video that you watched?

A     On that video I could see the person, but the view was little farther.  But when I zoomed it, I couldn't see the exact of this thing, but in between that proximity.

Q     Okay.  Did the video capture the collision;

just not clear enough for you to mark which particular tile it was on?

A    Yes.

Q    Okay.

A    I'm not able to particularly mark on the tile.

Q    Okay.  But it's -- but you're confident it's roughly in this general area.

A    Yes.

Q    Okay.  Now, let's go down -- and I'll mark Exhibit 7., and this is going to be a series of photos as well.

(Plaintiff's Exhibit 7 marked for identification.  New series of photos.)

BY MS. GANDER:

Q    And did you take these photographs as well?

A    Yes, ma'am.

It starts with a scooter.

Q    All right.  Is -- what are we looking at?

And this is Bates Number 1972, 1973, 1984, and 1975.

So tell us, sir, what we're looking at in this photograph.

A    This scooter was rided by Miss Smith; the person who was driving the scooter.

Q    Is this the actual scooter she was driving?

A     Yes, ma'am.

Q     Where -- did you ask her to bring the scooter back to the scene of the accident so you could photograph it on site?

A     Luckily she was passing by that area where I -- where I stop her, and I inquired her about the incident.

And she was there, so I took the photograph then.

Q     Okay.  Had you already spoken to her at that point, so you knew who she was, or is that the point where you just happened to run into her at the same location where she had hit Miss Perez-Sera the prior day?

A     I wanted to confirm that she's the one, so I -- I help her to memorize the location and the timings.  So she was in the casino area; I requested her to come with me.

So I showed her the area as well where she confirmed that yes, this was the area, and I asked her if I can take the pictures, and then I took the picture of the scooter.

Q     Okay.  Did she get off the scooter to let you take the picture?

A     Yes, ma'am.

Q    Okay.  So the next photograph is 1973.  And I'm just going to scroll through these, because I think these are all photographs of the same scooter, just from different angles.  Correct?

A    Yes, ma'am.

Q    Okay.  And this area -- I don't know if you can see my cursor, but where I just drew -- I'm going to color it green just so that we can actually see it stand out here.  Where I just drew this green line, wall to wall, that's the hallway she would have been coming out of; correct?

A    Yes.

Q    Okay.  And --

A    But the scooter is not at the exact location where the collision occurred.

Q    Okay; I understand.  And in 1974, that's not where the collision occurred, but that is the walkway that the scooter was driving through, and then out of --

A    Yes, ma'am --

Q    -- when she took the right turn, where she hit Miss Perez from behind.  Correct?

A    Yes, ma'am.

Q    Okay.  And then 1975 is a close up.

And it says legend, and it has some tires and what looks like white paint in the bottom.  And there's

something either on the top of it or it's just a reflection; I can't tell.

What was your purpose in taking photograph 1975?

A    Just to document the -- which model or which company is the scooter.

Q    Okay.  Was this a scooter that was rented or leased from Carnival?

A    That I don't know.

Q    Are you used to seeing scooters that look like this on board the Carnival ships?

A    No, Ma'am.

Q    When people are going to use a scooter on board a Carnival vessel that they've rented through Carnival or through a vendor that Carnival recommends, are those scooters located in a particular pick-up area on board the ship?

A    That's not my duty, ma'am.  That I don't know.

Q    You don't know.

A    No, Ma'am.

Q    Okay.  Are there any audible warnings or instructions that are given over the loudspeaker -- either to scooter drivers or to pedestrians -- to be aware that there is scooter traffic mixed in with pedestrian traffic?

A    No, I'm not aware about that.

Q    Are the scooters that are operated on board Carnival vessels required to have beepers or some sort of auditory signal or warning that they are approaching?

A    No, Ma'am; I don't know about it.

Q    All right.  Do you know if the people who are using the scooters on board the Carnival Horizon, if they're required to demonstrate any familiarity or proficiency when operating a scooter before they are allowed to operate it freely aboard the Carnival vessels?

A    That I don't know, ma'am.

Q    Is that outside your area?

A    Yes.  It does not come in my duty.

Q    Do you know what area it would come under?

A    Come again, ma'am; sorry about that.

Q    Do you know what area or job function that would come under?

Like, what department would handle that?

A    I don't know the exact department who's handling, but I have seen the scooter in the Guest Services back office, but I never asked.

I have seen, but I don't know whether it comes under them or not.

Q    Did the scooters that you saw in the back of

the Guest Services office look to be the same type scooter that we looked at a moment ago, or Exhibit 7?

A   No, Ma'am; I never saw this scooter in that office.

Q   Did you -- I'm sorry; what?

A   No, I meant -- I don't remember exactly, but this kind of scooter, I wasn't that familiar.

I mean, it was just like a new for me, but -- yeah. I haven't seen that kind of scooter.

Q   Okay. Did you leave the medical clinic with Miss Perez-Sera, or did you leave her there?

A   No. With Maria and other two -- her companion was with her. The lady.

Q   Do you know who the person with her was?

A   I don't remember the names, but they were traveling together, I guess, because they were very familiar with each other.

So I guess they were together.

Q   Do you remember any type of a familial relationship, like oh, that was her sister, that was her cousin, that was her best friend, or anything like that?

A   No; I don't remember that.

Q   And you -- do you remember if she left the medical clinic in a wheelchair or with a crutch or with a walker, or walking of her own accord?

A    Don't remember that.

Q    If she had left in a wheelchair -- I just want to go back and talk about what your normal procedures would be; okay?

If she had left in a wheelchair, would it have been your standard procedure to inquire as to whether her cabin could accommodate the wheelchair or she would need any other type of assistance that Carnival could provide her while she was on the voyage?

A    Yes. If there is any incident or accidents, we need to conform the area by -- if the injured is unable to walk or unable to leave the Medical Center, then we prefer -- all the time, whenever the accident happens we escort the injured person. We offer them a wheelchair if they're unable to walk, and we escort them to the accident area, and we confirm the location with the injured person.

Q    Okay. But my question was a little bit different from that.

Once she leaves in the wheelchair -- I'm going to ask you to assume she was in a wheelchair; okay?

Would it be your standard procedure or job function to make sure that she can use that wheelchair in her cabin? Does her cabin accommodate a wheelchair, do we need to provide her other cabin accommodations for

this voyage, now that she's been hurt and is in a wheelchair?  Is any of that your job?

A    Not taking care of all these things, but if -- we ask assistance them, and if they need assistance, then we direct them to the Guest Services, and they do the necessary things.

Q    Okay.  So you leave it up to the passenger to ask for help, and if they do ask for that type of help, you would refer them to Guest Services?

A    Yes.

Q    Do you have any --

A    We provide them -- first of all, from my side, because I have to see the area, we provide the wheelchair.  We escort the guest, and if they request further we escort them.

If they want to go Guest Services we escort them to the Guest Services, so they can go there and ask further questions.

Q    But if by that point they haven't been back to their cabin yet.

A    They don't wish to -- I mean -- I don't remember that, whether they wanted to go, but I remember that I escort -- I went with them to the area, show them the area.

And I don't remember after that, but for sure

I -- asked for their assistance; if they want me to do something for them, like escort to the Guest Services.

Q    But it wouldn't have been part of your job duty to say okay, now that you're in a wheelchair, let's go to your cabin and see if the wheelchair fits through the door, or anything like that.

You didn't take it upon yourself to do that part of the investigation.  Correct?

MR. JARNAGIN:  Objection.  Form.

THE WITNESS:  We direct them to the Guest Services.  We make sure they reach Guest Services so they can -- their request is processed by the Guest Services.

BY MS. GANDER:

Q    Do you have any conversations with the medical doctor, either while you're there or at the point of release, such as are there any limitations we need to tell the passenger about, do we need to provide any accommodations for the rest of the voyage based on their medical condition?

Do you have any of those conversations with the medical facility?

A    No.

Q    Did you -- or do you, as part of your regular course of your job functions -- check in with the

passenger on the day of disembarkation to find out if they need help with their luggage and things like that, since she is now leaving the ship in a wheelchair?

A     No.  After my investigation, we go further. We have other duties, so that doesn't come in my line of duty.

Q     Does the ship have cabins that are equipped to be handicapped accessible?

A     Yes; we have cabins for handicapped persons.

Q     Do you know how many are on each vessel?

A     That I don't remember.

Q     Do you know if any are reserved for the voyage, meaning they're not sold when the ship sails, but they're kept empty in case something happens during the voyage, there is a place to put someone?

A     That I don't know, ma'am.

Q     Who did you speak to other than Miss Perez-Sera and Miss Eileen Smith, who was the scooter driver?

You spoke to the person who was with Miss Perez-Sera in the medical bay; right?

A     Yes, ma'am.

Q     Did you speak to anyone else, other than those three women?

A     No.  I mean -- I don't remember, but I speak

to the injured and the ladies with the injured.

I speak to them, because they were together.

Q    And she listed on that piece of paper three eyewitnesses.  Did you speak --

A    Yes --

Q    -- remember there were three eyewitnesses?

Did you speak to the other two?

A    Yes.  I spoke to them.

Q    When -- did you track them down and speak to them?

A    Come again, ma'am; sorry about that.

Q    Sure.  When you first met Miss Perez-Sera, one of the witnesses was with her.  And you just said that you also spoke to the other two eyewitnesses whose names were written on that incident -- Passenger Injury Statement.

Let me take you back so you know what I'm talking about.

All right.  And this is Exhibit 1 to the deposition.

Do you see my screen, where it states, "Who witnessed the accident?  Lucy Garcia, Jorge Perez, and Elizabeth Perez"?

A    Yes; I can see that.

Q    Okay.  Did you speak to all three of these

people at some point during your investigation?

A    Yes.  We have to speak, because their name is there.  So injured guest, she -- she -- she identified and she'd written the name -- she has written the name on that paper, and I spoke to them in presence of her only; yes.  I spoke to them.

Q    Did you get signed statements from them, or did you just to them and write in your own handwriting what they said?

A    That I don't remember, ma'am, but I spoke to them, and they confirmed that this thing happened.

Q    Okay.  Did you report the injury to the -- first of all, were you the Chief Security officer, or were you one of the Security officers aboard the Horizon on that voyage?

A    I am a Security officer.

I'm not the Chief Security Officer.

Q    Okay.  Who was the Chief Security Officer on that voyage?

A    I don't remember that.

Q    Does Jagdish Pai sound familiar?

A    Yes.  Yes, yes, yes.

Q    Was that person the Chief Security Officer?

A    Yes.

Q    And is that a man?

A     Yeah.  He's a Chief Security Officer.

He was on board Horizon.

Q     Okay.  Did you report the injury to the Chief Security Officer Pai?

A     Yes.

Q     Did you report --

A     After it --

Q     Go ahead.

A     Yes; yes.  I reported it to them.

They are my supervisor.  Whatever I notice, any discrepancy, any kind of thing, I report to my supervisors.

Q     Do you verbally report it to him, or do you send him a memo, or something like that?

A     Verbally.

Q     Did you report the injury to the staff captain?

A     Yes.  And after completion -- for completion to draft -- it goes to Chief Security, and he reviews the report.  And then it goes to the Staff Captain, and then Staff Captain reviews the report, and he submit.

Q     And he what?

A     He submits to the -- he finalize the accidents.  Until Chief Security I know, because Assistant Chief are above us, and above the Assistant

Chief Security, there is Chief Security.

There's a Chief Security.

Q    Did you -- or in your presence -- either the Chief Security Officer or the Staff Captain discuss this injury at any safety meetings?

A    The meetings, which is called -- but I don't attend that. But all the senior officer officials, they discuss all the accidents, incidents in the meetings.

Q    But you're not at those meetings; is that what you just said?

A    Yes.

Q    You are at the meeting, or you are not at the meeting?

A    I don't remember that time if I attended or not, but -- I was not in that meeting.

Q    How -- so you were never in a meeting.

You were never in a safety meeting where this scooter collision was discussed. Correct?

A    That I don't remember.

And I was not in that meeting.

Q    All right. Do you know that it was discussed in a meeting?

And I'm not asking you to guess, I'm just saying, do you know that this scooter collision, in fact, was discussed in a safety meeting.

A    I don't know.  I don't know.

Q    Did anyone ever tell you that they had discussed it in a safety meeting?

A    No.

Q    Did you fill out any Coast Guard paperwork related to this incident?

A    No.

Q    Did you speak to Miss Perez-Sera directly, or did you speak to her family member to get the information that was contained on this statement?

A    I directly speak to Miss Maria Perez when it happened.

Q    How long do you think that conversation lasted?

A    That I don't remember, but until I get my -- all the answers from her -- the questions answered -- when I was satisfied with that investigation.  I was with her, but I don't remember the timing; how long I was with her.

Q    After you spoke with Miss Eileen Smith, the scooter driver, did you ever go back and have another conversation with Miss Perez-Sera?

A    I don't remember that.

Q    Okay.  Based upon your memory, does Miss Perez-Sera speak English?

A     Yes.  I mean, I could understand.

I could understand her.

Q     And so would you have been speaking to her in English?

A     Yes; I was speaking to her in English.

Q     And was she answering you in English?

A     I was answering in English only, but when I met Miss Maria, there was other lady also.  And they all together, they were telling me.  And Maria -- or Miss Maria was also acknowledging that; that this thing happened.

Q     Was anyone --

A     I don't exactly --

Q     Go ahead.

A     I don't know exactly that she speaks good English, but they were -- more than one, like two or three -- I don't remember exactly, but two or three guests all together with Maria -- Miss Maria -- and then they were explaining me that this incident happened.

So Miss Maria acknowledging that this thing happened.

Q     Did she give you a description in words, or was she just nodding her head while other people spoke?

A     That I don't remember.

Q     All right.  In the five years that you've been

aboard Carnival vessels, have you had -- or do you have knowledge -- either because you investigated it or because you learned of it in a safety meeting or through any other source -- of other passengers being injured when they were struck by scooters?

A     No, I never investigated such an accident which was like -- before this accident, I don't remember.  And I never investigated the accident which includes a scooter.

Q     Even after her -- even after Miss Perez was hit by the scooter, you've never investigated any scooter collision, other than the one where Miss Perez was injured?

A     Yes, ma'am.

I never investigated after also, that includes scooter.

Q     And I also asked you were you aware of any other scooter incidents, either through safety meetings, or through just talking to your colleagues.

So I understand you haven't investigated any others, but were you aware of any additional scooter incidents aboard Carnival vessels, through any source?

A     No, Ma'am.

Q     All right.  Did you have any conversations with Miss Perez or any of her family members that you

have not told me about?

A    No.   I never have had any conversation with other people.

Q    Okay.   And I was advised that you created a 9 page investigative accident report on August 25th, and that that included the one page, handwritten statement of Elizabeth Perez which I think we just looked at as Exhibit 1.

It included a summary of an oral statement obtained by Eileen Smith, and that's what you told me about, and that she had declined to handwrite one herself; correct?

A    Yes, ma'am.   She declined.

Q    All right.   Two photographs taken of the subject area -- and those would be Exhibit 6 -- the two photographs in Exhibit 6; correct?

A    Yes.

Q    And then four photographs of the scooter, and those were the exhibits we looked at in Exhibit 7.

Correct?

A    How many -- count of the photograph, I don't remember, but I took that photograph.

Q    Okay.   I'll represent to you that I actually individually numbered them, and their numbers are 1972, 1973, 1974 and 1975.

So we have four scooter photographs, and you did tell me that you had taken all of them.  Correct?

A    Yes, ma'am.

Q    Have you ever had -- strike that.

Have you ever been present in any safety meetings where scooters or scooter safety or anything related to scooters were discussed in safety meetings?

A    No, Ma'am.

Q    Have you ever been given any training or instruction by anyone at Carnival related to scooter safety?

A    No.

Q    What was your understanding of what the cause of this accident was?

A    The lady's driving the scooter, she -- she did not decrease the speed, and she did not pay attention by taking the turn, I guess.

This is the cause of accident.

Q    Are there signs posted anywhere aboard the ship that instructs scooter drivers to drive slowly?

A    No, Ma'am.

Q    Are there signs posted on the vessel that instruct scooter drivers to slow down when they take turns, or when they come up to corners?

A    No.

Q    Are you aware of any safety training or instruction that Carnival gives to passengers or anyone before they are allowed to operate a scooter on board a Carnival vessel?

A    That I don't know, ma'am.

Q    When you were on the Carnival ship during quarantine -- so while it was not sailing, but you were still employed and on board -- were there any scooters on board at that time?

A    There was no guests, so no scooter.

Q    I didn't hear you; I'm sorry.

A    If there is no guest, the crew members, they don't use it.  And -- there's no scooter on board.

Q    Okay.  So are the scooters exclusively used by paying passengers aboard the ship?

A    Yes.  By the passengers.

Q    Okay.  Do you know if there is an additional charge for a passenger to bring a scooter on board the ship?

A    That I don't know, ma'am.

Q    All right.  Mr.~Lagas, I appreciate your time here today.  I don't have any further questions for you.

MR. JARNAGIN:  Mr. Lagas, I also appreciate your time.  I don't have any questions for you, so we're good.

THE WITNESS: All right.

THE VIDEOGRAPHER: The time on the monitor is 10:36 a.m., and this concludes the deposition.

          - - -

THE REPORTER: Ms. Gander, are you ordering this transcript today?

MS. GANDER: Yes.

THE REPORTER: Mr. Jarnagin, are you ordering Copy on the transcript?

MR. JARNAGIN: We will order a copy, and we'll also read.

(Following the conclusion of the Deposition, Plaintiff's Exhibit 8, a photo ID of the deponent, was transmitted and marked for identification.)

(THE DEPOSITION WAS CONCLUDED AT 10:39 A.M.)

          - - -

ERRATA SHEET

PAGE          LINE          CORRECTION              REASON

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

                      _____
                      ARVIND LAGAS                    (DATE)

CERTIFICATE OF OATH

STATE OF FLORIDA            )

COUNTY OF PINELLAS          )

I, Lisa Selby-Brood, notary public in and for the State of Florida, the undersigned authority, certify that ARVIND LAGAS appeared remotely via video teleconference for this deposition, and having presented a valid form of identification remotely, was thereafter duly sworn.

WITNESS my hand and official seal this 3rd day of November, 2021.

_____

Lisa Selby-Brood, RMR
Notary Public,
State of Florida
My commission expires 12/26/2021
Commission #:  GG 162424

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA          )

COUNTY OF PINELLAS        )

I, LISA SELBY-BROOD, Registered Merit Reporter, certify that I was authorized to and did stenographically report the deposition of ARVIND LAGAS; that this was a Video-teleconference deposition and that all parties appeared remotely from their various locations, that I was not physically present with the witness but that I administered the oath remotely per stipulation of counsel for both parties to this lawsuit, that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

        DATED this 3rd day of November, 2021.


        _____
        LISA SELBY-BROOD, RMR
        Registered Merit Reporter

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
Arvind Lagas on 10/26/2021                    Index: (2)..8

| Exhibits | 0 | 32:14,17 | 35   3:16,18 |
|---|---|---|---|
| | | 2006   9:5,7 | 38   3:19 |
| LagasA 1 | 02   35:19 | 2008   8:17 | |
|   3:12 | 08   25:22 |   9:12 | 4 |
|   24:19,23 | | 2016   5:19 | |
|   55:19 62:8 | 1 |   8:21 9:8, | 4   3:6,16 |
| LagasA 2 | | 11,23 |   34:25 |
|   3:13 32:14 | 1   3:12 |   10:3,6 |   35:2,4,24 |
| | 24:19,23 | 2019   10:20, | 45   3:21 |
| LagasA 3 |   55:19 62:8 |   21 25:23 | |
|   3:15 32:15 | 10   9:6,9 |   28:8,11 | 4th   30:14 |
|   33:9 | 10:36   65:3 |   31:12 | |
| LagasA 4 | 10:39   65:15 | 201900211 | 5 |
|   3:16 34:25 | 17   42:5 |   26:20 | |
|   35:2,24 | | 2020   6:5 | 5   3:18 |
| LagasA 5 | 19   8:7 | 2021   3:3 |   35:3,4 |
|   3:18 35:3 | 1969   32:15 | 2157   24:24 |   36:17,19 |
|   36:17,19 | 1972   45:19 | 24   3:12 | 6 |
| LagasA 6 |   62:24 |   25:22 | |
|   3:19 | 1973   45:19 | 24th   25:24 | 6   3:19 |
|   38:11,12 |   47:1 62:25 |   28:8,11 |   38:11,12 |
|   62:15,16 | 1974   47:16 | 25th   31:11 |   62:15,16 |
| LagasA 7 |   62:25 |   62:5 | 65   3:22 |
|   3:21 | 1975   45:20 | 26th   3:3 | 66   3:8 |
|   45:10,12 |   47:23 48:4 | | 67   3:8 |
|   50:2 62:19 |   62:25 | 3 | 68   3:9 |
| LagasA-8 | 1976   42:6 | | |
|   3:22 65:13 | 1984   45:19 | 3   3:15 | 7 |
| | 1994   32:16 |   32:15,17 | |
| ( |   33:10 |   33:9 | 7   3:21 |
| | | 3-year   8:14 |   45:10,12 |
| (2)   3:20 | 2 | 32   3:13,15 |   50:2 62:19 |
| (4)   3:21 | | | 8 |
| | 2   3:13 | | 8   3:22 |

25:21
65:13

**8-days**
25:21,24

**808242019**
25:14

**9**

9   62:5

9:03   4:2

**A**

A-R-V-I-N-D
4:24

a.m.   4:2
65:3,15

aboard   6:16
11:14 12:5
49:10
56:14
61:1,22
63:19
64:15

Access   11:11

accessible
54:8

accident
11:3 14:6
17:17
18:2,6
19:20
21:20,22
22:9 26:8

28:8 29:1,
8 30:13,
17,23 31:2
46:3
51:13,16
55:22
61:6,7,8
62:5
63:14,18

accidentally
34:12

accidents
13:9 51:10
57:24 58:8

accommodate
51:7,24

accommodations
51:25
53:19

accord   50:25

acknowledging
60:10,20

actively
42:1

actual   19:24
33:19
40:24
45:25

additional
61:21
64:17

administration
4:6

admitted

21:5 34:5,
7

advised
27:12 62:4

aft   35:20

age   8:5
20:19 21:1

ahead   57:8
60:14

airline
9:11,12,21

airlines
9:10,15,
17,20

airport   8:17

allowed
16:14,15
49:10 64:3

angles   47:4

announcement
42:24

announcements
9:13

answering
60:6,7

answers
59:16

apologize
35:10

appearance
20:5,15
33:6

appears
25:14

apple   26:20

approaching
49:4

approximate
37:25

approximation
38:1

April   10:20

archway
38:22

area   8:1
13:15
18:4,6
20:18
38:23
39:3,24
43:2,25
45:7 46:5,
17,19,20
47:6 48:16
49:13,15,
17 51:11,
16 52:13,
23,24
62:15

areas   15:10

argue   27:14

arm   28:19
29:10

arrive   30:2

arrived   18:8

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
Arvind Lagas on 10/26/2021                    Index: Art..call

Art  35:19

Arts  8:15

Arvind  3:4
  4:14,24,25
  27:7

assignments
  6:23

assist  30:3

assistance
  30:1  51:8
  52:4  53:1

assistant
  9:16  57:25

assume  51:21

assuming
  43:5

Atrium  16:4
  35:18
  36:11  39:3
  41:15

attend  58:7

attended
  58:14

attention
  63:16

attorneys
  23:12

audible
  48:21

auditory
  49:4

August  17:16

22:21
25:25
28:8,11
31:11  62:5

authorities
  30:2

avoid  31:2

aware  5:23
  17:12
  31:23
  48:24  49:1
  61:17,21
  64:1

_____

        B

BA  8:14

Bachelor
  8:15

back  6:18
  37:10,13
  38:5
  39:14,17
  41:10
  42:14,22
  43:21,22
  46:3
  49:22,25
  51:3  52:19
  55:17
  59:21

background
  7:13

backing
  35:17

backward
  37:16

backwards
  41:5

Bar  35:19

bars  15:13

based  36:2,
  20  40:23
  53:19
  59:24

basically
  21:1

Bates  24:24
  32:15,16
  33:10  35:2
  42:5  45:19

bay  18:6,8
  54:21

beepers  49:3

beg  6:2

begin  4:10

behavior
  12:4

belongings
  11:10

bit  7:12
  39:3  51:18

blind  34:17

blow  25:5
  29:14

blue  28:4

board  6:7,8,

9  10:21
11:17,21,
25  13:9,10
20:11
21:16,17
22:13,20
23:1,3
32:8  36:6
48:11,14,
17  49:2,7
57:2  64:3,
8,9,13,18

bodily  16:15

body  41:20

bottom  47:25

bow  35:16,
  17

Box  35:19

Boy  5:1

break  8:11

bring  35:15
  46:2  64:18

brown  43:17
  44:5

_____

        C

cabin  51:7,
  24,25
  52:20  53:5

cabins  15:1
  54:7,9

calendar  9:3

call  17:16

18:15

**called** 18:15
32:1,9
58:6

**camera** 20:17

**cameras**
14:7,9,11,
18,21,23,
25 15:4,7,
9,20,22
16:4

**capacity**
8:20

**captain**
57:17,20,
21 58:4

**capture**
14:11
15:24,25
44:25

**care** 52:3

**career** 5:21

**Carmen** 31:8

**Carnival**
5:4,7,8,9,
14,16,18,
20,21,23
6:15,20
8:22 9:8,
11,23
10:6,7,8,
9,15,16,
17,19,22
11:1,21,25

12:5,11
13:8
14:18,24,
25 15:3,6,
9 16:3
23:4,5,12
27:3 35:13
36:6 38:16
48:8,11,
14,15
49:3,7,10
51:8 61:1,
22 63:10
64:2,4,6

**case** 54:14

**casino** 15:25
35:18 37:1
38:22
39:2,6
40:1,9
41:2 42:14
46:17

**casinos**
15:22

**catch** 11:5

**category**
13:22
20:19

**caught** 24:17

**caused** 30:16

**CCLHZ** 27:25

**CCLHZH** 26:8,
15

**Center**

17:17,19
18:11,13,
14,20
29:20
51:12

**CERTIFICATE**
3:8,9

**chance** 14:7

**change** 37:22

**charge** 30:8
64:18

**charges**
30:1,5,6

**check** 26:21
53:25

**Chief** 56:13,
17,18,23
57:1,3,19,
24,25
58:1,2,4

**children**
12:22,24

**circle** 43:21

**circling**
43:3

**clear** 20:18
21:21 45:1

**clinic** 15:4,
7 18:9
31:22,25
50:10,24

**close** 12:2
36:19,20,

21 47:23

**close-up**
3:18 35:3

**closed** 24:14

**closer** 7:20
35:17
43:23,24,
25 44:4,5,
8,10

**Club** 35:19

**Coast** 59:5

**colleagues**
61:19

**collecting**
13:15

**college** 7:20

**collided**
34:13,18

**collision**
19:24
33:19
36:4,21
37:3
39:13,18,
20 40:24
42:21
44:25
47:15,17
58:18,24
61:12

**color** 47:8

**companion**
50:12

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
Arvind Lagas on 10/26/2021        Index: company..declined

company   48:6

compare
  20:12

comparison
  37:23

completion
  57:18

computers
  21:21

CONCLUDED
  65:15

concludes
  65:3

conclusion
  65:12

condition
  12:7  53:20

confident
  45:6

confirm
  46:15
  51:16

confirmed
  46:20
  56:11

conform
  51:11

conformed
  21:4

consistent
  31:14
  44:19

contact   6:20

contacted
  20:21

contained
  17:4  59:10

content
  16:22

continue
  8:10

continuing
  6:10

contract
  6:17  10:22

contracted
  6:13

contracts
  6:12

control
  11:11,12

conversation
  33:22,25
  59:13,22
  62:2

conversations
  23:10
  53:15,21
  61:24

copy   65:9,
  10

corner   34:21
  41:3

corners
  63:24

correct   5:14
  14:13
  22:16
  26:10
  28:19,23
  29:2  30:24
  31:17,22
  33:15,22
  37:25
  38:23  39:5
  40:6
  41:11,12
  42:18
  47:4,11,21
  53:8  58:18
  62:12,16,
  20  63:2

correctly
  31:6

Counsel   4:7

count   62:21

court   16:14

cousin   50:21

covered   14:6

Covid   6:1,4

created   12:6
  17:5  62:4

crew   64:12

Cross   3:6

crowd   11:12

crowded   11:7

cruise
  25:22,24

crutch   19:9
  50:24

curser   36:9

cursor   29:17
  36:3,8,13,
  23,24
  39:12,16
  47:7

Cádiz   5:11

D

daily   22:16

dangerous
  12:6

data   27:23

database
  20:13

date   28:8,
  11  31:11

day   18:10,
  11,15,16
  19:3  27:13
  28:14
  31:16,22
  46:14  54:1

dealers   16:1

December
  5:19

deck   35:12
  36:2

declined
  62:11,13

decrease
  63:16

defendant
  5:23

degree  7:21,
  22  8:14

del  31:8

demonstrate
  49:8

denied  34:4

department
  49:19,20

deponent
  3:23  65:13

deposition
  3:4  4:5
  22:23
  24:24
  38:11
  55:20
  65:3,12,15

describe
  17:15  36:2

describing
  17:1

description
  20:5  60:22

detail  21:4
  29:7  30:12

details  19:2

device  19:9

diagram
  3:17,18

35:3

difference
  12:14,15

dining  15:10

direct  3:6
  4:17  52:5
  53:10

directed
  18:24

direction
  39:1,24
  40:3  41:2,
  14  42:12,
  17

directly
  34:22
  59:8,11

discrepancy
  22:13
  57:11

discuss
  58:4,8

discussed
  58:18,21,
  25  59:3
  63:7

disembarkation
  54:1

docked  6:12
  11:9

doctor  53:16

document
  13:18

23:23 25:3
  48:5

documentation
  27:2

documenting
  13:17

documents
  21:23  22:8
  23:9,13
  32:13

door  43:23
  53:6

doorway
  43:18

draft  57:19

drawn  39:10

drew  47:7,9

drive  63:20

driver  23:18
  54:19
  59:21

drivers
  48:23
  63:20,23

driving
  11:21  19:4
  30:18
  33:12,13
  34:16
  39:25  40:5
  42:17
  45:24,25
  47:18
  63:15

drydock  5:13

duly  4:15

duties  22:16
  54:5

duty  18:24
  22:7  48:18
  49:14  53:4
  54:6

E

e-mails  6:24

earlier
  28:13
  31:15

early  39:7

easily  25:6

education
  7:14  8:10,
  12  9:19

Edward
  26:18,19

Eileen  3:15
  23:18
  33:15
  54:18
  59:20
  62:10

elevator
  20:18

elevators
  35:18

Elizabeth
  28:23

55:23 62:7

**employed**
6:15 64:8

**empty** 54:14

**encounter**
31:15

**English** 7:4,
6,8 8:3,4
59:25
60:4,5,6,
7,16

**entered**
40:14,19

**equipment**
30:22

**equipped**
54:7

**equivalent**
7:17

**ERRATA** 3:8

**escort** 18:5
51:14,15
52:14,15,
16,23 53:2

**exact** 30:13
44:23
47:14
49:20

**Examination**
3:6 4:17

**examined**
4:15

**exclusively**

64:14

**Exhibit**
24:19,23
32:14,15
33:9 34:25
35:2,3,24
36:17,19
38:11,12
45:10,12
50:2 55:19
62:8,15,
16,19
65:13

**exhibits**
32:17 35:4
62:19

**explaining**
60:19

**eyewitness**
17:21,24,
25

**eyewitnesses**
16:8 55:4,
6,14

---

**F**

---

**face** 41:13

**facility**
53:22

**facing**
40:11,25
41:5,10,
15,20
42:13

**fact** 33:4
58:25

**facts** 13:16

**failed** 8:16

**fair** 28:15

**familial**
50:19

**familiar**
35:21
50:7,17
56:21

**familiarity**
49:8

**family** 12:16
13:3 23:15
59:9 61:25

**farther**
39:17
44:22

**fast** 11:22
30:19

**fell** 29:9
34:14

**file** 14:2
17:5
21:12,25
23:7 26:7,
24

**filed** 27:4,
24

**fill** 13:21
16:25
33:25 34:2

59:5

**filled** 28:17

**film** 14:13,
15

**finalize**
57:23

**financial**
12:25

**find** 54:1

**fine** 28:7
35:15

**finish** 8:13,
15 9:1,4

**finished**
7:25 8:6,
7,8 9:6

**finishing**
6:17

**firm** 23:12

**fits** 53:5

**floor** 30:14
43:25

**flow** 11:13

**focus** 8:1

**folder** 21:21

**folders**
21:20

**footage**
40:14

**forgive**
35:10

MARIA PEREZ-SERA vs CARNIVAL CORPORATION
Arvind Lagas on 10/26/2021          Index: form..happened

form  12:8
  13:19,21
  22:10 26:2
  27:6 29:6,
  21 31:12
  32:3 40:7
  53:9
Formalities
  4:3
forward
  29:10 31:5
  34:14
  37:2,5,8,
  11,12,18
  39:7 40:11
  41:2
freely  49:10
friend  50:21
front  27:11
  30:14
  34:13
  40:4,6,11,
  22 42:20
  44:2
function
  10:25
  49:17
  51:23
functions
  53:25
furloughed
  6:1,6
future  22:5

——————————
        G
——————————
Gallery
  35:19
Gander  3:6
  4:8,10,18
  12:10
  22:14
  24:15,20
  27:10
  32:4,14,19
  35:1,6,24
  36:1,9,12
  38:14
  40:12
  45:14
  53:14
  65:5,7
gangways
  11:9
Garcia
  28:22,25
  55:22
gather  16:7
gathered
  20:6 27:3,
  24
Gathering
  13:14
gender  20:20
general
  42:16 45:7
geography
  8:4

gestures
  16:16
gift  39:4
  40:4,6,15,
  19 41:1,
  13,20
  43:18
give  4:21
  9:21,22
  19:12
  21:22
  24:13
  60:22
good  4:19
  12:13,15
  13:7 44:12
  60:15
  64:25
green  47:8,9
Guard  59:5
guess  43:4
  50:16,18
  58:23
  63:17
guest  18:25
  20:8,20
  33:1,5
  34:12,13,
  14 42:13
  49:22 50:1
  52:5,9,14,
  16,17
  53:2,11,13
  56:3 64:12
guests  60:18

64:10
guided  18:24

——————————
        H
——————————
hallway  15:7
  47:10
hallway-type
  38:23
hallways
  14:25
hand  11:13
  41:2
handicapped
  54:8,9
handle  49:19
handling
  49:21
handwrite
  62:11
handwriting
  17:1 24:5
  25:11,17,
  18 28:3
  29:8 30:18
  31:3 34:1
  56:8
handwritten
  30:23 62:6
happen  14:11
happened
  18:1,20
  19:1,3
  20:16 29:7

31:17
34:8,23
39:13
44:18
46:12
56:11
59:12
60:11,19,
21

**head**  60:23

**hear**  64:11

**high**  7:7,8,
15,20,23
8:1,8 9:1,
4,7

**higher**  7:16,
23 8:7

**highest**  7:14

**hired**  9:19

**hit**  19:4,
13,16 20:6
29:9 30:5,
19 31:5
32:1 41:22
46:13
47:20
61:11

**hitting**  21:7

**hold**  10:1

**home**  6:17,
19,25 30:3

**Horizon**
10:15,16,
17,19,23

11:1
14:24,25
15:3,6,9,
14,15,22,
23 16:3
17:10,16
21:10
23:4,5
25:21
35:13
36:6,11
38:21
42:14 49:7
56:14 57:2

**hurt**  28:18
52:1

**HZ**  25:14,21

_____

I

_____

**ID**  3:23
65:13

**identification**
24:19
32:18 35:5
38:12
45:12
65:14

**identified**
56:3

**impact**  38:2
40:25

**impacted**
41:3

**important**
14:21

**impression**
34:15

**in-house**
23:12

**incident**
13:19
14:2,6
16:23 17:5
18:15,16
23:21
26:1,6,7,
25 27:4,24
31:16 46:7
51:10
55:15 59:6
60:19

**incidents**
11:3 58:8
61:18,22

**include**  14:1

**included**
62:6,9

**includes**
33:4 61:9,
15

**independently**
19:8

**INDEX**  3:2

**India**  7:1
8:13 9:12
12:12

**Indian**  8:2

**individually**
62:24

**industry**
8:20,23,24

**infirmary**
32:10

**inform**  11:17

**information**
13:14,15,
18 18:22,
23 19:2
20:6 26:2,
5,11 27:23
33:3 43:20
59:10

**informed**
44:16

**initiated**
19:17

**injured**
18:25
32:8,9
33:1,5
51:11,14,
17 55:1
56:3 61:4,
13

**injuries**
13:10 19:6

**injury**  3:12
17:18
22:2,9
24:1,6,25
31:25
55:15
56:12
57:3,16

58:5

inquire   51:6

inquired
 19:1  46:6

inside   15:4,
 9,12  43:6,
 7,22

instruct
 63:23

instruction
 63:10  64:2

instructions
 48:22

instructs
 27:17
 63:20

intend   5:21

intent   5:16

interpret
 16:15

interrupt
 23:2

interview
 16:20

interviewing
 13:14,16

investigate
 13:9

investigated
 20:4  61:2,
 6,8,11,15,
 20

investigation
 11:3  16:21
 17:6
 19:15,17,
 19 21:8,11
 22:2 23:7
 26:7,24
 27:4,25
 29:22 36:4
 38:1,8
 39:21,23
 53:8 54:4
 56:1 59:17

investigative
 62:5

Invicta
 30:15 39:4
 40:9,10,
 11,22

involved
 30:22

issues   13:17

**J**

Jagdish
 56:21

Jarnagin   4:9
 12:8 22:10
 23:11
 24:15,17
 27:6,13,20
 32:3 40:7
 53:9 64:23
 65:8,10

job   8:11,22

9:14,24
10:1,25
11:2 22:7
49:17
51:22 52:2
53:3,25

joined   9:11,
 16

Jorge   28:22
 55:22

judge   27:15

jump   27:20

**K**

kind   44:3
 50:7,9
 57:11

knee   28:18

knees   29:10

knew   16:13
 20:12
 46:11

knowledge
 61:2

**L**

L-A-G-A-S
 4:25

ladies   55:1

lady   30:7,8
 50:13 60:8

lady's   63:15

Lagas   3:4
 4:14,20,
 21,25
 24:21
 64:23

landed   29:10

language
 7:2,6

large   3:17
 35:3

larger   25:6

lasted   59:14

law   23:11

lawsuit   5:24

lawyer   23:9

layout   14:22

leads   38:22

learn   19:16

learned   61:3

learning   7:9
 8:18

leased   48:8

leave   5:16
 50:10,11
 51:12 52:7

leaves   51:20

leaving   54:3

left   9:11
 30:21 37:8
 50:23
 51:2,5

legal   27:14

legend   47:24

level   7:14

limitations
  53:17

liquid   35:17

Lisa   16:14

list   20:8,
  10,15,19,
  21,22

listed   55:3

lists   33:14

litigation
  22:3

living   6:16
  7:1

lobby   20:17,
  18

local   30:2

located   5:9
  14:18
  48:16

location
  30:13
  36:21
  44:17
  46:13,16
  47:14
  51:16

locations
  14:21

long   5:18

7:4 59:13,
18

looked   21:2
  23:25 50:2
  62:7,19

lose   43:14

lot   12:11,
  13

loudspeaker
  9:13 42:24
  48:22

lounge   15:12
  35:17,20

Luckily   46:5

Lucy   28:22,
  25 55:22

luggage   54:2

luggages
  11:10

_____

___ M ___

made   34:16,
  17

major   7:25

make   12:11,
  12 24:13
  25:5,7
  26:10
  27:13
  35:11
  36:17
  39:19
  51:23

53:11

making   11:8

man   56:25

manner   11:21

Marathi   7:3

March   6:5

Maria   3:14
  17:9,20
  18:25
  29:1,24
  31:8 33:1,
  2 34:21
  36:8 41:25
  44:16
  50:12
  59:11
  60:8,9,10,
  18,20

maritime
  8:20,21,
  23,24

mark   24:8,
  23 26:21
  34:25
  38:10
  45:1,5,9

marked   24:19
  32:17 35:4
  38:12
  44:14,15
  45:12
  65:14

married
  12:20

master   20:10

matched   21:2
  33:18

math   8:2,4

meaning
  54:13

meant   50:6

medical
  15:4,7
  17:17,19
  18:6,8,9,
  11,12,14,
  19 29:20
  31:22
  50:10,24
  51:12
  53:15,20,
  22 54:21

meeting
  58:12,13,
  15,16,17,
  20,22,25
  59:3 61:3

meetings
  58:5,6,8,9
  61:18
  63:6,7

member   23:15
  59:9

members   13:3
  61:25
  64:12

memo   57:14

memorialize

33:24

**memorialized**
33:24

**memorize**
46:16

**memory** 22:23
23:7 40:23
59:24

**met** 17:20
18:12 19:1
55:12 60:8

**mind** 42:11
43:15

**misread**
26:12

**mixed** 48:24

**model** 48:5

**Mom** 13:4

**moment** 42:2
50:2

**money** 12:11

**monitor** 65:2

**month** 25:22

**months** 6:13,
18,20
10:21

**morning** 4:19

**mother** 13:5

**motion** 41:22

**motor** 19:4
29:9 30:24

**move** 33:9
37:2 44:4,
5

**movement**
11:14

**moving** 15:24
37:5

**Mr.~lagas**
32:20
64:21

**Mumbai** 7:1

---

**N**

**named** 17:8
44:6

**names** 16:8
50:15
55:14

**native** 7:2

**needed** 6:21

**night** 18:20

**nod** 16:12

**nodded** 16:11

**nodding**
60:23

**normal** 7:22
8:3 51:3

**notice** 57:10

**number** 21:22
24:24
25:13,18,
19 26:1,6,

7,8,24
27:5,25
32:15,16
33:10 42:5
45:19

**numbered**
62:24

**numbers** 35:2
62:24

**nurse** 18:24

---

**O**

**oath** 3:8
4:6

**Objection**
12:8 22:10
27:6 32:3
40:7 53:9

**objections**
27:13,14

**obtained**
62:10

**occasion**
11:16,24

**occur** 42:22

**occurred**
13:10
17:2,13,
22,24 26:3
31:25 36:4
47:15,17

**occurs** 14:11

**October** 3:3

10:21

**offer** 51:14

**offered**
29:24 34:3

**office**
21:13,15,
19,21
24:25
32:15,16
49:22
50:1,4

**officer** 9:25
11:2 22:7
56:13,16,
17,18,23
57:1,4
58:4,7

**officers**
56:14

**officials**
58:7

**on-board**
20:8

**on-duty** 9:21

**open** 38:22
39:3

**operate**
49:10 64:3

**operated**
49:2

**operating**
11:17,20,
25 12:1,5
49:9

opportunity
  14:12

opposite
  41:14,16

optional  8:3

oral  62:9

order  65:10

ordered
  18:11

ordering
  65:5,8

---

**P**

---

p.m.  28:11

Pai  56:21
  57:4

paint  47:25

paper  26:6
  33:4 55:3
  56:5

paperwork
  59:5

pardon  6:2

parenthesis
  29:12

parents  13:2

part  16:21
  21:7 22:6,
  15 29:22
  38:8 53:3,
  8,24

passenger
  3:12,14,15
  20:3 24:1,
  5,25 52:7
  53:18 54:1
  55:15
  64:18

passengers
  6:11 20:12
  24:1 61:4
  64:2,15,16

passing  46:5

path  39:9,
  20

patient
  18:16

patrolling
  11:3,7

pay  63:16

paying  64:15

pedestrian
  36:5 48:25

pedestrians
  11:18 12:2
  48:23

people  11:4,
  20 12:7
  15:24
  20:23
  43:14
  48:13 49:6
  56:1 60:23
  62:3

Perez  3:14

17:20 21:7
28:22,23
29:24 31:9
33:1,2
36:8 40:8,
17 41:19
47:21
55:22,23
59:11
61:10,12,
25 62:7

Perez'  42:22

Perez-sera
  17:9 18:5
  23:15
  28:18
  29:1,4
  31:16 32:8
  34:17 36:5
  39:1 40:3,
  14,18,25
  41:3,11
  44:6 46:13
  50:11
  54:18,21
  55:12
  59:8,22,25

person
  11:17,25
  12:1,4
  13:15
  19:4,12,16
  20:2,6,13,
  25 21:7
  30:5,18
  31:4,24
  32:7,24

33:11
44:21
45:24
50:14
51:14,17
54:20
56:23

persons  54:9

perspective
  42:11
  43:14

photo  3:14,
  15,23
  65:13

photograph
  21:2 32:24
  33:17
  42:21 43:5
  45:22
  46:4,8
  47:1 48:3
  62:21,22

photographs
  13:24 14:1
  20:8,13
  38:7,18
  42:7 45:15
  47:3
  62:14,16,
  18 63:1

photos  3:20,
  21 38:13,
  15 45:10,
  13

pick-up

48:16

picture
  20:18
  42:15
  43:12  44:6
  46:21,24

pictures
  46:21

piece  26:5
  33:4  55:3

pinned  4:12

place  54:15

places  11:7

plaintiff's
  3:12,13,
  15,16,18,
  19,21,22
  24:19
  32:17  35:4
  38:12
  45:12
  65:12

plan  35:12
  36:2

point  7:24
  8:9  11:11
  19:15
  37:3,7
  38:2,5
  39:20
  40:25
  46:11
  52:19
  53:16  56:1

port  5:12
  30:3

portion  23:6

posted
  63:19,22

potentially
  12:6

prefer  51:13

prepare  23:7

presence
  56:5  58:3

present  18:1
  63:5

presently
  5:10

preserve
  14:15

press  30:1,4

pressing
  30:6,7

prior  19:3
  46:13

problem  43:1

problems
  11:6

procedure
  22:4  51:6,
  22

procedures
  51:3

processed
  53:12

proficiency
  49:9

prompt  27:15

pronounce
  4:19

provide
  51:9,25
  52:12,13
  53:18

provided
  19:2

proximity
  44:24

pull  25:7

purpose  48:3

put  20:1
  36:3  38:5
  44:8  54:15

---

Q

quarantine
  6:4  64:7

question
  27:8,16,
  18,20,21,
  22  32:5
  51:18

questions
  16:18
  52:18
  59:16
  64:22,24

---

R

R-V  5:2

Radiance
  10:8

ramp  9:16

reach  6:21
  37:2  53:11

read  26:9,
  12  27:25
  29:13,15
  31:6  65:11

reading  33:3

reads  29:8,
  17  30:13,
  23

reason  43:5

recognize
  19:20,22
  32:24
  33:11

recognized
  20:9,20
  33:5

recollect
  24:4

recommends
  48:15

record  4:2,
  23  14:7
  28:1

red  37:23
  43:21

44:14,15

refer   52:9

references
  22:5

referring
  24:9  25:3

reflection
  48:2

refresh
  22:22  23:7
  24:4

regular   6:20
  53:24

related
  27:3,24
  59:6  63:7,
  10

relationship
  50:20

release
  53:17

relies   12:16

rely   12:24

remember
  15:5,11
  17:8,12
  19:7,11
  24:7  28:5,
  6  32:13
  40:16,21
  42:3,23
  50:6,15,
  19,22,23
  51:1

52:22,25
54:11,25
55:6
56:10,20
58:14,19
59:15,18,
23  60:17,
24  61:8
62:22

remote   4:4

remotely   4:6

renamed   10:7

rented   48:7,
  14

repeat   27:8

rephrase
  27:15

report   13:19
  14:2  16:23
  17:5,17
  23:21  26:1
  28:15
  32:10
  56:12
  57:3,6,11,
  13,16,20,
  21  62:5

reported   4:3
  28:11  57:9

reporter   3:9
  4:7  16:15
  65:5,8

reports
  31:24

represent
  62:23

request
  52:14
  53:12

requested
  46:17

required
  49:3,8

reserved
  54:12

response
  30:18,23

rest   53:19

restaurant
  35:20

restaurants
  15:10

result   22:3

reveal   39:23

revealed
  36:4  38:1
  39:21

review
  14:12,16
  22:22,25
  23:6

reviews
  57:19,21

rided   45:23

riding   34:9
  36:6

rough   21:1

roughly   8:5,
  25  43:2
  45:7

run   46:12

_____

S

_____

safety   58:5,
  17,25  59:3
  61:3,18
  63:5,6,7,
  11  64:1

sail   6:10

sailing   6:14
  64:7

sails   54:13

satisfied
  59:17

save   14:15
  21:6,24
  22:5,6,7,
  8,12

saved   21:10,
  13,14,18

scene   46:3

schedule
  6:24

school   7:7,
  8,20,23
  8:1,6  9:1,
  4,7

schooling
  7:23

schools  7:15

schooltime
 7:5

scooter
 11:17,25
 12:1,5
 17:10 19:5
 20:7,11,12
 23:18
 29:9,11
 30:19,24
 32:1
 33:12,13
 34:9 36:6
 39:25 40:5
 42:17,22
 45:17,23,
 24,25
 46:2,22,23
 47:3,14,18
 48:6,7,13,
 23,24
 49:9,21
 50:2,3,7,9
 54:19
 58:18,24
 59:21
 61:9,11,
 12,16,18,
 21 62:18
 63:1,6,10,
 15,20,23
 64:3,10,
 13,18

scooters
 11:20
 20:23

48:10,16
49:2,7,25
61:5 63:6,
7 64:8,14

Scratch
 29:10

screen  4:13
 11:9 24:10
 31:20
 32:22 35:7
 38:17
 55:21

scribbled
 30:20

scroll  35:10
 47:2

secondary
 7:15,16,23
 8:1,7,8
 9:1,4,7

seconds
 16:11

security
 9:16,18,
 19,25 11:2
 21:13,14,
 17,18,21
 22:7 32:1,
 9 56:13,
 14,16,17,
 18,23
 57:1,4,19,
 24 58:1,2,
 4

send  57:14

sending  6:23

senior  58:7

Sera  3:14

Sera's  41:19

series
 45:10,13

Services
 49:22 50:1
 52:5,9,16,
 17 53:2,
 11,12,13

share  24:10
 31:20
 38:17

shared  23:9
 24:21

she'd  56:4

SHEET  3:8

ship  3:17,
 18 5:4
 6:8,16
 9:13 10:3,
 5 11:8,14,
 18,21,25
 12:5
 14:10,12
 20:22,24
 21:16,17
 22:20
 25:21 26:3
 35:16
 48:17
 54:3,7,13
 63:20

64:6,15,19

ship's  3:14

ships  3:15
 6:10 13:9,
 11 14:19,
 20,22
 15:16,17,
 18,19
 48:11

shoe  42:20

shop  30:15
 36:10 39:4
 40:4,6,15,
 19,22
 41:1,13,20
 43:18

shops  36:10
 37:6

short  26:2

show  32:2,
 12 34:24
 52:23

showed  40:14
 46:19

showing
 20:25
 29:16

shows  21:6

shut  6:4

side  34:21
 36:8
 37:11,12
 41:6,16,19
 42:14 44:1

52:12

signal  49:4

signed  10:20
  31:8  56:7

signs  63:19,
  22

simply  33:6

sir  35:8
  44:15
  45:21

sister  50:20

site  46:4

situation
  24:16

Sky  35:18

slow  11:18
  63:23

slowly  26:10
  63:20

smaller  25:7
  43:8

smiles  24:15

Smith  3:15
  23:18
  33:15  36:5
  39:24  40:5
  41:1,9,14,
  16,18
  42:17,22
  45:23
  54:18
  59:20
  62:10

sold  54:13

son  13:7

sort  11:5,
  12  49:3

sound  56:21

source  61:4,
  22

Spain  5:11

Spanish  7:10

speak  6:21
  7:10  16:6,
  8  30:2
  54:17,23,
  25  55:2,4,
  7,9,25
  56:2  59:8,
  9,11,25

speaking  7:4
  60:3,5

speaks  60:15

specific
  20:22  43:5

speed  63:16

spell  4:22

spoke  40:18
  54:20
  55:8,14
  56:5,6,10
  59:20
  60:23

spoken  46:10

Sports  35:19

spotlight
  4:11

staff  57:16,
  20,21  58:4

stand  47:8

standard  4:4
  13:21
  51:6,22

standing
  40:10
  41:4,23,
  24,25
  42:13

starboard
  36:7

start  8:19
  37:1  43:7

started
  8:17,21
  9:7,12,23
  19:19

starts  25:23
  45:17

state  29:7
  30:12  31:1

statement
  3:12  17:1
  23:14,17
  24:2,6
  25:1  34:1,
  2,4  55:16
  59:10
  62:6,9

statements

27:23  56:7

states  7:18
  29:4,6
  31:3  55:21

stern  35:20

stipulate
  4:7

stipulations
  4:4

stop  26:13
  34:19  37:3
  41:23  46:6

stopped
  39:12,16

straight
  34:16

strike  63:4

struck  17:9
  61:5

stuff  30:20

subject  7:6
  8:16  62:15

subjects  7:9
  8:2,3

submit  57:21

submits
  57:23

suddenly
  34:10

summarize
  16:22

summary

23:20 62:9

**Sunshine**
5:4,7,8,9
10:9,10

**supervisor**
57:10

**supervisors**
57:12

**support**
12:18,25
13:2

**supporting**
13:6

**supposed**
27:18,20

**surveillance**
14:10
15:3,6,22
16:3 40:13

**suspicious**
11:6

**switch** 36:16
42:5

**sworn** 4:15

---
**T**
---

**tables** 16:1

**taking** 48:3
52:3 63:17

**talk** 7:12
51:3

**talking** 7:7

14:9 41:11
55:18
61:19

**technical**
7:21,22

**teleconferenci
ng** 4:5

**telling** 60:9

**testified**
4:16

**testify** 23:8

**thing** 44:23
56:11
57:11
60:10,20

**things** 11:6,
13 52:3,6
54:2

**thought**
11:22
12:1,6

**tile** 45:2,5

**time** 5:6
6:3,6,7,19
8:17,18
10:12,14
17:20
18:2,12
20:5,7,16
22:18
25:7,8
27:19
29:1,7
32:2,9
51:13

58:14
64:9,21,24
65:2

**timing** 59:18

**timings**
13:15
46:17

**tires** 47:24

**title** 9:14,
24 10:25
11:2

**titled** 24:25

**today** 5:3
10:1 23:8
64:22 65:6

**told** 16:22
19:3 28:13
31:14 34:9
40:20
44:17,19
62:1,10

**top** 24:25
25:13 26:8
48:1

**track** 55:9

**tracked**
33:21

**traffic**
48:24,25

**trained**
13:13

**training**
9:18,21

13:8 63:9
64:1

**transcript**
65:6,9

**transmitted**
65:13

**traveling**
50:16

**Tuesday** 3:3

**turn** 34:10,
11,16,17,
20,22 39:8
47:20
63:17

**turned** 40:3,
5

**turns** 63:24

**type** 16:17
19:9 50:1,
19 51:8
52:8

**typically**
16:21,25

---
**U**
---

**ultimately**
22:3

**Umm-hmm**
33:16

**unable**
51:12,15

**unaware**
18:19

31:19,21

**understand**
16:9 29:17
32:5 47:16
60:1,2
61:20

**understanding**
38:25
63:13

**United**  7:18

**unusual**
31:24
32:7,11

**upload**  21:24

---

**V**

---

**vendor**  48:15

**verbalize**
16:13

**verbally**
57:13,15

**vessel**  10:5
48:14
54:10
63:22 64:4

**vessels**
49:3,11
61:1,22

**victim**  44:6

**Victor**  5:1,2
26:23

**Victory**  10:7

**video**  4:4
14:4,7
19:22,24
20:1,2,14,
17 21:3,6,
10,11,24
22:7,19,24
23:5 33:18
40:24
44:20,21,
25

**videos**  14:5

**videotape**
4:3

**view**  42:5
44:22

**viewed**  21:7
40:24

**visible**  19:6

**voyage**  17:10
26:3,4
51:9 52:1
53:19
54:13,15
56:15,19

---

**W**

---

**Wait**  41:8
44:3

**walk**  51:12,
15

**walker**  19:10
50:25

**walking**

11:14 12:2
19:8 29:4,
9 31:5
34:13 40:3
42:2,16
50:25

**walkway**
37:6,7
47:17

**wall**  47:9,
10

**wanted**  34:10
46:15
52:22

**warning**  49:4

**warnings**
48:21

**watch**  11:18

**watched**
44:20

**watches**
30:15

**watching**
11:4,5
41:6

**wheelchair**
19:10
50:24
51:2,5,7,
15,20,21,
23,24
52:2,14
53:4,5
54:3

**white**  42:20
47:25

**wide**  20:22,
24

**wife**  12:24

**witnessed**
55:22

**witnesses**
13:16
16:6,9,20
28:22
55:13

**woman**  17:8,9
21:1,2

**women**  54:24

**words**  16:17
30:21
60:22

**work**  5:14
9:19
10:17,19
11:9

**worked**  10:6,
14 11:1
15:18,19
21:16,17

**working**  5:19
8:16,17,
19,21 9:8,
10,12,14,
23

**world**  6:3

**write**  34:4
56:8

**writing**
  33:25

**written**
  23:20
  36:11
  55:15  56:4

**wrong**   24:9

---

### Y

**year**   8:13,
  15,25  9:3
  25:23

**years**   9:6,9,
  10  60:25

**yellow**   37:19

---

### Z

**zoom**   43:12,
  13

**zoomed**   44:22