**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
**Charles Jordan, MD on 12/21/2021**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO:  1:20-cv-23463-XXXX

MARIA PEREZ-SERA,

   Plaintiff,

vs.

CARNIVAL CORPORATION, a
Panamanian Corporation, the
owner and operator of the
Trademark CARNIVAL CRUISE
LINE,

   Defendant.
_____/

PLACE:           REMOTE VIA ZOOM

DATE TAKEN:    Tuesday December 21, 2021

TIME:          5:00 PM - 6:20 PM

REPORTER:      Anne W. Fox
               Certified Shorthand Reporter
               State of Florida

_____

- via Zoom -

VIDEOTAPED MEDICAL DEPOSITION OF
CHARLES JORDAN,MD
_____

HUSEBY - Litigation Partners

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
**Charles Jordan, MD on 12/21/2021**                    Pages 2..5

**Page 2**

APPEARANCES

Counsel for Plaintiff:
    Deborah J. Gander, Esq.
    COLSON HICKS EIDSON
    255 Alhambra Circle, PH
    Coral Gables, FL 33134

    Deborah@colson.com
    Eservice@colson.com
        ^ Appeared via Zoom video conference

Counsel for Defendant:
    W. Cooper Jarnigan, Esq.
    GRAY ROBINSON, PA
    515 North Flagler
    Suite 1425
    West Palm Beach, FL 33401
    Cooper.jarnigan@gray-Robinson.com
    Lilia.parker@gray-robinson.com
        ^ Appeared via Zoom video conference

ALSO PRESENT:
    Roosevelt Harrison - Videographer
        ^ Appeared via Zoom video conference

**Page 3**

INDEX OF EXHIBITS

                                              Page
Plaintiff's Exhibit No. 1..................... 10
    Dr. Jordan's CV
Plaintiff's Exhibit No. 2..................... 12
    Dr. Fongue's Patient Note
Plaintiff's Exhibit No. 3..................... 13
    Dr. Jordan Assessment Plan, 191 - 194
Plaintiff's Exhibit No. 4..................... 19
    Diagnostic Radiology Report
Plaintiff's Exhibit No. 5..................... 20
    X-Ray Report - 8/31
Plaintiff's Exhibit No. 6..................... 22
    X-Rays - Bate's Number 949-951
Plaintiff's Exhibit No. 7..................... 27
    Medical Notes, Indication:  Bates 266-268
Plaintiff's Exhibit No. 8..................... 31
    Post Op X-Ray - Bates 913-914, 921-924
Plaintiff's Exhibit No. 9..................... 34
    Inter Op X-Ray - Bates 929
Plaintiff's Exhibit No. 10.................... 34
    Scar Picture - Bates 2-3 & 6

-*-

INDEX OF EXAMINATIONS

                                              Page
DIRECT EXAMINATION BY MS. GANDER................ 5
CROSS EXAMINATION BY MR. JARNIGAN............... 52

-*-

REPORTER'S CERTIFICATE OF OATH.................. 59

**Page 4**

- STIPULATION -

Good afternoon, everyone.  My name is Anne Fox and I'm your court reporter today.  I am just going to read into the record the following:

The attorneys participating in this proceeding acknowledge that I am not physically present with the Witness, and that I will be reporting and administering the oath remotely.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Will counsel please state their name and confirm this agreement on the record starting with counsel for Plaintiff?

MS. GANDER:  Debra Gander.  Confirmed.

MR. JARNIGAN:  Cooper Jarnigan.  Agreed.

**Page 5**

P R O C E E D I N G S

VIDEOGRAPHER:  All right.  This is the beginning of media number one in the deposition of Dr. Charles J. Jordan in the matter of Maria Perez-Sera v. Carnival Corporation.  Today's date is December 21st, 2021.  The time on the monitor is 5:06 PM Eastern Standard Time.

Counsel, please introduce yourselves, after which the court reporter, Anne, will read her stipulation and swear in the Doctor.

MS. GANDER:  Thank you.  Deborah Gander on behalf of the Plaintiff, Maria Perez-Sera.

MR. JARNIGAN:  And Cooper Jarnigan on behalf of Defendant, Carnival Corporation.

WHEREUPON,

CHARLES JORDAN, MD

BEING CALLED AS A WITNESS AND AFTER BEING DULY SWORN WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MS. GANDER:

Q.   Doctor, would you please give us your name and professional address.

A.   Sure.  It's Charles Jordan, and I'm currently at my office at 15955 Southwest 96th Street in Miami.  That's 33196, I believe.

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
**Charles Jordan, MD on 12/21/2021**                                    Pages 6..9

Page 6

Q.   What -- what type of a doctor are you?

A.   I'm an orthopedic surgeon.

Q.   Would you give us the benefit of your education and training going back -- I understand you went to Duke University and undergrad and then bring us forward through your final training, fellowships, and certifications.

A.   Sure.  I did my, as you mentioned, my undergraduate work at Duke University.  I then went on to do my medical school, and I received my MD degree from Rutgers University in Newark.  At the time it was called the University of Medicine and Dentistry of New Jersey.

And I did my orthopedic surgical residency at the NYU Hospital for Joint Diseases in New York City.  I then went on to do a Fellowship in orthopedic trauma at the Florida Orthopaedic Institute in Tampa.  And I worked at Tampa General Hospital and at St. Joseph's Hospital, both in Tampa.

Q.   Are you licensed to practice medicine in the state of Florida?

A.   Yes.

Q.   And do you hold any board certifications?

A.   I do.  I'm board certified in orthopedic surgery.

Page 7

Q.   Would you explain to us what board certification means and what it represents?

A.   Board certification is the process by which orthopedic surgeons receive a peer-reviewed validation of their ability to work at the highest level.

It's a process by which we take a series of examinations.  Part one of the boards is a written test that we take once we've done our residency training.  And then part two of the boards is done when we -- I'm sorry, it's actually done after Fellowship.

And then part two of the boards is when we're in practice.  We collect our first six months worth of cases.  And then those cases get reviewed by reviewers.  And we are brought in to do an oral examination and we basically -- you know, it's what we call defending our cases.

And that's when the -- after those -- that series of testing, that's when you're, the decision is made whether or not you receive board certification.  And then we have to recertify through a process every ten years that starts approximately five years into every cycle with regards to keeping up with certain levels of continuing medical education and test taking as well.

Q.   In reviewing your CV and the other information

Page 8

I was able to find, I understand you lecture both nationally and internationally on orthopedic injuries?

A.   Yes, ma'am.

Q.   You are -- you have published research in leading medical journals and medical textbooks on orthopedic treatments and surgical techniques; is that accurate?

A.   Yes, ma'am.

Q.   Okay.  And while you were in New York, you served as a physician for the Alvin Ailey Dance Theater and for the New York City Public School Athletic League?

A.   I did.

Q.   And currently you are an assistant team physician for the Florida Panthers Hockey Team; is that right?

A.   Yes, ma'am.

Q.   Can you estimate for us the number of surgeries that you have performed in your career?

A.   I would say somewhere -- probably somewhere in the neighborhood of 5,000 since I've been out in practice, not including the thousand that I did in Fellowship and the 7- or 800 that I may have participated in during residency.

Q.   And would you explain to us how orthopedic trauma and orthopedic surgery, specifically what that

Page 9

specialty encompasses?

A.   So orthopedic surgery is the specialty related to the treatment of musculoskeletal conditions.  And orthopedic trauma more specifically is the subspecialty by which we focus on -- on fractures, complex fractures more specifically, and their complications including, you know, posttraumatic arthritis, infections, nonunions when the bone doesn't heal, malunions when a bone doesn't heal in the proper position.

Q.   Okay.  Which hospitals do you have privileges at?

A.   I have privileges at Baptist Hospital of Miami, Doctors' Hospital in Coral Gables, South Miami Hospital, and West Kendall Baptist Hospital.  And also Dural, Dural Baptist, Dural.

Q.   Do you recall seeing a patient or have you reviewed a file and refreshed your memory that you had a patient named Maria Perez-Sera?

A.   Yes.

Q.   Okay.  Do you have an independent memory of Ms. Perez-Sera?

A.   As I reviewed my records, I recognized her name; I recognized her condition.  I can't say that I can picture her in my head.  But I have a recollection that is aided by my records.

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
**Charles Jordan, MD on 12/21/2021**                    Pages 10..13

Page 10

Q.  And based upon your memory and your review of the records, do you recall how Ms. Perez-Sera became your patient?

A.  Is it all right, also, if during this I refer back to my records as well?

Q.  Always.  And if you would, just let us know which record you're referring to so that we can keep abreast of that.

A.  Okay.  I just don't want to assume anything so I'm looking through my records now.  And -- and I'm seeing.  -- I'm looking for my first note when I saw her.  I remember she had a tibial plateau fracture.  So she first became my patient around the time that I operated on her which was September 3rd, 2019.

Q.  Okay.  And based upon my review -- and if it's okay, I'm going to share a screen with you.

A.  Yes.

Q.  All right.  And we've --

MS. GANDER:  I've marked your CV as Exhibit 1.  I don't think I said that on the record.

(Plaintiff's Exhibit No. 1 was marked for identification.)

BY MS. GANDER:

Q.  So give me a second.  Actually let me take this down.  Okay.  Can you see that?  Doctor, can you see

Page 11

that?

A.  Hold on one second.  Yes, now I can see.

Q.  Okay.  Okay.  Do you have a colleague named Vivien Fongue?

A.  I do.

Q.  All right.  And do you recall, or have you seen in your records, that Dr. Fongue originally saw Ms. Perez-Sera at Doctors' Hospital and ordered a consult with you because of the nature of the fracture that was present?

A.  Right.  I -- I believe that Dr. Fongue saw the patient -- he must have been on call at the time.  And given the condition and the timing that which she would require surgery, I ended up becoming involved because I'm -- he was on call and those were days that I'm regularly there and take over care of a lot of patients that are seen when they get admitted.

Q.  Okay.  And the record that I have on the screen, it indicates from Dr. Fongue:  I explained to the patient that the surgery performed by my partners, either Dr. Charles Jordan or Dr. Bar-Eli, in the next 48 if the swelling is adequate.

Do you see that?

A.  I see that.

MS. GANDER:  Okay.  So we'll mark that as

Page 12

Exhibit 2 to this deposition.

(Plaintiff's Exhibit No. 2 was marked for identification.)

BY MS. GANDER:

Q.  Okay.  What would be the relevance or the relationship of swelling to go a surgeon's ability to go ahead and perform the surgery?

A.  Well, oftentimes, especially with extremity surgery, there needs to be -- we generally wait a period of time.

Depending on the part of the body that it is, we'll wait a period of time for the swelling to decrease in order to be able to perform the surgery more safely and decrease the risk of complications associated with excessive swelling.

Q.  Okay.  And that record indicated that she must remain nonweight-bearing in bed with ice to assist with the swelling.  What is the importance of having a person being nonweight-bearing as it relates to swelling of a fracture site?

A.  Nonweight-bearing precautions are implemented in order to prevent further displacement of the fracture or worsening of the condition which can lead to worsening of the soft tissue envelope.  The soft tissues can either continue or worsen with regards to any damage

Page 13

to the soft tissues, and that includes swelling as well.

Q.  Okay.  What do you mean by the soft tissue envelope?

A.  So basically anything that's not bone.  But mostly what I mean by the -- the skin and the subcutaneous tissues and muscles and fascia, which are all layers of tissue from the skin down to the bone.

But that also includes what we call the neurovascular structures or the neurovascular bundles, which can be nerves and arteries and things as well.

Q.  Okay.  As part of your training to become a surgeon, and specifically a trauma surgeon, were you trained to review radiology and films independently, and not just rely on reports of other doctors?

A.  Yes.

Q.  Did you review any films in relation to Ms. Perez-Sera before you determined a plan of care for her?

A.  Yes.

Q.  Okay.  I'm going to put up what I have on my file that I understand is your first visit with her.  And again, I'll screen share.

Okay.  It's Bate's numbered by my office 191 through 194, and it will be Exhibit 3 to this deposition.

(Plaintiff's Exhibit No. 3 was marked for

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
**Charles Jordan, MD on 12/21/2021**                    **Pages 14..17**

Page 14

identification.)

BY MS. GANDER:

Q.   And this appears to me -- and please tell me if I'm scrolling too fast.  Dr. Charles Jordan, MD, your assessment plan.  And it says:  NPO after midnight September 3rd, '19.

So would that indicate that this was done no later than November 3rd, 2019?

A.   So that -- that order of NPO after midnight just means nothing to eat or drink after midnight, and that would be -- so starting at 12:01 AM on September 3rd, that generally presumes that we'll be doing the surgery on that day.  So --

Q.   Okay.

A.   -- it will be at midnight the night before, or the midnight on the morning of surgery.

Q.   All right.  And looking at what I've highlighted here -- and if there's anything else you want to discuss, please feel free to do it.  I just highlighted what I considered the pertinent parts to help facilitate the deposition.

It indicates:  Tibial plateau fracture, right.  Patient sustained a right lateral tibial plateau fracture that required surgical intervention.

And it said "required" as if it's already

Page 15

happened.

Case discussed with admitting physician for medical optimization.  NPO after midnight.  Plan for surgery tomorrow with Dr. Jordan.

Can you explain to us in layman's terms what that medical terminology means?

A.   Sure.  And do you -- if you don't mind, I'm just going to take a look for a second at my records just so I can -- it's kind of a little bit easier for me to scroll through the entire note quickly and get a better idea of...

Q.   All right.  Let me take this down so that we're not -- so that I'm not blocking you from people being able to see you.

A.   Okay.  Could you -- do you mind telling me the date of that note?

Q.   It's -- it says it's signed on September 16th, but based upon the -- that was why I asked you, did it indicate is was done at least on September 3rd?

A.   Right.  And I'll be able to tell you that, also.  When I look through my records, it will tell me exactly when the note was written, and those sorts of things.

Q.   Yeah.  Let me see if I can go down to the very bottom, and it may.  It looks like it says 12:30 on -- I

Page 16

can't because it's showing the date things are signed or the dates things are printed.

A.   Hold on.  Let me -- let me get that for you.

Q.   Take your time.

A.   Okay.  I believe I have the same note in front of me, and it was actually done on September 2nd --

Q.   Okay.

A.   -- by my nurse practitioner.  And then I wrote below that I had reviewed her note, agreed with the clinical details, and that's what was signed on September 16th.  But it was an attestation.  That signature is an attestation stating that I had reviewed all of these records prior to that or at the time that it was written.

And yes, I'm sorry, so I have that note in front of me.  So now your questions were as far as the medical relevance of what the plan says here?

Q.   Okay.  So -- exactly.  When it describes a tibial plateau fracture that requires surgical intervention, explain to us what that medical terminology means just in simple layman's terminology.

A.   Sure.  So the tibial plateau, if you think of somebody's knee and the knee is sort of acting like a hinge, it's made up of primarily the femur, which is your thigh bone, and the tibia, which is -- you know,

Page 17

people commonly refer to it as the shin bone.

So when those two bones meet in the middle, that space that bends like a hinge is the knee joint.

So at the very top of that tibia is what we call the tibial plateau.  So it's the portion of the tibia that kind of flares up and forms a plateau, a -- a platform by which the femur can rest on and then the bone -- and the knee bends.

And so a fracture of the tibial plateau or a comminuted fracture or a depressed fracture is basically -- it can happen after trauma where the femur will actually, if the -- if the knee bends the wrong way either -- either inwardly or outwardly, what we call varus or valgus, it can -- the femur can hit up against the tibia and create a depression in the joint and create very commonly what we call a split depression where the plateau itself, the joint surface becomes depressed almost like a divot when a golf ball hits the grass on the golf course after -- after it lands.  And also the bone can split as well.

And so that's what -- that's what I'm referring to in that note or what we're referring to as a right lateral tibial plateau fracture.

So lateral means, if you imagine that the knee can be divided into two parts, the lateral side and the

## MARIA PEREZ-SERA vs CARNIVAL CORPORATION
### Charles Jordan, MD on 12/21/2021
Pages 18..21

Page 18

medial side, which is lateral being the more outside from the midline, and medial being more inside from the midline or closer to the midline of the body, lateral is the outside part.

And so this is -- so the outer part of the femur hit against the outer part of the tibia inside the knee joint and broke the tibia. So that's a lateral tibial plateau fracture.

And so moving further in the note, it just says that the case was discussed with the admitting physician for medical optimization. That would be the primary internal medicine doctor that admitted the patient who's had optimizing the patient for surgery from a medical perspective.

We say "medical" as opposed to surgical, so there's doctors that look at the internal medicine perspective and the primary care perspective of the patient during their stay. And then NPO after midnight means nothing to eat or drink after midnight. And then plan for surgery tomorrow with Dr. Jordan. That's me.

Ice as needed for comfort. The ice is used in order to help relieve pain and decrease swelling primarily. And that's basically the long and the short of what is written in that paragraph.

Q. Okay. I'm going to screen share with you

Page 19

again.

A. Uh-huh.

Q. And what we'll mark here as Exhibit 4 to your deposition.

(Plaintiff's Exhibit No. 4 was marked for identification.)

BY MS. GANDER:

Q. This is a diagnostic radiology report. I don't know if you have this and want to look at your own, but it -- excuse me. It comes from -- it says it was signed on the 4th; although, it was taken on the 1st.

MS. GANDER: Give me one second. Give me one second. I apologize for that interruption.

BY MS. GANDER:

Q. Doctor, let's go back to the record I was showing.

A. Yep.

Q. Okay. It appears that it was taken on September 1, 2019. It's the knee, right knee as I read it, three views on x-ray. And it indicates a tibial plateau fracture. Trauma patient fell one week ago, complains of right knee pain.

There is a depressed impacted fracture through the right lateral tibial plateau. Moderate effusion is noted. And the Impression is: Depressed impacted

Page 20

fracture through the right lateral tibial plateau.

Is that consistent with what you yourself viewed on the radiology?

A. Yes.

Q. Okay. And is that what you were describing to us earlier as well?

A. Yes.

Q. All right. I'm going to mark this as Exhibit 4. And I'm going to mark as Exhibit 5 the x-ray report that is dated -- this I believe is also -- this is 8-31. So this would have been the day before.

(Plaintiff's Exhibit No. 5 was marked for identification.)

BY MS. GANDER:

Q. And this indicates a tibial fibular right two views of x-ray. And it talks about a comminuted fracture involving the lateral tibial plateau. Impression: Fracture of the lateral tibial plateau.

How does this information differ from the other radiology report that we looked at in Exhibit 4?

A. So these radiology reports we'll essentially use in order to correlate with what we -- you know, after we review the imaging after I review the imaging myself and come up with a diagnosis myself, I will usually look at these reports in order to correlate what

Page 21

I see with what the radiologist saw and if there's anything else that the radiologist notes that I may have not noticed on the first -- on the first look.

So this is essentially saying the same thing, just a little bit less I suppose specific compared to what I had described to you.

But a comminuted fracture involving the lateral tibial plateau on the radiology report essentially corroborates what I saw and what I -- what I was thinking at the time as well and what I described to you.

Now, the only difference between this or the different -- one of the differences between this and the last radiology report you just showed me is that this would have been the report associated with a tibia fibula x-ray, which means it's an x-ray that's taken of the entire tibia as opposed to the other one which I believe was a knee x-ray.

So it's an x-ray where the x-ray is focused on the knee joint itself, so it's a little bit higher than -- a little bit further up than what this second x-ray would have -- would have been showing you.

Q. And what does the terminology "comminuted" mean?

A. "Comminuted" is the term that we use to

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
**Charles Jordan, MD on 12/21/2021**                    **Pages 22..25**

Page 22

describe a fracture that is not just a simple fracture. In a sense it's basically a fracture that's in multiple pieces or multiple fragments. So that -- that's what we describe as comminution and -- or when a fracture is comminuted.

Q.   Okay. But the x-ray reports we just looked at were both of the same area of the same leg; they were basically just different views of that same area of the same leg. Is that fair?

A.   Yeah, that's fair.

Q.   Okay. All right. So I'm going to screen share with you. We'll go up to Exhibit 6 now.

(Plaintiff's Exhibit No. 6 was marked for identification.)

BY MS. GANDER:

Q.   I believe we have some photographs that may help. Okay. I'm going to have to zoom out on these a little bit.

All right. And this is Exhibit 6. And they're the x-rays that are marked 931, 933, 932, 949, 950, and 951 by my office. And, Doctor, tell me if you need me to make it even smaller or if this helps you.

Can you describe for us what we're looking at and where the fracture sites are?

A.   So --

Page 23

Q.   I'll hold it still.

A.   Do you mind -- do you mind scrolling down one more, because that actually looks like the left knee to me, in which case I would tell you that --

Q.   Wrong knee?

A.   Yeah. I mean, it looks like -- like a left knee x-ray, an AP and a lateral, which are different -- different views and projections.

Now that's the right knee that you're showing me now. But the other knee basically just looks like it has some arthritic changes, which I don't think you want me to get into and are probably not relevant to what you're asking me.

But what you're showing me now is the right knee.

Q.   Okay. And this is Bates number 949, 950, and 951, so I'll narrow Exhibit 6 to just those three.

Tell us what we're looking at if you don't mind, Doctor.

A.   Okay. So the image that I'm looking at right now is what we call an AP or an anterior posterior view. Basically it's an x-ray that's taken shooting from the front of the knee to the back so we see essentially what one might call a frontal view of the knee.

And if you see the structure of the bone that's

Page 24

coming down onto that space of the knee joint, that's the femur. And then -- and then there's another bone at the end of that space, and that's the tibia that kind of heads down to where your shin normally is.

And I assume that you guys can't see the mouse that I'm moving around, right?

Q.   We cannot. But I -- how about if I move my mouse and you tell me where to stop?

A.   Sure. Okay. So put it back right -- right to where you had it before. Move over to the right a little more. Yeah, right about there. Go back. Little more. Little more, little more, little more. Yeah. So right there in this area.

So that area right where your cursor is is where the lateral tibial plateau is. You're actually pointing directly to the portion of the knee joint that -- that is a part of the tibia. That's the tibial plateau. That's the bottom part of the knee where the knee bends.

And what we're looking at here is what I described to you before, where if you look at the opposite side, there is -- you can see a smooth surface or a congruent surface where the surface is flat.

Whereas the point where your cursor is showing, you can see multiple levels, so you can see actually,

Page 25

yeah, exactly that. Your -- what your cursor is doing is outlining sort of what I described earlier as a divot or a depression in the joint.

And then there's also a fracture, a fracture line that extends down and inferiorly along the tibia basically exactly where your cursor is pointing now. And that would be what I had described earlier as a split.

So this is -- this is a well-known fracture pattern and a well-described fracture pattern that can happen in patients called a lateral split depression tibial plateau fracture.

Q.   Should the side of the tibial plateau that my cursor is on be as smooth and even as the side that I've just now moved it to?

A.   Generally, yes.

Q.   Okay. And is this fracture consistent with someone being hit from behind by a motorized scooter and being thrown forward?

MR. JARNIGAN:   Objection to form.

BY MS. GANDER:

A.   Sure. It can be. Generally what we think of as the primary mechanism of this injury is being struck or hit in some way that your knee would turn sort of into what I would describe to you as a knock-kneed

**Page 26**

position.

So when the knee kind of moves inward, that's what we call a valgus stress. But it's hard for me to kind of, not being in person, sort of using my hands and describing it.

But essentially what happens is the knee gets pushed inward. So it can happen with someone getting hit from behind. Classically it's described as somebody getting hit from the side, like from the outside in.

But I certainly had no reason, based on the injury and -- if that's -- if that's the way it would have been described to me, I wouldn't have had any reason to question it.

Q. Okay. Is that your opinion within a reasonable degree of medical probability?

A. Yes.

Q. Okay. Now, I'm going to ask you, do you have your operative report in front of you?

A. I can get it right now.

Q. Okay. Because I'll ask you some questions about that, and it will probably help if you had that up.

A. Sure. Okay. I have my operative report in front of me. It's a report dated 9-3-2019.

Q. Okay. And it's Bate's numbered 266 through 268

**Page 27**

by my office, and we'll mark it as Exhibit 7 to your deposition.

MS. GANDER: And, Anne, tell me if at any point I get out of order with my exhibits.

(Plaintiff's Exhibit No. 7 was marked for identification.)

BY MS. GANDER:

Q. Okay. So Exhibit 7 to your deposition.

What was your indication for surgery for Ms. Perez-Sera?

A. So I'm reading here: Indication for surgery. The patient is a 65-year-old female with a displaced comminuted lateral split depression, unicondylar right tibial plateau fracture. So that's just a little bit more specific or descriptive of -- of a description of the patient's injury.

Q. Okay. And the procedure that you performed, as I read it, is arthroscopically-assisted open reduction internal fixation right unicondylar tibial plateau fracture. Is that accurate?

A. Right. And you'll notice we've kind of introduced a new word here. And the word "unicondylar" is in my description.

And what that means is essentially when you pointed out to us the one side that was fractured and

**Page 28**

the way that it should look compared to the other side, there are some tibial plateau fractures that can happen on both sides. So you get what's called a bicondylar plateau fracture. So it affects both the lateral and the medial side of the tibia.

So this one is unicondylar, which is one of the descriptive terms we use to relay the information that it's only affecting the one side.

Q. Okay. Would it have been a larger surgery if it affected both sides?

A. Generally speaking, yes.

Q. Okay. And I noticed that you listed that you had an assistant who was medically necessary for completion of the surgery. Correct?

A. Yes.

Q. Okay. Can you tell us approximately how long this surgery would have taken?

A. So from my -- my portion, which is the -- the surgery without including all of the, you know, the anesthesia and all of the nursing and the positioning and the preparation that's done before and after, probably would have been somewhere in the neighborhood of an hour and a half to two and a half hours.

Q. Okay. Is that what is sometimes referred to as "skin to skin"?

**Page 29**

A. Sure.

Q. Okay.

A. That's right.

Q. And my understanding from reading your report is that you had to implant screws and a plate into Ms. Perez-Sera's body to stabilize the bony structures you were dealing with; is that accurate?

A. Correct.

Q. Okay. Can you explain to us why that was necessary?

A. So a little bit earlier I described to you the fracture having a component of a split, which basically means that the bone fractured down along the wall of the tibia, and also a depression which the joint basically was pushed down and depressed.

So the goals of the surgery are to restore the alignment of the joint or what we call the articular congruent -- the articular congruence, which is, you know, the articular surface being the joint surface.

So what we'll do during the surgery is bring the -- the surface of the joint back up to where it belongs, provisionally hold it there with some special wires that hold the bone in the right position.

And oftentimes -- so if you imagine right below the joint surface, the bone is quite soft and spongy.

## MARIA PEREZ-SERA vs CARNIVAL CORPORATION
### Charles Jordan, MD on 12/21/2021

Page 30

So when you bring back up the joint surface to where it's supposed to be, there will be a void because the bone below was compacted by the -- by the impact of the injury.

And so many times we'll use either bone graft or what we call an allograft cement which is a cement generally made out of calcium phosphate, which is -- which gets -- which we put into the void in order to prevent the joint space from coming -- the joint from coming back down or falling back down over time with the patient's body weight or with any other -- any other reason.

So once the joint is back up to where it's supposed to go, we replace that split. We close the split back to where it's supposed to be. This is all called reducing the fracture. We reduce the deformity of the fracture and return the bones to where they're supposed to be.

And the plate and screws, the plate acts as a buttress in order to be able to hold that portion of the bone in its right place. And the screws transfix or go through the bottom of the joint surface or what we call the subcondylar surface in order to raft the joint and to keep the articular surface or the joint surface from -- from falling back down into that depressed area.

Page 31

So essentially what we do is we fix the divot, so to speak; we bring the joint back up. And then we -- we -- we compress and reduce the lateral split and then hold it together with the plate and the screws.

Q. Okay. I'm going to screen share what we'll mark as Exhibit 8.

(Plaintiff's Exhibit No. 8 was marked for identification.)

BY MS. GANDER::

Q. I'm going to ask you to let us know is this what you've been describing to us?

A. Hold on. I lost your screen for a second, but now I have it back up.

Q. You have it? Okay.

A. Yes. That's what I was describing. And if you see the -- the x-ray that we're looking at basically is a post-operative x-ray. I'm not sure exactly at what point in our post-operative course that was taken, but that's essentially showing the joint surface having been brought back up to where it's supposed to be, or within, you know, reasonably accurate positioning and acceptable positioning where it's supposed to be.

And then a plate and screw is holding the fractures together into the correct position.

Q. Okay. And as I'm counting, I see -- and

Page 32

correct me if I'm wrong, please -- one, two, three, four, five, six, seven, eight screws and this plate. Did I count correctly?

So a lot of those screws up top, the higher screws overlap. So knowing this design --

Q. Uh-huh.

A. -- of a plate, I can tell you that it much -- it more likely had -- I think it may have had nine screws. Actually if you scroll down one more, I'll be able to probably tell you exactly. Let's see. One, two, three, four, five, six, seven -- yeah, nine. It looks like there's nine screws there.

Q. Okay. And let me keep going down because I think there's a view down here that shows something you described to us a moment ago. And what is the name of this hardware? Does it have a specific name?

A. So generally we describe these plates as proximal tibia plates or proximal tibia buttress plates. This is a particular type of plate that's designed to go on this particular part of the body in order to perform the job that I just described, which is kind of buttressing or holding -- holding up that lateral wall of the tibia.

Q. Okay. And then this view, does this describe the wires and the holding it up before you put the plate

Page 33

in that you were talking about earlier?

A. Yeah. So this -- what you're showing now on your screen would have been an intraoperative x-ray, so we take x-rays during the surgery.

Q. Okay.

A. And what they -- and what this is showing is -- this is the portion of the surgery where the joint has been reduced; the joint has been brought back up to where it's supposed to go.

The wires, you can see some wires kind of coming out of the other side. And those wires are wires that we place in provisionally to hold the joint while we use the cement that I mentioned.

Which, if you see the area of the joint that you had originally pointed to, which was that depressed area of bone, just below it there's kind of a darker region?

Q. Uh-huh.

A. That's the -- that's the cement that we insert into the region where there was a -- where there was a void left behind by the injury.

Q. Okay. Is it where I'm moving my cursor right now?

A. Correct. Yeah. That area that kind of just looks a little bit darker than the rest of the bone.

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
**Charles Jordan, MD on 12/21/2021**                    **Pages 34..37**

**Page 34**

Q.   Okay.  So now it takes cement to replace bone?

A.   Yeah.  So basic -- it's a type of cement that's made out of a substance called calcium phosphate.  And it's meant to have -- to be strong enough to not be able to compact the way bone does in order to be able to provide axial stability so the joint can't fall back down over time while it's trying -- while it's healing.

And over time, the body replaces it with its own bone.  It usually takes a -- it can take a year or more.  But essentially that calcium -- that calcium phosphate gets reabsorbed over time, and the body remodels that area and lays down its own bone.

MS. GANDER:  Okay.  So we'll mark that interoperative x-ray, which is Bate's numbered 929 as Exhibit 9.  And the postoperative x-rays are Exhibit 8, and that encompasses Bate's numbers 913, 914, and 921 through 924.

(Plaintiff's Exhibit No. 9 was marked for identification.)

MS. GANDER:  So let me take this down so you and I can see each other.  I actually want to show you another photograph.

Okay.  So this will be Exhibit 10 to your deposition.

(Plaintiff's Exhibit No. 10 was marked for

**Page 35**

identification.)

BY MS. GANDER:

Q.   Is this scar that we see on the outside of Mr. Perez-Sera's leg, is that the scar that was the result of the surgery that you performed on her?

A.   It's thinking.  Oh, here we go.  The scar that you're -- that you're showing me?  That -- that's from -- yeah, that's from the surgery.  But that would be -- that would be the type of incision that we make for this type of procedure.

Q.   Okay.  And let me --

MS. GANDER:  So this will be Exhibit 10, and it's numbers 2, 3, and 6, Bate's numbers.

BY MS. GANDER:

Q.   In looking at the person in the wheelchair now, do you now recognize her as being one of your own patients?

A.   Yes.

Q.   Okay.  And is the area that you see in the wheelchair consistent with your memory and your records of what you treated her for?

A.   Yes.

Q.   Do you recall a left -- an issue with her left leg that was not something you performed surgery on?

A.   Yes.

**Page 36**

Q.   Okay.  What can you tell us about that if you remember or your records reflect it?

A.   Sure.  So -- so she also has a -- had essentially an ankle fracture, so she had a fibula fracture.

There's -- there -- two of the main bones that involve, that are involved in the ankle joint are the tibia and the fibula, the tibia being the same bone we've been talking about all along, but now down at the bottom by the ankle joint.

The fibula is the smaller bone that's on the outside or what we call the lateral side of the leg.  And so when you feel a little bump on the outside of your ankle, that's the fibula.  And so she had a fracture of that portion of the bone, what we call the distal fibula.

And her -- based on her diagnosis of the -- the type of fracture that she had was one that we determined that she would be able to -- that could -- that would be amenable to treatment without surgery.  And she was treated with the CAM -- the CAM walker boot that you could see on the picture that you showed me earlier.

And so that was part of, part of the overall sort of treatment that we provided to her.

Q.   The big gray boot that we were looking at in

**Page 37**

the photograph?

A.   That's right.

Q.   Okay.  And did her inability to bear weight in the CAM boot impact her recovery from the knee surgery so that she was required to be in a wheelchair as opposed to being able to be mobile?

A.   If you don't mind, I'm just going to look back for one second in my notes.

Q.   Yeah.  And if that question didn't make sense, I'll re-ask it.

A.   Sure.  Just -- let me just take a look here.  So do you mind repeating your question?

Q.   Sure.  Was her recovery from the knee surgery impacted at all by the fact that she was in a CAM boot on the opposite leg for a different injury?

A.   Yeah, it would -- it would just add to or complicate her recovery in the sense that she had an injury on the opposite side as well.

So there -- there was a short period where she was nonweight-bearing on that side.  And even after we allowed her to start weight bearing on the left side, her -- the side she didn't have surgery on, it certainly would have affected her ability to mobilize, you know, her pain levels, and being able to get up and move around and participate in therapy.

**Page 38**

So it would have definitely been a factor in her recovery, for sure.

Q. And would it have made it more necessary for her to have assistance from Home Health or nurses or people like that with activities of daily living that she could not do herself with the injuries to each leg?

A. Sure. I think that's a reasonable statement.

Q. Okay. Was the injury to the ankle consistent with having been hit from behind by a motorized scooter and thrown to the ground?

MR. JARNIGAN: Object to form.

BY MS. GANDER:

A. Yes, I believe so.

Q. Okay. Is that your opinion within a reasonable degree of medical probability?

A. Yes.

Q. Okay. Was the care that you provided to Ms. Perez-Sera, including the CAM boot walker and the surgery, were those reasonably medically necessary based upon the injuries with which she was presented to you as a patient?

A. Yes.

Q. Okay. You talked a little bit about the plateau area being into the joint. Does that impact her future risk of developing arthritis in that knee

**Page 39**

compared with if she had not had that injury to the articular surface?

A. Yes, ma'am.

Q. Okay. Could you explain that to us, sir?

A. So the injury that we've been describing throughout this deposition involves the articular surface or the joint surface. And as such, it also imparts injury to the cartilage and the cartilaginous surface of the joint.

In general, injuries to the joint surface, especially what we call axial loading injuries or injuries such as these where the joint gets punched or pushed down, can cause injury to the joint surface and to the -- and to the cartilage cells that create cartilage and maintain the health of the cartilage of the joint.

And, therefore, it can be common to develop what we call posttraumatic arthritis, which is essentially a degeneration of the surface of the joint as a result of an injury that involved that same joint.

Q. Okay. And is that your opinion within a reasonable degree of medical probability?

A. Yes.

Q. Okay. When Ms. Perez-Sera was discharged from Doctors Hospital, she was discharged to West Gables

**Page 40**

Rehabilitation Center. Is that typical that a patient of yours, who would have a surgery of this type, would go to a rehabilitation center as opposed to going directly home?

A. It depends very much on the patient and on the injury and on what -- you know, the different factors that are involved in her ability to be able to be safe at home or to take care of herself at home.

For somebody who has injuries to both legs, it is certainly not uncommon for them to go to a rehab facility rather than to go home.

Q. Okay. And is physical therapy an important part of her overall recovery in addition to the surgery that you performed?

A. I'm sorry. Repeat that.

Q. Was physical therapy an important part of her recovery from this injury in addition to the surgery that you performed?

A. Yes.

Q. And was that something that you ordered for her?

A. Yes.

Q. Okay. And was that also reasonably medically necessary based upon the injury for which you were treating her?

**Page 41**

A. Yes.

Q. Once she was at West Gables Rehabilitation Center, did you continue to be the orthopedic doctor in charge of her orthopedic care?

A. So while she is in the facility, being that I don't have any -- I don't have privileges at that facility, there are physicians that will assume responsibility for her care while she's at the facility.

But I'm able to follow up with her on an outpatient basis and make recommendations, which in general are usually followed by the physicians, and the therapists in the facility will follow.

Q. Okay. Let me -- give me one second. Would it be typical that patients who are at a facility such as West Gables would be transported to your office to be seen in person by you at your office?

A. Yeah. It's variable depending on the facility. And frankly, I -- I don't know the factors that it depends on. But sometimes I get -- I have patients transported back for outpatient follow-up while they're at the facility. And other times I don't see them until after they're discharged.

And they often cite different reasons that they were given by the facility as to why they either couldn't leave or weren't able to be transported. But

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
**Charles Jordan, MD on 12/21/2021**                    Pages 42..45

**Page 42**

it's not unusual for patients to come see me while they're still at the facility.  That's correct.

Q.   According to my notes, I have that she saw you in your office, so after her discharge and after she was already a patient at West Gables Rehab, on September 18th, on October 18th, and on December 6th, which was right before she was discharged from West Gables.

Do you have those clinic notes in your file?

A.   I have September 18th.

Q.   Uh-huh.

A.   October 18th.  December 6th, is that a date that you mentioned?

Q.   Yes.  That's the last date I have while she was still at West Gables, and...

A.   Okay.  Yeah, I'm not sure -- I don't know if I can quickly verify or find out through my own records which of these visits, you know, were visits that happened while she was there.  But it doesn't sound unreasonable to me.

Although -- although in December she was also -- she was still at the facility --

Q.   Yeah.

A.   -- according to what you see?

Q.   Yes.  And she was discharged from the facility on December 12th, I believe.

**Page 43**

A.   Okay.

Q.   I mean December 11th.  She was discharged from the facility on December 11th.

A.   Okay.  I would -- I would take your word for that -- for it.  And then I have an office visit here February 28th as well.

Q.   Okay.

A.   I'll keep looking if you need me to.

Q.   Okay.  No problem.  Would those consults be in your file if you had seen her at the facility, or would they only be in your file if she had come to your office in person?

A.   I wouldn't -- I wouldn't have seen her at the facility, so they -- if I have notes during that time, it's because she came to the office.

Q.   Okay.  So the dates we just --

A.   Were brought back -- sometimes some patients are brought back to the hospital.  So it would have to be somewhere where I work, essentially.

Q.   Okay.  So the dates that we just discussed -- September, October, and December -- are where you saw her in person either in your office or at the hospital, but not as West Gables?

A.   Correct.  I believe so.

Q.   Okay.  And would it be normal that someone

**Page 44**

would still be under your orthopedic care three months post surgery?

A.   Yeah.  Especially for an injury like this, it's not uncommon for patients to see me much longer than that even.

Q.   Okay.  All right.  What are the deficits that Ms. Perez-Sera had when she was discharged out of Doctors' Hospital and into the rehabilitation center?  For example, was she unable to walk?

A.   So on -- on discharge, you know, with the injuries that she had on both sides of her -- on both legs, she would have had difficulty with mobilization and getting up and walking.

As far as the term "inability to walk," she -- she was -- we allowed her to put weight and to walk on her -- the leg, the left leg where she had the ankle fracture or the distal fibula fracture.

But she would have been nonweight-bearing, or we would have restricted her from putting weight down on the side that we did surgery on, the right side.

So unable to walk?  I wouldn't question if she told me she was unable to walk that quickly after her injury or after her treatment because of the fact that it would have been very difficult for her to walk despite the fact that we were allowing her at the time

**Page 45**

what we call weight bearing as tolerated, which means that --

It's not medically necessary to keep her off the left leg.  But she probably -- I would imagine she would have had difficulty with walking and ambulation at that point.

Q.   Would she have been a fall risk if she didn't have assistance around her?

A.   Yeah, I would say so.

Q.   Is Ms. Perez-Sera still one of your patients, or have you discharged her?

A.   So I am still treating her for a -- for another injury.  So she's -- she's still under the care of not just myself, but the other members of my orthopedic trauma group, my other partners as well as my extended PAs, and whatnot.

So I believe the last -- the last couple of visits, she's seen one of my Physician Assistants in the office for --

Q.   Okay.  But that's -- that's unrelated to either the right tibial plateau fracture or the left distal fibula fracture.  Correct?

A.   Yeah.  I believe it was a -- a completely separate injury.

Q.   Okay.  All right.  Now, focusing on those two

Page 46

injuries that you treated her for, at the time they occurred, would those be painful injuries?

MR. JARNIGAN:  Objection to form.

BY MS. GANDER:

A.   Yeah.  Generally speaking, patients describe as having pain with those injuries.  Yes.

Q.   And in your review of your records from Ms. Perez-Sera, was she making complaints of pain in the --- in those areas which led to the x-rays being taken to determine what the underlying cause of the pain may be?

A.   Yes.

Q.   And that would be consistent with your understanding of the type of injury and the pain that it can generate.  Correct?

A.   Yes.

Q.   All right.  And the surgery that you performed on her, after she comes out of recovery, would she have been prescribed pain medication to deal with the aftereffects of the surgical pain?

A.   Yes.

Q.   And for how long would she have been on pain medication?

A.   That's very variable.  But in general, patients are generally on some sort of medication to either directly treat the pain or indirectly treat the pain

Page 47

with like, for example, anti-inflammatory medication and those sorts of medications, generally for several weeks after the surgery.

Q.   Is the hardware that we looked at on the x-rays still in her body?

A.   To my recollection I believe they are, yes.

Q.   Do you have any plan or intent to remove that hardware?

A.   I would have to look at my notes to see if we had to -- if I had discussed that with the patient at all for whatever reason.

But in general, we don't generally plan to remove this type of hardware unless -- unless there's a complication or an issue, or if she requires any further treatment in the future that would require or be facilitated by us removing the implants.

Q.   Do you believe that she has reached the maximum level of improvement she will reach with your surgery and the recovery at this point?  She's now two and a half years post injury and post surgery.

A.   I would have to look exactly through my notes to see, but being that I do recognize that I had discharged her from my care at one point with regards to those specific injuries, I -- I -- I am comfortable saying that I think that she reached her maximum level

Page 48

of improvement with regards to the injury.

Q.   Okay.  Does she have the same leg on that side as if she would have had and she had never had this injury and never needed the surgery?  Meaning, did the surgery put her back in the same condition she would have been in if she had never had the injury?

A.   No.  She -- she had to my recollection developed posttraumatic arthritis.  And so that would be a post -- that would be a sequela of her injury and of the trauma and something that may always affect her.

Q.   Is that something that may necessitate a knee replacement in the future?

A.   It's possible.

Q.   Is it more likely than not?

A.   No, I wouldn't say that.

Q.   At what intervals will she need to be watched for that knee to determine if it is developing into a setting where she would need a knee replacement?

A.   Generally, after -- after the fracture is completely healed and we've determined that -- that we've provided, you know, all the -- the treatment that's reasonable at the time, it's really up to the patient to come back and see me as needed.  There's no set interval.

But if we do -- if she is complaining of the

Page 49

symptoms that we would associate with posttraumatic arthritis, we would probably follow her in three-month intervals or -- six-week to three-month intervals until the symptoms are controlled, and then spread it out to six months to a year.

And really it's all more dependent -- dependent on her symptoms and her complaints how often we would see her or at what intervals and what kind of treatment we would offer her.

Q.   Would there be medications that you would recommend for her now to address, first of all, the pain of the posttraumatic arthritis?

A.   Generally, the -- the -- as far as medications go, the mainstay of treatment for posttraumatic arthritis is anti-inflammatory medications.

The goal of those medications, very commonly you would see -- some examples are like Advil and Motrin and those sorts of medications that sometimes are over-the-counter but can also be prescribed; there's also prescription strength medications.

And in general the goal of those medications are to decrease the inflammation that comes as a result of the arthritis and as a result of the irritation of the joint with movement and with any other activities.

And the decrease in inflammation also results

## MARIA PEREZ-SERA vs CARNIVAL CORPORATION
### Charles Jordan, MD on 12/21/2021                         Pages 50..53

Page 50

in a decrease in pain.

Q.   Okay.  Are there any medications that you would recommend she take to slow down the progression of any degeneration, or is that a possibility?

MR. JARNIGAN:  Objection to form.

BY MS. GANDER:

Q.   Generally speaking, we don't really have medications that are proven to slow down the progression of arthritis and to slow down the degeneration if it's going to happen.

There are -- there are some -- there is some data to suggest that certain treatment such as glucosamine and chondroitin and those sort of medications may reduce or slow down the progression of such a disease.

But it's definitely not something that I would consider proven.

Q.   All right.  Did you make records of your care and treatment of Ms. Maria Perez-Sera?

A.   I'm sorry, repeat that.  I missed that.

Q.   Okay.  Did you make records of your treatment of Ms. Perez-Sera?

A.   Sure.  In my notes?  Yeah.

Q.   Okay.  And were those created at or around the time of your care and treatment of her in the normal

Page 51

course of your practice?

A.   Yes.

Q.   And I -- has all of the care that you've rendered to Ms. Perez-Sera been reasonable and necessary based upon the condition with which she was referred to you?

A.   Yes.

Q.   And have all -- did you bill her for your care and treatment?

A.   So as an employee of the Baptist Health System, I don't do any billing myself.  I -- I imagine that the Health System would have billed on my behalf and on behalf of the facility that she was treated in.

Q.   And would all of the bills for your services have been the usual and customary in the community?

A.   I imagine so.  But I have actually never seen her bills.

Q.   Okay.  And is there anything else about Ms. Perez-Sera that I failed to ask you that you think would be important for us to understand about her condition or her future going forward?

A.   Oh, I think that was pretty complete.

Q.   Okay.  And thank you.  And have all of the opinions that you've rendered for us today been within a reasonable degree of medical probability?

Page 52

A.   Yes, ma'am.

MS. GANDER:  Thank you, sir, for your time.  I have no further questions.  But I believe Mr. Jarnigan may.

THE WITNESS:  Thank you.

MR. JARNIGAN:  Hi.  Good evening, Doctor.  Do you mind if I take a brief five-minute bathroom break, and then I just have very brief follow-up questions for you?

THE WITNESS:  Sure.  That's totally fine.  Actually, if you don't mind, I'll do the same.

MR. JARNIGAN:  Okay, great.

VIDEOGRAPHER:  The time on the monitor is 6:40 PM, and we're going off the record.

(Brief Recess)

VIDEOGRAPHER:  The time on the monitor is 6:12 PM, and we're back on the record.

CROSS-EXAMINATION

BY MR. JARNIGAN:

Q.   Good evening, Dr. Jordan.  My name is Cooper Jarnigan and I'm the attorney on behalf of Carnival Corporation.  I just had a few follow-up questions from Ms. Gander's questioning for you.

A.   Yes, sir.

Q.   You testified that you're currently treating

Page 53

Ms. Perez-Sera for another injury.  Could you please explain what that injury is?

A.   So we're currently treating her for a right proximal humerus fracture.  So what that means is a fracture of the upper part of the humerus near the shoulder joint.

Q.   So you're treating her for a shoulder injury currently?

A.   Correct.  Myself and my -- and my team, yes.

Q.   Do your notes reflect how Ms. Perez-Sera sustained that right proximal humerus fracture?

A.   So she was initially treated for this injury by my partner, Dr. Howard Bar-Eli.  And in his note on 8-16-21, it says that:  67-year-old right-hand dominant female who presents to the clinic for evaluation of her right shoulder injury.

Patient states that she tried to pick up a backpack from the floor and fell forward onto her outstretched arm three days ago, which would have been August 13th of '21.

Q.   Can you please spell out the name of the doctor you mentioned?

A.   Sure.  It's Bar-Eli, B-a-r, hyphen, E-l-i is the last name.  The first name is Howard.

Q.   Thank you.  With regards to Ms. Perez-Sera's

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
**Charles Jordan, MD on 12/21/2021**                    **Pages 54..57**

**Page 54**

leg injuries, when is the last time you treated her for those?

A.   So the last time that I have documentation here of having addressed the right tibia and the left ankle are on July 30th of this year.

Q.   And I -- I do not actually have that note in my possession.  Can you please tell me what Ms. Perez-Sera was complaining of at the time?

A.   So it says here: A 67-year-old female, established patient, one year and ten months status post the surgery that we did.

She was complaining of left hip pain.  We were treating her for arthritis of the left hip.  She was also complaining of the right knee.

Patient states she continues to experience intermittent pain over the anterior and lateral aspect of her knee, which would have been the region that -- of the injury in question and -- and the region that we operated on.

And it also says here:  Left ankle.  Patient continues to experience sharp pain on the medial aspect of the left ankle.  So this -- that was the ankle that she had the fracture that we did not operate on.

So on this visit I was treating her for left hip osteoarthritis, posttraumatic arthritis of her right

**Page 55**

tibia, and posttraumatic arthritis of her left ankle.

Q.   In response to Ms. Perez-Sera's visit on that date, what was your plan for medical treatment moving forward?

A.   So with regards to the arthritis in her left ankle, I talked to her about arthritis treatments once again.  And we discussed conservative management in the way of activity modification, weight loss, physical therapy, nonsteroidal anti-inflammatory medications.

And so we prescribed her, I believe, anti-inflammatory medication and physical therapy.

With regards to the tibia fracture, I documented:  The patient is doing well.  She appears to have -- or she has minimal pain and the fracture is well aligned.  And I recommended that she continue activities as tolerated without restrictions, and that she could follow up as needed.

With regards to the arthritis of the left hip, I documented similarly -- or I documented:  Same as above.  Continue with nonsteroidal anti-inflammatories and therapy as she has been responding well.

Q.   Does -- excuse me.  Does Ms. Perez-Sera currently have any appointments to visit with you in the future with regards to her leg injuries?

A.   I don't know exactly.  But this last note would

**Page 56**

lead me to believe that she does not at this time, unless she's made an appointment that I'm not aware of to come back and see me --

Q.   Okay.

A.   -- for that.

MR. JARNIGAN:  All right.  Thank you, Dr. Jordan.  I appreciate your time today.

THE WITNESS:  Oh, sure.  My pleasure.

MS. GANDER:  Doctor, you have the right to read your transcript or to waive the reading of the transcript.

Most people waive the reading, but a lot of professionals such as yourself do want to read it to ensure that the terminology was taken down.

It's entirely your decision and your right, but you do need to let the court reporter know now if you're going to read it or waive it.

THE WITNESS:  I think I'm okay waiving.

MS. GANDER:  Okay.  Thank you very much for your time.  We appreciate it.

THE WITNESS:  Sure, absolutely.

VIDEOGRAPHER:  The time on the monitor is 6:18 PM, and this concludes the deposition.

(The deposition was concluded at 6:20 PM, and Reading and Signing were Waived by the Witness.)

**Page 57**

CERTIFICATE OF REPORTER OATH

STATE OF FLORIDA
COUNTY OF PINELLAS

I, the undersigned authority, hereby certify that CHARLES JORDAN, MD personally appeared before me via Zoom video conference and was duly sworn.

WITNESS my hand and official seal this 6th DAY OF JANUARY, 2022.

*Certified Shorthand Reporter*
_____
ANNE W. FOX
NOTARY PUBLIC - STATE OF FLORIDA

Page 58

REPORTER CERTIFICATE

STATE OF FLORIDA

COUNTY OF PINELLAS

I, ANNE W. FOX, Certified Shorthand Reporter in and for the State of Florida at large, certify that I was authorized to and did, via Zoom video conference, stenographically and electronically report the deposition, and that a review of the transcript was not requested, and that the transcript is a true and complete record of my stenographic notes and recordings thereof.

I FURTHER CERTIFY that I am neither an attorney, nor counsel for the parties to this cause, nor a relative or employee of any attorney or party connected with this litigation, nor am I financially interested in the outcome of this action.

DATED THIS 6th DAY OF JANUARY 2022.

*Certified Shorthand Reporter*

ANNE WHITNEY FOX
NOTARY PUBLIC - STATE OF FLORIDA
CERTIFIED SHORTHAND REPORTER

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
**Charles Jordan, MD on 12/21/2021**                    **Index: 1..929**

| Exhibits |
| --- |

JordanC 1
3:3 10:19,
21

JordanC 2
3:4 12:1,2

JordanC 3
3:5 13:23,
25

JordanC 4
3:6 19:3,5
20:8,9,20

JordanC 5
3:7 20:9,
12

JordanC 6
3:8 22:12,
13,19
23:17

JordanC 7
3:9 27:1,
5,8

JordanC 8
3:10 31:6,
7 34:16

JordanC 9
3:11
34:15,18

JordanC 10
3:12
34:23,25
35:12

| 1 |
| --- |

1  10:19,21
19:19

10  34:23,25
35:12

11th  43:2,3

12:01  14:11

12:30  15:25

12th  42:25

13th  53:20

15955  5:24

16th  15:17
16:11

18th  42:6,
9,11

19  14:6

191  13:22

194  13:23

1st  19:11

| 2 |
| --- |

2  12:1,2
35:13

2019  10:14
14:8 19:19

2021  5:6

21  53:20

21st  5:6

266  26:25

268  26:25

28th  43:6

2nd  16:6

| 3 |
| --- |

3  13:23,25
35:13

30th  54:5

33196  5:25

3rd  10:14
14:6,8,12
15:19

| 4 |
| --- |

4  19:3,5
20:9,20

48  11:21

4th  19:11

| 5 |
| --- |

5  20:9,12

5,000  8:20

5:06  5:7

| 6 |
| --- |

6  22:12,13,
19 23:17
35:13

65-year-old
27:12

67-year-old
53:14 54:9

6:12  52:16

6:18  56:22

6:20  56:24

6:40  52:13

6th  42:6,11

| 7 |
| --- |

7  27:1,5,8

7-  8:22

| 8 |
| --- |

8  31:6,7
34:16

8-16-21
53:14

8-31  20:10

800  8:22

| 9 |
| --- |

9  34:15,18

9-3-2019
26:24

913  34:16

914  34:17

921  34:17

924  34:17

929  34:14

**931** 22:20

**932** 22:20

**933** 22:20

**949** 22:20 23:16

**950** 22:20 23:16

**951** 22:21 23:17

**96th** 5:24

---

**A**

---

**ability** 7:5 12:6 37:23 40:7

**abreast** 10:8

**absolutely** 56:21

**acceptable** 31:21

**accurate** 8:7 27:20 29:7 31:21

**acknowledge** 4:6

**acting** 16:23

**activities** 38:5 49:24 55:15

**activity** 55:8

**acts** 30:19

**add** 37:16

**addition** 40:13,17

**address** 5:22 49:11

**addressed** 54:4

**adequate** 11:22

**administering** 4:8

**admitted** 11:17 18:12

**admitting** 15:2 18:10

**Advil** 49:17

**affect** 48:10

**affected** 28:10 37:23

**affecting** 28:8

**affects** 28:4

**aftereffects** 46:19

**afternoon** 4:2

**agreed** 4:17 16:9

**agreement**

4:13

**ahead** 12:7

**aided** 9:25

**Ailey** 8:10

**aligned** 55:15

**alignment** 29:17

**allograft** 30:6

**allowed** 37:21 44:15

**allowing** 44:25

**Alvin** 8:10

**ambulation** 45:5

**amenable** 36:20

**anesthesia** 28:20

**ankle** 36:4, 7,10,14 38:8 44:16 54:4,20,22 55:1,6

**Anne** 4:2 5:9 27:3

**anterior** 23:21 54:16

**anti-inflammatories** 55:20

**anti-inflammatory** 47:1 49:15 55:9,11

**AP** 23:7,21

**apologize** 19:13

**appears** 14:3 19:18 55:13

**appointment** 56:2

**appointments** 55:23

**approximately** 7:21 28:16

**area** 22:7,8 24:13,14 30:25 33:14,16, 24 34:12 35:19 38:24

**areas** 46:9

**arm** 53:19

**arrangement** 4:10

**arteries** 13:10

**arthritic** 23:11

**arthritis**
9:7 38:25
39:18 48:8
49:2,12,
15,23 50:9
54:13,25
55:1,5,6,
18

**arthroscopical ly-assisted**
27:18

**articular**
29:17,18,
19 30:24
39:2,6

**aspect**
54:16,21

**assessment**
14:5

**assist** 12:17

**assistance**
38:4 45:8

**assistant**
8:13 28:13

**Assistants**
45:18

**associate**
49:1

**assume** 10:9
24:5 41:7

**Athletic**
8:11

**attestation**
16:11,12

**attorney**
52:21

**attorneys**
4:5

**August** 53:20

**aware** 56:2

**axial** 34:6
39:11

———————
**B**
———————

**B-A-R** 53:23

**back** 6:4
10:5 19:15
23:23
24:9,11
29:21
30:1,10,
13,15,25
31:2,13,20
33:8 34:6
37:7 41:20
43:17,18
48:5,23
52:17 56:3

**backpack**
53:18

**ball** 17:18

**Baptist**
9:12,14,15
51:10

**Bar-eli**
11:21
53:13,23

**based** 10:1,
15 15:18
26:10
36:17
38:19
40:24 51:5

**basic** 34:2

**basically**
7:15 13:4
17:11
18:23
22:2,8
23:10,22
25:6
29:12,14
31:16

**basis** 41:10

**Bate's** 13:22
26:25
34:14,16
35:13

**Bates** 23:16

**bathroom**
52:7

**bear** 37:3

**bearing**
37:21 45:1

**bed** 12:17

**beginning**
5:3

**behalf** 5:12,
13 51:12,
13 52:21

**belongs**
29:22

**bends** 17:3,
8,12 24:19

**benefit** 6:3

**bicondylar**
28:3

**big** 36:25

**bill** 51:8

**billed** 51:12

**billing**
51:11

**bills** 51:14,
17

**bit** 15:9
21:5,20,21
22:18
27:14
29:11
33:25
38:23

**blocking**
15:13

**board** 6:23,
24 7:1,3,
19

**boards** 7:7,
9,11

**body** 12:11
18:3 29:6
30:11
32:20
34:8,11

47:5

**bone** 9:8
13:4,7
16:25
17:1,8,20
23:25 24:2
29:13,23,
25 30:3,5,
21 33:16,
25 34:1,5,
9,12 36:8,
11,15

**bones** 17:2
30:17 36:6

**bony** 29:6

**boot** 36:21,
25 37:4,14
38:18

**bottom** 15:25
24:18
30:22
36:10

**break** 52:8

**bring** 6:5
29:20 30:1
31:2

**broke** 18:7

**brought** 7:14
31:20 33:8
43:17,18

**bump** 36:13

**bundles** 13:9

**buttress**
30:20

32:18

**buttressing**
32:22

---

**C**

---

**calcium** 30:7
34:3,10

**call** 7:15
11:12,15
13:8 17:5,
13,16
23:21,24
26:3 29:17
30:6,22
36:12,15
39:11,18
45:1

**called** 5:17
6:12 25:11
28:3 30:16
34:3

**CAM** 36:21
37:4,14
38:18

**care** 11:16
13:17
18:17
38:17 40:8
41:4,8
44:1 45:13
47:23
50:18,25
51:3,8

**career** 8:18

**Carnival**
5:5,14
52:21

**cartilage**
39:8,14,15

**cartilaginous**
39:8

**case** 15:2
18:10 23:4

**cases** 7:13,
16

**cells** 39:14

**cement** 30:6
33:13,19
34:1,2

**center** 40:1,
3 41:3
44:8

**certification**
7:2,3,19

**certifications**
6:7,23

**certified**
6:24

**charge** 41:4

**Charles** 5:4,
16,23
11:21 14:4

**chondroitin**
50:13

**cite** 41:23

**City** 6:15
8:11

**Classically**
26:8

**clinic** 42:8
53:15

**clinical**
16:10

**close** 30:14

**closer** 18:3

**colleague**
11:3

**collect** 7:12

**comfort**
18:21

**comfortable**
47:24

**comminuted**
17:10
20:16
21:7,23,25
22:5 27:13

**comminution**
22:4

**common** 39:17

**commonly**
17:1,16
49:16

**community**
51:15

**compact** 34:5

**compacted**
30:3

**compared**

21:5 28:1 39:1

complaining
  48:25
  54:8,12,14

complains
  19:22

complaints
  46:8 49:7

complete
  51:22

completely
  45:23
  48:20

completion
  28:14

complex   9:5

complicate
  37:17

complication
  47:14

complications
  9:6 12:14

component
  29:12

compress
  31:3

concluded
  56:24

concludes
  56:23

condition
  9:23 11:13

12:23 48:5 51:5,20

conditions
  9:3

confirm   4:13

Confirmed
  4:16

congruence
  29:18

congruent
  24:23
  29:18

consent   4:9

conservative
  55:7

considered
  14:20

consistent
  20:2 25:17
  35:20 38:8
  46:12

consult   11:8

consults
  43:9

continue
  12:25 41:3
  55:15,20

continues
  54:15,21

continuing
  7:23

controlled
  49:4

Cooper   4:17
  5:13 52:20

Coral   9:13

Corporation
  5:5,14
  52:22

correct
  28:14 29:8
  31:24 32:1
  33:24 42:2
  43:24
  45:22
  46:14 53:9

correctly
  32:3

correlate
  20:22,25

corroborates
  21:9

counsel   4:9,
  12,14 5:8

count   32:3

counting
  31:25

couple   45:17

court   4:3
  5:9 56:16

create
  17:15,16
  39:14

created
  50:24

CROSS-
EXAMINATION
  52:18

cursor
  24:14,24
  25:1,6,14
  33:22

customary
  51:15

CV   7:25
  10:19

cycle   7:22

_____

D

daily   38:5

damage   12:25

Dance   8:10

darker
  33:16,25

data   50:12

date   5:5
  15:16 16:1
  42:11,13
  55:3

dated   20:10
  26:24

dates   16:2
  43:16,20

day   14:13
  20:11

days   11:15
  53:19

deal 46:18

dealing 29:7

Deborah 5:11

Debra 4:16

December 5:6
42:6,11,
20,25
43:2,3,21

decision
7:18 56:15

decrease
12:12,14
18:22
49:22,25
50:1

Defendant
5:14

defending
7:15

deficits
44:6

deformity
30:16

degeneration
39:19
50:4,9

degree 6:10
26:15
38:15
39:22
51:25

Dentistry
6:12

dependent
49:6

depending
12:11
41:17

depends 40:5
41:19

deposition
5:3 12:1
13:24
14:21 19:4
27:2,8
34:24 39:6
56:23,24

depressed
17:10,18
19:23,25
29:15
30:25
33:15

depression
17:15,16
25:3,11
27:13
29:14

describe
22:1,4,23
25:25
32:17,24
46:5

describes
16:18

describing
20:5 26:5
31:11,15

39:5

description
27:15,23

descriptive
27:15 28:7

design 32:5

designed
32:19

details
16:10

determine
46:10
48:17

determined
13:17
36:18
48:20

develop
39:17

developed
48:8

developing
38:25
48:17

diagnosis
20:24
36:17

diagnostic
19:8

differ 20:19

difference
21:12

differences
21:13

difficult
44:24

difficulty
44:12 45:5

DIRECT 5:19

directly
24:16 40:4
46:25

discharge
42:4 44:10

discharged
39:24,25
41:22
42:7,24
43:2 44:7
45:11
47:23

discuss
14:19

discussed
15:2 18:10
43:20
47:10 55:7

disease
50:15

Diseases
6:15

displaced
27:12

displacement
12:22

distal 36:16
  44:17
  45:21

divided
  17:25

divot 17:18
  25:2 31:1

doctor 5:10,
  21 6:1
  10:25
  18:12
  19:15
  22:21
  23:19 41:3
  52:6 53:21
  56:9

doctors
  13:14
  18:16
  39:25

Doctors'
  9:13 11:8
  44:8

documentation
  54:3

documented
  55:13,19

dominant
  53:14

drink 14:10
  18:19

Duke 6:4,9

DULY 5:17

Dural 9:14,
  15

---
**E**
---

E-L-I 53:23

earlier 20:6
  25:2,7
  29:11 33:1
  36:22

easier 15:9

Eastern 5:7

eat 14:10
  18:19

education
  6:3 7:23

effusion
  19:24

employee
  51:10

encompasses
  9:1 34:16

end 24:3

ended 11:14

ensure 56:14

entire 15:10
  21:17

envelope
  12:24 13:3

essentially
  20:21
  21:4,8
  23:23 26:6

27:24
31:1,19
34:10 36:4
39:19
43:19

established
  54:10

estimate
  8:17

evaluation
  53:15

evening
  52:6,20

examination
  5:19 7:14

examinations
  7:7

EXAMINED
  5:18

examples
  49:17

excessive
  12:15

excuse 19:10
  55:22

Exhibit
  10:19,21
  12:1,2
  13:23,25
  19:3,5
  20:8,9,12,
  20 22:12,
  13,19
  23:17

27:1,5,8
31:6,7
34:15,16,
18,23,25
35:12

exhibits
  27:4

experience
  54:15,21

explain 7:1
  8:24 15:5
  16:20 29:9
  39:4 53:2

explained
  11:19

extended
  45:15

extends 25:5

extremity
  12:8

---
**F**
---

facilitate
  14:21

facilitated
  47:16

facility
  40:11
  41:5,7,8,
  12,14,17,
  21,24
  42:2,21,24
  43:3,10,14
  51:13

fact  37:14
  44:23,25

factor  38:1

factors  40:6
  41:18

failed  51:19

fair  22:9,
  10

fall  34:6
  45:7

falling
  30:10,25

fascia  13:6

fast  14:4

February
  43:6

feel  14:19
  36:13

fell  19:21
  53:18

Fellowship
  6:16 7:10
  8:22

fellowships
  6:6

female  27:12
  53:15 54:9

femur  16:24
  17:7,11,14
  18:6 24:2

fibula  21:16
  36:4,8,11,

14,16
  44:17
  45:22

fibular
  20:15

file  9:17
  13:20 42:8
  43:10,11

films  13:13,
  16

final  6:6

find  8:1
  42:16

fine  52:10

five-minute
  52:7

fix  31:1

fixation
  27:19

flares  17:6

flat  24:23

floor  53:18

Florida
  6:17,21
  8:14

focus  9:5

focused
  21:19

focusing
  45:25

follow  41:9,
  12 49:2

55:17

follow-up
  41:20
  52:8,22

Fongue  11:4,
  7,11,19

form  25:20
  38:11 46:3
  50:5

forms  17:6

forward  6:5
  25:19
  51:21
  53:18 55:4

Fox  4:2

fracture
  10:12 11:9
  12:20,22
  14:22,24
  16:19
  17:9,10,23
  18:8
  19:21,23
  20:1,17,18
  21:7 22:1,
  2,4,24
  25:4,9,10,
  12,17
  27:14,20
  28:4 29:12
  30:16,17
  36:4,5,15,
  18 44:17
  45:21,22
  48:19

53:4,5,11
  54:23
  55:12,14

fractured
  27:25
  29:13

fractures
  9:5 28:2
  31:24

fragments
  22:3

frankly
  41:18

free  14:19

front  16:5,
  16 23:23
  26:18,24

frontal
  23:24

future  38:25
  47:15
  48:12
  51:21
  55:24

---

G

Gables  9:13
  39:25
  41:2,15
  42:5,7,14
  43:23

Gander  4:16
  5:11,20
  10:19,23

11:25 12:4 14:2 19:7, 12,14 20:14 22:15 25:21 27:3,7 31:9 34:13,20 35:2,12,14 38:12 46:4 50:6 52:2 56:9,19

**Gander's** 52:23

**general** 6:18 39:10 41:11 46:23 47:12 49:21

**generally** 12:9 14:12 25:16,22 28:11 30:7 32:17 46:5,24 47:2,12 48:19 49:13 50:7

**generate** 46:14

**give** 5:21 6:3 10:24 19:12 41:13

**glucosamine** 50:13

**goal** 49:16, 21

**goals** 29:16

**golf** 17:18, 19

**Good** 4:2 52:6,20

**graft** 30:5

**grass** 17:19

**gray** 36:25

**great** 52:12

**ground** 38:10

**group** 45:15

**guys** 24:5

---
**H**
---

**half** 28:23 47:20

**hands** 26:4

**happen** 17:11 25:11 26:7 28:2 50:10

**happened** 15:1 42:18

**hard** 26:3

**hardware** 32:16 47:4,8,13

**head** 9:24

**heads** 24:4

**heal** 9:8,9

**healed** 48:20

**healing** 34:7

**health** 38:4 39:15 51:10,12

**helps** 22:22

**higher** 21:20 32:4

**highest** 7:5

**highlighted** 14:18,20

**hinge** 16:24 17:3

**hip** 54:12, 13,25 55:18

**hit** 17:14 18:6 25:18,24 26:8,9 38:9

**hits** 17:18

**Hockey** 8:14

**hold** 6:23 11:2 16:3 23:1 29:22,23 30:20 31:4,12 33:12

**holding** 31:23 32:22,25

**home** 38:4 40:4,8,11

**hospital** 6:15,18,19 9:12,13,14 11:8 39:25 43:18,22 44:8

**hospitals** 9:10

**hour** 28:23

**hours** 28:23

**Howard** 53:13,24

**humerus** 53:4,5,11

**hyphen** 53:23

---
**I**
---

**ice** 12:17 18:21

**idea** 15:11

**identification** 10:22 12:3 14:1 19:6 20:13 22:14 27:6 31:8 34:19 35:1

**image** 23:20

imagine
  17:24
  29:24 45:4
  51:11,16

imaging
  20:23

impact   30:3
  37:4 38:24

impacted
  19:23,25
  37:14

imparts   39:8

implant   29:5

implants
  47:16

implemented
  12:21

importance
  12:18

important
  40:12,16
  51:20

Impression
  19:25
  20:18

improvement
  47:18 48:1

inability
  37:3 44:14

incision
  35:9

includes
  13:1,8

including
  8:21 9:6
  28:19
  38:18

independent
  9:20

independently
  13:13

indication
  27:9,11

indirectly
  46:25

infections
  9:7

inferiorly
  25:5

inflammation
  49:22,25

information
  7:25 20:19
  28:7

initially
  53:12

injuries   8:2
  38:6,20
  39:10,11,
  12 40:9
  44:11
  46:1,2,6
  47:24 54:1
  55:24

injury   25:23
  26:11
  27:16 30:4

33:21
37:15,18
38:8 39:1,
5,8,13,20
40:6,17,24
44:3,23
45:13,24
46:13
47:20
48:1,4,6,9
53:1,2,7,
12,16
54:18

insert   33:19

inside   18:2,
  6

Institute
  6:17

intent   47:7

intermittent
  54:16

internal
  18:12,16
  27:19

internationall
y   8:2

interoperative
  34:14

interruption
  19:13

interval
  48:24

intervals
  48:16

49:3,8

intervention
  14:24
  16:20

intraoperative
  33:3

introduce
  5:8

introduced
  27:22

involve   36:7

involved
  11:14 36:7
  39:20 40:7

involves
  39:6

involving
  20:17 21:7

inwardly
  17:13

irritation
  49:23

issue   35:23
  47:14

─────────────

J

─────────────

Jarnigan
  4:17 5:13
  25:20
  38:11 46:3
  50:5 52:4,
  6,12,19,21
  56:6

Jersey  6:13

job  32:21

joint  6:15
  17:3,15,17
  18:7 21:20
  24:1,16
  25:3
  29:14,17,
  19,21,25
  30:1,9,13,
  22,23,24
  31:2,19
  33:7,8,12,
  14 34:6
  36:7,10
  38:24
  39:7,9,10,
  12,13,16,
  19,20
  49:24 53:6

Jordan  5:4,
  16,23
  11:21 14:4
  15:4 18:20
  52:20 56:7

Joseph's
  6:18

journals  8:5

July  54:5

K

keeping  7:22

Kendall  9:14

kind  15:9

17:6 24:3
26:2,4
27:21
32:21
33:10,16,
24 49:8

knee  16:23
  17:3,8,12,
  24 18:7
  19:19,22
  21:18,20
  23:3,5,7,
  9,10,15,
  23,24
  24:1,16,
  18,19
  25:24
  26:2,6
  37:4,13
  38:25
  48:11,17,
  18 54:14,
  17

knock-kneed
  25:25

knowing  32:5

L

lands  17:19

larger  28:9

lateral
  14:23
  17:23,24,
  25 18:1,3,
  7 19:24

20:1,17,18
21:7 23:7
24:15
25:11
27:13 28:4
31:3 32:22
36:12
54:16

layers  13:7

layman's
  15:5 16:21

lays  34:12

lead  12:23
  56:1

leading  8:5

League  8:11

leave  41:25

lecture  8:1

led  46:9

left  23:3,6
  33:21
  35:23
  37:21
  44:16
  45:4,21
  54:4,12,
  13,20,22,
  24 55:1,5,
  18

leg  22:7,9
  35:4,24
  36:12
  37:15 38:6
  44:16 45:4

48:2 54:1
55:24

legs  40:9
  44:12

level  7:5
  47:18,25

levels  7:23
  24:25
  37:24

licensed
  6:20

listed  28:12

living  38:5

loading
  39:11

long  18:23
  28:16
  46:21

longer  44:4

looked  20:20
  22:6 47:4

loss  55:8

lost  31:12

lot  11:16
  32:4 56:12

M

made  7:19
  16:24 30:7
  34:3 38:3
  56:2

main  36:6

mainstay
  49:14

maintain
  39:15

make  22:22
  35:9 37:9
  41:10
  50:18,21

making  46:8

malunions
  9:8

management
  55:7

manner  4:10

Maria  5:4,12
  9:18 50:19

mark  11:25
  19:3 20:8,
  9 27:1
  31:6 34:13

marked
  10:19,21
  12:2 13:25
  19:5 20:12
  22:13,20
  27:5 31:7
  34:18,25

matter  5:4

maximum
  47:17,25

MD  5:16
  6:10 14:4

Meaning  48:4

means  7:2
  14:10 15:6
  16:21
  17:24
  18:19
  21:16
  27:24
  29:13 45:1
  53:4

meant  34:4

mechanism
  25:23

media  5:3

medial  18:1,
  2 28:5
  54:21

medical  6:10
  7:23 8:5
  15:3,6
  16:17,20
  18:11,13,
  15 26:15
  38:15
  39:22
  51:25 55:3

medically
  28:13
  38:19
  40:23 45:3

medication
  46:18,22,
  24 47:1
  55:11

medications
  47:2

49:10,13,
  15,16,18,
  20,21
  50:2,8,14
  55:9

medicine
  6:12,20
  18:12,16

meet  17:2

members
  45:14

memory  9:17,
  20 10:1
  35:20

mentioned
  6:8 33:13
  42:12
  53:22

Miami  5:24
  9:12,13

middle  17:2

midline
  18:2,3

midnight
  14:5,9,10,
  15,16 15:3
  18:18,19

mind  15:7,
  15 23:2,19
  37:7,12
  52:7,11

minimal
  55:14

missed  50:20

mobile  37:6

mobilization
  44:12

mobilize
  37:23

Moderate
  19:24

modification
  55:8

moment  32:15

monitor  5:6
  52:13,16
  56:22

months  7:12
  44:1 49:5
  54:10

morning
  14:16

motorized
  25:18 38:9

Motrin  49:17

mouse  24:5,8

move  24:7,
  10 37:24

moved  25:15

movement
  49:24

moves  26:2

moving  18:9
  24:6 33:22
  55:3

multiple
  22:2,3
  24:25

muscles   13:6

musculoskeleta
l   9:3

**N**

named   9:18
  11:3

narrow   23:17

nationally
  8:2

nature   11:9

necessitate
  48:11

needed   18:21
  48:4,23
  55:17

neighborhood
  8:20 28:22

nerves   13:10

neurovascular
  13:9

Newark   6:11

night   14:15

nonsteroidal
  55:9,20

nonunions
  9:7

nonweight-
bearing

12:17,19,
  21 37:20
  44:18

normal   43:25
  50:25

note   10:11
  15:10,16,
  22 16:5,9,
  15 17:22
  18:9 53:13
  54:6 55:25

noted   19:25

notes   21:2
  37:8 42:3,
  8 43:14
  47:9,21
  50:23
  53:10

notice   27:21

noticed   21:3
  28:12

November
  14:8

NPO   14:5,9
  15:3 18:18

number   5:3
  8:17 23:16

numbered
  13:22
  26:25
  34:14

numbers
  34:16
  35:13

nurse   16:8

nurses   38:4

nursing
  28:20

NYU   6:15

**O**

oath   4:8

Object   38:11

Objection
  25:20 46:3
  50:5

objections
  4:10

occurred
  46:2

October
  42:6,11
  43:21

offer   49:9

office   5:24
  13:22
  22:21 27:1
  41:15,16
  42:4 43:5,
  11,15,22
  45:19

oftentimes
  12:8 29:24

open   27:18

operate
  54:23

operated
  10:14
  54:19

operative
  26:18,23

opinion
  26:14
  38:14
  39:21

opinions
  51:24

opposed
  18:15
  21:17 37:6
  40:3

opposite
  24:22
  37:15,18

optimization
  15:3 18:11

optimizing
  18:13

oral   7:14

order   12:13,
  22 14:9
  18:22
  20:22,25
  27:4 30:8,
  20,23
  32:20 34:5

ordered   11:8
  40:20

originally
  11:7 33:15

MARIA PEREZ-SERA vs CARNIVAL CORPORATION
Charles Jordan, MD on 12/21/2021·Index: Orthopaedic..photograph

Orthopaedic
 6:17

orthopedic
 6:2,14,16,
 24 7:4
 8:2,6,24,
 25 9:2,4
 41:3,4
 44:1 45:14

osteoarthritis
 54:25

outer  18:5,6

outlining
 25:2

outpatient
 41:10,20

outstretched
 53:19

outwardly
 17:13

over-the-
counter
 49:19

overlap  32:5

————————
        P
————————

pain  18:22
 19:22
 37:24
 46:6,8,10,
 13,18,19,
 21,25
 49:11 50:1
 54:12,16,

21 55:14

painful  46:2

Panthers
 8:14

paragraph
 18:24

part  7:7,9,
 11 12:11
 13:11
 18:4,5,6
 24:17,18
 32:20
 36:23
 40:13,16
 53:5

participate
 37:25

participated
 8:23

participating
 4:5

parties  4:9

partner
 53:13

partners
 11:20
 45:15

parts  14:20
 17:25

PAS  45:16

patient
 9:16,18
 10:3,13

11:12,20
 14:23
 18:12,13,
 18 19:21
 27:12
 38:21
 40:1,5
 42:5 47:10
 48:23
 53:17
 54:10,15,
 20 55:13

patient's
 27:16
 30:11

patients
 11:16
 25:11
 35:17
 41:14,19
 42:1 43:17
 44:4 45:10
 46:5,23

pattern
 25:10

peer-reviewed
 7:4

people  15:13
 17:1 38:5
 56:12

Perez-sera
 5:5,12
 9:18,21
 10:2 11:8
 13:17
 27:10

38:18
 39:24 44:7
 45:10 46:8
 50:19,22
 51:4,19
 53:1,10
 54:7 55:22

Perez-sera's
 29:6 35:4
 53:25 55:2

perform
 12:7,13
 32:20

performed
 8:18 11:20
 27:17
 35:5,24
 40:14,18
 46:16

period  12:9,
 12 37:19

person  12:18
 26:4 35:15
 41:16
 43:12,22

perspective
 18:14,17

pertinent
 14:20

phosphate
 30:7 34:3,
 11

photograph
 34:22 37:1

photographs
  22:16

physical
  40:12,16
  55:8,11

physically
  4:6

physician
  8:10,14
  15:2 18:10
  45:18

physicians
  41:7,11

pick   53:17

picture   9:24
  36:22

pieces   22:3

place   30:21
  33:12

Plaintiff
  4:14 5:12

plaintiff's
  10:21 12:2
  13:25 19:5
  20:12
  22:13 27:5
  31:7
  34:18,25

plan   13:17
  14:5 15:3
  16:17
  18:20
  47:7,12
  55:3

plate   29:5
  30:19
  31:4,23
  32:2,7,19,
  25

plateau
  10:12
  14:22,23
  16:19,22
  17:5,6,9,
  17,23 18:8
  19:21,24
  20:1,17,18
  21:8
  24:15,18
  25:12,13
  27:14,19
  28:2,4
  38:24
  45:21

plates
  32:17,18

platform
  17:7

pleasure
  56:8

PM   5:7
  52:14,17
  56:23,24

point   24:24
  27:3 31:18
  45:6
  47:19,23

pointed
  27:25
  33:15

pointing
  24:16 25:6

portion   17:5
  24:16
  28:18
  30:20 33:7
  36:15

position   9:9
  26:1 29:23
  31:24

positioning
  28:20
  31:21,22

possession
  54:7

possibility
  50:4

post   44:2
  47:20 48:9
  54:10

post-operative
  31:17,18

posterior
  23:21

postoperative
  34:15

posttraumatic
  9:7 39:18
  48:8 49:1,
  12,14
  54:25 55:1

practice
  6:20 7:12
  8:21 51:1

practitioner
  16:8

precautions
  12:21

preparation
  28:21

prescribed
  46:18
  49:19
  55:10

prescription
  49:20

present   4:6
  11:10

presented
  38:20

presents
  53:15

presumes
  14:12

pretty   51:22

prevent
  12:22 30:9

primarily
  16:24
  18:23

primary
  18:11,17
  25:23

printed   16:2

prior   16:13

privileges
  9:10,12

41:6

**probability**
26:15
38:15
39:22
51:25

**problem**   43:9

**procedure**
27:17
35:10

**proceeding**
4:5

**process**   7:3,
6,20

**professional**
5:22

**professionals**
56:13

**progression**
50:3,8,14

**projections**
23:8

**proper**   9:9

**proven**   50:8,
17

**provide**   34:6

**provided**
36:24
38:17
48:21

**provisionally**
29:22
33:12

**proximal**
32:18
53:4,11

**Public**   8:11

**published**
8:4

**punched**
39:12

**pushed**   26:7
29:15
39:13

**put**   13:19
24:9 30:8
32:25
44:15 48:5

**putting**
44:19

—————————

**Q**

—————————

**question**
26:13
37:9,12
44:21
54:18

**questioning**
52:23

**questions**
16:16
26:20
52:3,9,22

**quickly**
15:10
42:16
44:22

—————————

**R**

—————————

**radiologist**
21:1,2

**radiology**
13:13 19:8
20:3,20,21
21:8,14

**raft**   30:23

**re-ask**   37:10

**reabsorbed**
34:11

**reach**   47:18

**reached**
47:17,25

**read**   4:4
5:9 19:19
27:18
56:9,13,17

**reading**
27:11 29:4
56:10,12,
25

**reason**
26:10,13
30:12
47:11

**reasonable**
26:14
38:7,14
39:22
48:22
51:4,25

**reasons**
41:23

**recall**   9:16
10:2 11:6
35:23

**receive**   7:4,
19

**received**
6:10

**recertify**
7:20

**Recess**   52:15

**recognize**
35:16
47:22

**recognized**
9:22,23

**recollection**
9:24 47:6
48:7

**recommend**
49:11 50:3

**recommendation
s**   41:10

**recommended**
55:15

**record**   4:4,
13 10:7,20
11:18
12:16
19:15
52:14,17

**records**

9:22,25
10:2,5,10
11:7 15:8,
21 16:13
35:20 36:2
42:16 46:7
50:18,21

**recovery**
37:4,13,17
38:2
40:13,17
46:17
47:19

**reduce**  30:16
31:3 50:14

**reduced**  33:8

**reducing**
30:16

**reduction**
27:18

**refer**  10:4
17:1

**referred**
28:24 51:5

**referring**
10:7
17:21,22

**reflect**  36:2
53:10

**refreshed**
9:17

**region**
33:17,20
54:17,18

**regularly**
11:16

**rehab**  40:10
42:5

**rehabilitation**
40:1,3
41:2 44:8

**related**  9:2

**relates**
12:19

**relation**
13:16

**relationship**
12:6

**relay**  28:7

**relevance**
12:5 16:17

**relevant**
23:12

**relieve**
18:22

**rely**  13:14

**remain**  12:17

**remember**
10:12 36:2

**remodels**
34:12

**remotely**  4:8

**remove**  47:7,
13

**removing**
47:16

**rendered**
51:4,24

**repeat**  40:15
50:20

**repeating**
37:12

**replace**
30:14 34:1

**replacement**
48:12,18

**replaces**
34:8

**report**  19:8
20:9,20
21:8,14,15
26:18,23,
24 29:4

**reporter**  4:3
5:9 56:16

**reporting**
4:7,11

**reports**
13:14
20:21,25
22:6

**represents**
7:2

**require**
11:14
47:15

**required**
14:24,25
37:5

**requires**
16:19
47:14

**research**  8:4

**residency**
6:14 7:8
8:23

**responding**
55:21

**response**
55:2

**responsibility**
41:8

**rest**  17:7
33:25

**restore**
29:16

**restricted**
44:19

**restrictions**
55:16

**result**  35:4
39:20
49:22,23

**results**
49:25

**return**  30:17

**review**  10:1,
15 13:13,
16 20:23
46:7

**reviewed**
7:13 9:17,

22 16:9,12

**reviewers**
7:13

**reviewing**
7:25

**right-hand**
53:14

**risk** 12:14
38:25 45:7

**Rutgers** 6:11

---

**S**

---

**safe** 40:7

**safely** 12:13

**scar** 35:3,
4,6

**school** 6:10
8:11

**scooter**
25:18 38:9

**screen** 10:16
11:19
13:21
18:25
22:11
31:5,12
33:3

**screw** 31:23

**screws** 29:5
30:19,21
31:4 32:2,
4,5,9,12

**scroll** 15:10
32:9

**scrolling**
14:4 23:2

**sense** 22:2
37:9,17

**separate**
45:24

**September**
10:14
14:6,11
15:17,19
16:6,11
19:19
42:5,9
43:21

**sequela** 48:9

**series** 7:6,
18

**served** 8:10

**services**
51:14

**set** 48:24

**setting**
48:18

**share** 10:16
13:21
18:25
22:11 31:5

**sharp** 54:21

**shin** 17:1
24:4

**shooting**

23:22

**short** 18:23
37:19

**shoulder**
53:6,7,16

**show** 34:21

**showed** 21:14
36:22

**showing** 16:1
19:16
21:22
23:9,14
24:24
31:19
33:2,6
35:7

**shows** 32:14

**side** 17:25
18:1 24:22
25:13,14
26:9 27:25
28:1,5,8
33:11
36:12
37:18,20,
21,22
44:20 48:2

**sides** 28:3,
10 44:11

**signature**
16:12

**signed** 15:17
16:1,10
19:10

**Signing**
56:25

**similarly**
55:19

**simple** 16:21
22:1

**sir** 39:4
52:2,24

**site** 12:20

**sites** 22:24

**six-week**
49:3

**skin** 13:5,7
28:25

**slow** 50:3,
8,9,14

**smaller**
22:22
36:11

**smooth** 24:22
25:14

**soft** 12:24
13:1,2
29:25

**somebody's**
16:23

**sort** 16:23
25:2,24
26:4 36:24
46:24
50:13

**sorts** 15:22
47:2 49:18

sound   42:18

South   9:13

Southwest
  5:24

space   17:3
  24:1,3
  30:9

speak   31:2

speaking
  28:11  46:5
  50:7

special
  29:22

specialty
  9:1,2

specific
  21:5  27:15
  32:16
  47:24

specifically
  8:25  9:4,6
  13:12

spell   53:21

split   17:16,
  20  25:8,11
  27:13
  29:12
  30:14,15
  31:3

spongy   29:25

spread   49:4

St   6:18

stability
  34:6

stabilize
  29:6

Standard   5:7

start   37:21

starting
  4:13  14:11

starts   7:21

state   4:12
  6:21

statement
  38:7

states   53:17
  54:15

stating
  16:12

status   54:10

stay   18:18

stipulation
  4:1  5:10

stop   24:8

Street   5:24

strength
  49:20

stress   26:3

strong   34:4

struck   25:23

structure
  23:25

structures

13:9  29:6

subcondylar
  30:23

subcutaneous
  13:6

subspecialty
  9:4

substance
  34:3

suggest
  50:12

suppose   21:5

supposed
  30:2,14,
  15,18
  31:20,22
  33:9

surface
  17:17
  24:22,23
  29:19,21,
  25  30:1,
  22,23,24
  31:19
  39:2,7,9,
  10,13,19

surgeon   6:2
  13:12

surgeon's
  12:6

surgeons   7:4

surgeries
  8:17

surgery   6:25
  8:25  9:2
  11:14,20
  12:7,9,13
  14:13,16
  15:4
  18:13,20
  27:9,11
  28:9,14,
  17,19
  29:16,20
  33:4,7
  35:5,8,24
  36:20
  37:4,13,22
  38:19
  40:2,13,17
  44:2,20
  46:16
  47:3,18,20
  48:4,5
  54:11

surgical
  6:14  8:6
  14:24
  16:19
  18:15
  46:19

sustained
  14:23
  53:11

swear   5:10

swelling
  11:22
  12:6,12,
  15,18,19
  13:1  18:22

SWORN   5:17

symptoms
  49:1,4,7

System
  51:10,12

**T**

takes   34:1,9

taking   7:23

talked   38:23
  55:6

talking   33:1
  36:9

talks   20:16

Tampa   6:17,
  18,19

team   8:13,
  14  53:9

techniques
  8:6

telling
  15:15

ten   7:21
  54:10

term   21:25
  44:14

terminology
  15:6  16:21
  21:23
  56:14

terms   15:5
  28:7

test   7:7,23

testified
  5:18  52:25

testing   7:18

textbooks
  8:5

Theater   8:10

therapists
  41:12

therapy
  37:25
  40:12,16
  55:9,11,21

thigh   16:25

thing   21:4

things   13:10
  15:23
  16:1,2

thinking
  21:10  35:6

thousand
  8:21

three-month
  49:2,3

thrown   25:19
  38:10

tibia   16:25
  17:4,6,15
  18:6,7
  21:15,17
  24:3,17
  25:5  28:5
  29:14

32:18,23
  36:8  54:4
  55:1,12

tibial   10:12
  14:22,23
  16:19,22
  17:5,9,23
  18:8
  19:20,24
  20:1,15,
  17,18  21:8
  24:15,17
  25:12,13
  27:14,19
  28:2  45:21

time   5:6,7
  6:11  10:13
  11:12
  12:10,12
  16:4,13
  21:10
  30:10
  34:7,8,11
  43:14
  44:25  46:1
  48:22
  50:25
  52:2,13,16
  54:1,3,8
  56:1,7,20,
  22

times   30:5
  41:21

timing   11:13

tissue   12:24
  13:2,7

tissues
  12:24
  13:1,6

today   4:3
  51:24  56:7

Today's   5:5

told   44:22

tolerated
  45:1  55:16

tomorrow
  15:4  18:20

top   17:4
  32:4

totally
  52:10

trained
  13:13

training
  6:4,6  7:8
  13:11

transcript
  56:10,11

transfix
  30:21

transported
  41:15,20,
  25

trauma   6:16
  8:25  9:4
  13:12
  17:11
  19:21
  45:15

48:10

treat  46:25

treated  35:21 36:21 46:1 51:13 53:12 54:1

treating  40:25 45:12 52:25 53:3,7 54:13,24

treatment  9:3 36:20, 24 44:23 47:15 48:21 49:8,14 50:12,19, 21,25 51:9 55:3

treatments  8:6 55:6

turn  25:24

type  6:1 32:19 34:2 35:9,10 36:18 40:2 46:13 47:13

typical  40:1 41:14

---

**U**

Uh-huh  19:2 32:6 33:18 42:10

unable  44:9, 21,22

uncommon  40:10 44:4

undergrad  6:5

undergraduate  6:9

underlying  46:10

understand  6:4 8:1 13:20 51:20

understanding  29:4 46:13

unicondylar  27:13,19, 22 28:6

University  6:5,9,11, 12

unreasonable  42:19

unrelated  45:20

unusual  42:1

upper  53:5

---

usual  51:15

---

**V**

valgus  17:14 26:3

validation  7:4

variable  41:17 46:23

varus  17:14

verify  42:16

view  23:21, 24 32:14, 24

viewed  20:3

views  19:20 20:16 22:8 23:8

visit  13:20 43:5 54:24 55:2,23

visits  42:17 45:18

Vivien  11:4

void  30:2,8 33:21

---

**W**

---

wait  12:9, 12

waive  4:10

---

56:10,12, 17

Waived  56:25

waiving  56:18

walk  44:9, 14,15,21, 22,24

walker  36:21 38:18

walking  44:13 45:5

wall  29:13 32:22

watched  48:16

week  19:21

weeks  47:2

weight  30:11 37:3,21 44:15,19 45:1 55:8

well-described  25:10

well-known  25:9

West  9:14 39:25 41:2,15 42:5,7,14 43:23

whatnot  45:16

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
Charles Jordan, MD on 12/21/2021          Index: wheelchair..zoom

wheelchair
  35:15,20
  37:5

wires  29:23
  32:25
  33:10,11

word  27:22
  43:4

work  6:9
  7:5 43:19

worked  6:18

worsen  12:25

worsening
  12:23,24

worth  7:12

written  7:7
  15:22
  16:14
  18:24

wrong  17:12
  23:5 32:1

wrote  16:8

___

**X**
___

x-ray  19:20
  20:9,16
  21:16,18,
  19,21 22:6
  23:7,22
  31:16,17
  33:3 34:14

x-rays  22:20
  33:4 34:15

46:9 47:4

___

**Y**
___

year  34:9
  49:5 54:5,
  10

years  7:21
  47:20

York  6:15
  8:9,11

___

**Z**
___

zoom  22:17