**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
30(b)(6)   **Suzanne B. Vazquez on 02/22/2022**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:  1:20-cv-23463-XXXX
MAGISTRATE JUDGE:  Jonathan Goodman

MARIA PEREZ-SERA,

    Plaintiff,

vs.

CARNIVAL CORPORATION,
a Panamanian Corporation,
the owner and operator of
the Trademark CARNIVAL
CRUISE LINE,

    Defendant.
                              /


VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF:  SUZANNE B. VAZQUEZ

DATE:         February 22, 2022

TIME:         10:00 a.m. - 11:35 a.m.

LOCATION:     Via Zoom

REPORTED BY:  LISA K. PENKACIK, RMR

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**

**30(b)(6)**   **Suzanne B. Vazquez on 02/22/2022**   **Pages 2..5**

**Page 2**

A P P E A R A N C E S:

DEBORAH J. GANDER, ESQUIRE
Colson Hicks Eidson, P.A.
255 Alhambra Circle, PH
Coral Gables, Florida 33134
305-746-7400
Deborah@colson.com
   On behalf of the Plaintiff.

MICHAEL J. DRAHOS, ESQUIRE
Gray Robinson, P.A.
515 N. Flagler Drive
Suite 1425
West Palm Beach, Florida  33401
561-268-5727

   On behalf of the Defendant.

**Page 3**

I N D E X

TESTIMONY OF:  SUZANNE B. VAZQUEZ

DIRECT EXAMINATION by Ms. Gander. . . . . . .    4
CROSS-EXAMINATION by Mr. Drahos . . . . . . .   69
ERRATA SHEET. . . . . . . . . . . . . . .   73
CERTIFICATE OF OATH . . . . . . . . . . . .   74
CERTIFICATE OF REPORTER . . . . . . . . . .   75


PLAINTIFF'S EXHIBITS:

1 (Notice of Taking Video Deposition) . . . .   72
2 (Photographs) . . . . . . . . . . . . . .   72
3 (March 2020 e-mail) . . . . . . . . . . .   72
4 (List of individuals responsive to area of
   inquiry number five) . . . . . . . . . .   72
5 (List of serial numbers of computers) . . .   72
6 (2/22/22 e-mail from Datalab to Drahos) . .   72

S T I P U L A T I O N S

   It is hereby stipulated and agreed by and between counsel for the respective parties and the deponent that the reading and signing of the deposition be reserved.

**Page 4**

P R O C E E D I N G S

   THE VIDEOGRAPHER:  This is the beginning of the 30(b)(6) deposition of Carnival Corporation in the matter of Maria Perez-Sera versus Carnival Corporation, et al.  Case number 1:20-cv-23463-MGC.  Today's date is February 22nd, 2022, and the time on the monitor is 10:02 a.m.  My name is Damon Okoro, I'm the videographer.  The court reporter is Lisa Penkacik.  We are with Huseby Global Litigation.

   Counsel, please introduce yourselves after which the court reporter will swear in the witness.

   MS. GANDER:  Deborah Gander on behalf of the plaintiff, Maria Perez-Sera.

   MR. DRAHOS:  Michael Drahos on behalf of the defendant Carnival Corporation.

   SUZANNE B. VAZQUEZ,
having been first duly sworn by the reporter, thereupon, testified upon her oath as follows:

   THE WITNESS:  Yes.

   DIRECT EXAMINATION

BY MS. GANDER:

   Q.   Good morning.  Could you please give us your name.

**Page 5**

   A.   Suzanne Brown Vazquez and everyone calls me Suzie.

   Q.   Miss Vazquez, you are being produced today as Carnival's chosen designate under Federal Rule of Civil Procedure 30(b)(6) to serve as a designate to respond to the areas of inquiry on the notice of video deposition that was served, correct?

   A.   That is correct.

   Q.   And I'm marking that notice of video deposition as Exhibit 1 to this deposition.

   You understand that you are appearing today pursuant to a Court order by Magistrate Judge Goodman, correct?

   A.   I do, yes.

   Q.   And you knew that you had to prepare by reviewing all available documents, including speaking with and electronically stored information to provide full and complete answers to these areas of inquiry, right?

   A.   Yes.

   Q.   And you are the person to do that?

   A.   I can answer all the areas of inquiry, yes, I believe so.

   Q.   You are fully prepared to speak on those issues today?

**Page 6**

A.   Yes.

Q.   Was there anything else that Carnival could have done that did not do to get additional information to respond to any of the areas of inquiry?

A.   I don't think so, no.

Q.   Do you have any documents or items with you to assist you in answering your questions today?

A.   Mr. Drahos sent me the file materials electronically, so to the extent that you need to ask me anything about that, I have those, and I would be able to refer to internal e-mails back and forth trying to figure out the timeline regarding the search for this video, what's been done to try to recover and restore the hard drive itself was corrupt.

Q.   Who did you speak with in preparation for your testimony?  And by that I'm not referring to the attorneys, I'm referring to the individuals who gave you actual information.

A.   Besides my attorneys, who did most of the witness discussions with shipboard staff regarding the IT issues.  I spoke to my litigation representative, Monica Borcegue who does most of the heavy lifting in the discovery process and who is the

**Page 7**

person who pulls the documents from the various departments.

Q.   Do you know who the individual crew members and IT individuals are who were spoken to who provided the information that you're relying on today?

A.   Yes.  So the current security officers on board, I think were spoken to, or at least the ones that were on board as of December of 2021, and then we also communicated in 2020 with some folks on the issue.  And many e-mails I think going back and forth with shore side folks, because the timeline of when the hard drive became corrupt and people -- we've had three separate experts now try to restore or recover the corrupt hard drive, so I guess there's been a lot of people working on this issue.

Q.   Is it your understanding that only the hard drive that was aboard the particular vessel was corrupted as opposed to it being a network wide event?

A.   That is correct.  So it is -- the ship's store the CCTV and body cam videos on an external hard drive rather than the -- well, at least back then, back in 2019 they were stored on an external hard drive.

**Page 8**

Q.   And which vessel are we discussing?

A.   The Horizon, but most of the ships operate that way or operated that way back in 2019.

Q.   The further area of inquiry is a question regarding the SSTV video footage for the subject incident, including but not limited to the initial preservation, when it became unavailable and how it became unavailable, so please provide me with whatever information Carnival has on that.

MR. DRAHOS:  Just objecting to the form.

Go ahead, Miss Vazquez.  Thank you.

A.   So it was initially stored on the external hard drive per the shipboard procedure by Mr. Arvind Lagas who I believe you deposed in this litigation.  That contemporaneous with the accident investigation which would have been on or around August 24, 25th or 26th of 2019 while he was conducting his investigation of the incident.  And he saved it per procedure to the external hard drive and automatically sent to -- that's where they save their videos and then the la- -- next thing we know, historically, we have found an e-mail from the ship and Mr. Minok Soppa (ph), who was the assistant chief security officer on board the Horizon in March of 2020.  And he then advised the CSO on board, who I

**Page 9**

believe was Rajesh Nalawade, N-a-l-a-w-a-d-e, who was the chief security officer, that the hard drive had somehow become corrupt, it was unreadable by his computer.  He could not get it to -- he couldn't find it, so when we plug it in, it's just not readable, so he called the IT officer on board and the IT officer on board confirmed that he could not access the hard drive.

They then sent sometime thereafter, a notification to the home office that the hard drive was unreadable and corrupt, because I guess they would need a new hard drive for that.  Then the next real notification that we had in connection with this litigation was in January of 2021, when Monica sat down to respond to your discovery requests in this litigation and she reached out to the ship for a copy of the video, which is referenced in the accident report, authored by Mr. Arvind Lagas, and it's noted that he viewed and saved the CCTV footage, so she asked them for it, and they reminded her that that hard drive was corrupt and unreadable.

Q.   Okay.  Do you have a copy of the e-mail that you discussed from the ship's crew member, Minok Soppa notifying his supervisor that the hard drive was corrupt and unreadable?

MARIA PEREZ-SERA vs CARNIVAL CORPORATION
30(b)(6)     Suzanne B. Vazquez on 02/22/2022     Pages 10..13

Page 10

A.   I'm sure we have it somewhere, yes.

Q.   Do you have it with you today?

A.   I probably have it in an attachment somewhere.

MS. GANDER:  Okay.  I would like to attach that as Exhibit 2 -- actually as Exhibit 3 to this deposition.  And Exhibit 2, I'm attaching our three photographs that were provided to me by Carnival yesterday and we'll get to those later.

Q.   So Exhibit 3 will be the March 2020 e-mail that you've just testified about, fair enough?

A.   Yes.

THE WITNESS:  Mike, can you pull that up for me and get it over to Deborah, that would be easier than me?

MR. DRAHOS:  Yeah.

THE WITNESS:  Thank you.

Q.   Is it the standard procedure to save all CCTV footage to an external hard drive or only footage that shows incidents that may be the basis of litigation?

A.   That's a complicated answer the way that you phrased it, so I'll put it like this.  We have accident reporting protocols in place when we

Page 11

anticipate a claim and are triggered usually by the severity of an injury on board, and when those protocols are triggered, when it meets the accident reporting criteria, then yes, the investigating security officer, whether it's a security officer, an assistant chief security officer or the chief themself will review the incident -- footage of the incident itself and save usually a couple minutes before and a couple minutes after; they try to keep it under 500 megabytes for size, but we ask them to try to get 5 minutes before and 5 minutes after, typically speaking, and yes, they will save it to that -- they used to save it to this external hard drive and during the time period where your client sailed with us in 2019.

Q.   What is the current protocol that differs from what you're telling me is an obsolete protocol of saving it to the external hard drive?

A.   So we had another hard drive on another ship, I think that failed, so when this one failed, we recognized that we did not want to use hard drives anymore, that we needed to figure out a way to get it into a cloud based system and so we did that sometime in 2020, I believe, and now everything was uploaded into a share file and sent directly to my department.

Page 12

Q.   For this hard drive going back to 2019, what was saved on the hard drive other than the CCTV clips that memorialize the moments before and including through the moments after of an incident that was anticipated to potentially lead to litigation?

A.   The only other thing on that hard drive I'm told would be the body cam videos of the security officers that they do activate when they are investigating a criminal matter.

Q.   Would the incident -- would the paper incident report that goes with the video also be stored on that hard drive?

A.   No, so the accident reports themselves and most of the attachments are put into -- in August of 2019 on the Horizon it would have been the Sea Event database.  We used to use also another database called Info Ship that was phased out over time through all the ships in 2019; and all the attachments go there, but due to size limitations, I think it's like 20 megabytes or the attachment size is limited in that database, so that is why they can't put the videos there; that's why they have to store them separately.

Q.   And what was the basis for Mr. Soppa's

Page 13

attempt in March 2020 to access the video on this hard drive?

A.   I don't know.  It didn't seem clear, it's probably just that's either went to finish an accident report on board and couldn't access it.  It was right around the time of the pandemic.  So we shut down our operations, I think our last day was March 13th of 2020 and I believe his e-mail, when you get it was dated mid March, like March 15th, around there, so most likely he was just finished an accident report and was trying to do his job and save the video and he couldn't access the hard drive.

Q.   Was his attempt to access the hard drive in any way connected to Miss Perez-Sera's accident?

A.   No, no, I don't believe so.  It doesn't seem like, from the e-mail that I read, it just seemed like he was doing his job, realized he couldn't access it, told his boss and then his boss sent that shore side to I guess list of anyone that might be interested.

Q.   The next area of inquiry is efforts made to locate the video footage for the subject incident, including when they were first made and by whom.  So please tell me what you know about that.

A.   Well, as I've just said, we know that they

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**

30(b)(6)                    Suzanne B. Vazquez on 02/22/2022                    Pages 14..17

Page 14

were trying to access the hard drive in 2020 and it was unreadable, so they had to, I guess get a new one, I'm not sure what they used after that, we weren't in operation, so they wouldn't have been really needing to save anything on that hard drive yet.

But then the next time anyone tried to access it, was, to my knowledge, this particular video was January of 2021 when Monica was reaching out to the ship for various shipboard documents including the CCTV footage of this incident.

Q.   And at what point were the three experts brought in that you told me about a moment ago?

A.   So, I don't know if you can call the IT officer on board an expert, but that is his job.  He is the shipboard IT manager.  He tried to recover the hard drive, so to speak, and found it to be corrupt and unreadable by his computer.

So then we had, I guess Monica reached out in 2021 and at some point our lawyers picked it up, brought it back to shore side IT and our shore side IT department and manager got involved and tried to restore and recover the corrupt hard drive.  So that would have been Darryl Mosley's team.  Darryl is the director, I think of ship and destination systems.

Page 15

He oversees shipboard IT, but from the shore side perspective.  So his team then tried to recover it; when they said it was unreadable and they were having no success in trying to revive this corrupt hard drive, through counsel we reached out to a -- I think it's called Datalab Recovery, an expert in the field of recovering hard drives that are corrupt and it is currently in their possession and the last information that we got Friday and even this morning, is that they believe that possibly with the alcohol bath that they gave it in a sterile environment on Friday, coupled with some new parts that are needed to restore the connection, basically, between the hard drive itself and the computer, that they might be able to get it readable again, maybe.  But as of today, they have been unable to recover anything from it, but they are still working on it.

Q.   When did they first receive it?

A.   I want to say in mid January.

Q.   Of 2022?

A.   Yes, yes.  They've had it for a couple of weeks, I believe, but we can get you the exact date from counsel, so then you know when they --

Q.   And you said counsel picked it up from the ship and brought it to shore side IT; what counsel

Page 16

was that?

A.   I believe it was Cooper Jarnagin who works with Mr. Drahos.

Q.   Do I have it correct that Darryl Mosley was the person it was given to?

A.   It would have been someone on his team; I don't know -- I don't know who on Darryl's team tried to recover or tried to get it -- see if they could read it, but they were unable to and then we gave it to -- we, again, shipped it to counsel, Fed-Ex or DHL to then let them, I think West Palm, and then they gave it to Datalab Recoveries and they're also in Broward County, I believe.

Q.   Who is the contact at Datalab Recovery who is working on this specific project?

A.   I can't recall his name offhand.

THE WITNESS:  Mike, you want to just maybe send her that in an e-mail?

MR. DRAHOS:  Yes.

A.   I know we received a communication from a James Gordon.

MR. DRAHOS:  He's the owner of the company and our direct contact.

A.   James Gordon, G-o-r-d-o-n.

Q.   Thank you.

Page 17

Did Mr. Gordon or anyone else at Datalab Recovery give you an estimated time frame for when they believe they will be able to restore the data on the hard drive or definitively confirm that it cannot be restored?

A.   They did not tell me.  We were very hopeful that they would have had it before today.

Q.   Did you or someone on your behalf ask them for a time frame?

A.   Yes, we've been asking them daily for updates and when it's going to be done and the last thing -- the last information we had before this morning was that they were giving the parts in a sterile environment an alcohol bath and they were very technical on, you know, what -- you have to be very careful not to get any dust particle on the read/write mechanism on the hard drive and they maybe need to maybe replace the connection between where you plug in basically it's like a USB plug in, that's the connection that's not -- that's not reading, so they're just trying to fix that.  I don't have a time frame for you.  I would hope that it would be sometime this week, since they're at that stage where they have opened it up, cleaned it out.  They should know what part it is that they need to see if he can

Page 18

replace it, but I don't have a time frame for it.

Q.   I'm looking at the e-mail that Mr. Jarnagin just sent, which I've marked as Exhibit 3 to this deposition.  It reads, our Seagate backup plus portable drive to T.B. that had all the CCTV and some BWC videos from the time Horizon came, can no longer be detected when plugged in.  The IT officer also had a look and informed me that the hard drive has become unusable and data cannot be retrieved as -- as it is, cannot be detected -- detected anymore.  Thanks and kind regards, Mayank Thapa, M-a-y-a-n-k, last name T-h-a-p-a.  Is that the video that you were referencing earlier?

A.   That is -- that's the e-mail that we were referencing earlier.

Q.   Forgive me, is that the e-mail that you were referencing earlier?

A.   Yes.

Q.   What is a BWC video?

A.   Body worn camera.

Q.   And the CCTV is what we might call stationary surveillance cam- -- video from cameras that are positioned in locations on the ship?

A.   Yes.

Q.   Are those camera angles controllable

Page 19

remotely or do they have to be manually changed?

A.   Yeah, I'm not sure if they can -- definitely not remotely, meaning off the ship.  It is possible that on the Horizon, which is a newer ship, that they can change the angles from the security office, but I don't know that for sure.

Q.   What was the purpose for Carnival's policy and procedure for preserving the video evidence on the hard drive as opposed to keeping it intact with the rest of the investigative file?

A.   Again, as I already explained, it can't be uploaded into the system; the files are too large, so videos are too -- they exceed the size limit for uploading into the Sea Event database, so they have to store those somewhere separately.  So they got dedicated hard drives for that purpose.

Q.   Was that a limitation of Sea Event or was that a decision of Carnival?

A.   It is a limitation of the Sea Event database that has a size limit for attachments.

Q.   And was Sea Event built by Carnival or was that outside software that Carnival purchased?

A.   It's an outside vendor that Carnival purchased.

Q.   Who had -- and this is area of inquiry

Page 20

number five, if you're following along, who had access to the CCTV video footage for the subject incident from the time it was created until the time it was last known to exist?

A.   So it would have been the chief security officer, the security officer and the assistant chief security officer on board and who had access to the security office and each of them have a log-in and password for the security office computer, and they would have had access to this hard drive when they're just doing their job in preserving the videos and creating their accident reports for incidents and accidents.  And, of course, if there was an issue, they could call in IT and type -- and the IT department on board have also had access in limited circumstances.

Q.   And who was the chief security officer?

A.   Well, Miss Gander, they change every few months, so, we could get you a list of every chief security officer, every CSO that had been on board since August 24th of 2019 through March of 2020 when we know it became unreadable.

Q.   That's exactly what I'm asking.  Do you have that information available to you now?

A.   I don't have that right now, but we could

Page 21

pull it up and send it to you later this afternoon.

MS. GANDER:  Please do and I'll mark that as Exhibit 4 and that will be the list of individuals responsive to area of inquiry number five.

Q.   And what is the name of the IT director that would be referenced here?

A.   We can look that up.  We could pull -- you mean from March 15th of 2020 when they realized -- yeah, so we could just pull up -- yeah, which IT officer was on board at that time.

Q.   Does the IT officer change and rotate as frequently as the security officers?

A.   All crew members usually go on three to six month contracts, so, yeah, I would assume there would have been probably two sets of crew members, so to speak, in the time parameter that we're talking about, August 24th, 2019 through March of 2020, but we'll get you a list of all those folks.

Q.   And please ensure that the IT directors for all those cruises during that time period are included in the list that we're marking as Exhibit 4 to this deposition.

A.   Yeah, if I could just chime in.

THE WITNESS:  Mike, if you can have Cooper

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
30(b)(6)                    Suzanne B. Vazquez on 02/22/2022                    Pages 22..25

Page 22

e-mail Monica and ask Tonya and ask them for a CPS printout of all cruise staff from those dates and all IT staff so we can see who's --

MR. DRAHOS: We were just working on it.

MS. GANDER: Thank you, all three.

Q. The area of inquiry number six is the make, model and serial number of the computer. That's the underlying computer used to store the CCTV footage for the subject incident, so -- and as I understand your prior testimony, it was not stored on a computer, it was only and exclusively stored on the hard drive; is that accurate?

A. That is accurate, because we have, through counsel and through Monica, actually gone and had them search through every laptop and computer in that office just to see if maybe, by chance, it also got saved somewhere else, you know, because the procedure is to put it on the external drive, but the officer who's working on a computer, might have saved it on his desktop before transferring it. We were hopeful that maybe we'd find, but there's nothing.

Q. And you mean the office on board the ship?

A. The security office. So the security office, you had asked actually for the PC, so I did get you those serial numbers, but, right, it's

Page 23

irrelevant to this litigation, because we know the video would have existed only on this particular hard drive that we've been trying to revive.

Q. Okay.

A. But I do have the serial numbers of the six or seven computers if you're interested.

Q. Do you have that in a written list?

A. Yeah, I can -- I can send it to you. Like --

MS. GANDER: So we'll do that as Exhibit 5 to the deposition, list of serial numbers of computers. That will be Exhibit 5.

THE WITNESS: Mike, you guys are taking notes, right?

MR. DRAHOS: And that's a list of serial numbers of all the computers, right?

THE WITNESS: Yes, there was, I think seven Dell computers and six OptiPlexes and then one other serial number set -- the ACSO or the CSO sent to us.

MR. DRAHOS: Okay.

Q. And that's Exhibit 5.

All right. Area of inquiry -- I'm going to skip number seven because -- well, actually, no. Number six is the serial numbers. Number seven is

Page 24

who had access to those computers; would that also be the people who you are giving me in the list number four, Exhibit 4?

A. Yes, that would be the security staff and IT under limited circumstances.

Q. Okay. All right. Area of inquiry number eight is the make, model and serial number of the external hard drive used to store of the CCTV footage for the subject incident.

A. I think that information is contained within that e-mail that we just talked about from March of 2020. It's a Seagate external two terabyte hard drive and I think he put the serial number in there and we also sent you pictures of the back of the hard drive with the serial numbers visible so you could use either of those as an attachment.

MR. DRAHOS: That's GR 000223, just for the record.

Q. Let me screen share with you what I have marked as Exhibit 2 to this deposition and they're Bates labeled as Perez-Sera 3899, 38 -- forgive me, 3900 and 3901 and my 3900 corresponds to GR 000223 that Mr. Drahos just mentioned.

Do you see the screen?

A. Yes.

Page 25

Q. Is this the serial number that you're responsive to area of inquiry number eight?

A. Yes.

Q. Okay. And is this the only hard drive that this video footage was ever stored on?

A. We have confirmed that it definitely doesn't exist on any of the other computers. I can't say whether someone had transferred it to a desktop in order to then, you know, save it where it's supposed to be saved and then later deleted it, but the normal procedure would be to put it on the hard drive. And we have confirmed that it does not exist anywhere else.

Q. Well, would there only be one hard drive in use at the time?

A. There is only one hard drive used for legal purposes for these videos at the time, but I'm sure they probably have other hard drives in other things that they do in the normal course of their duties, I don't know.

Q. I'm not asking you to guess or speculate. If security and IT are following the procedures of the ship, would there be one external hard drive that they would place all CCTV clips on as part of their job duties?

Page 26

A. Yes. So the Horizon went into service, I believe in March of 2018, and we were told that that hard drive -- that that two terabyte hard drive had all of the videos from the date she launched through March of 2020.

Q. Is the Horizon still in service today?

A. Yes, it is back in service in Miami, I believe.

Q. Can you see the screen share that I've got in front of you?

A. Yes.

Q. All right. This is still Exhibit 2. This is Bates number 3899 by my office. What is this photograph intended to depict or represent?

A. That looks like the connection between the hard drive and where you would connect it to a computer.

Q. Do you know what the purpose of taking the photograph of this angle of the device was?

A. No, I think we just told them to take pictures of, you know, the device, so they just took the pictures of the device.

Q. Is it your understanding based upon what you told me earlier, that this connection is what you believe is potentially the portion of the device that

Page 27

has been corrupted?

A. I don't know, I'm sorry, I'm not an IT person, but it's my understanding from my layperson's perspective that when it becomes unreadable, that might be a source of the problem, so I think they're probably focused on that, but again, I'm going to leave it up to the experts to try to see if they can restore the hard drive.

Q. Did someone either at Data Recovery -- Datalab Recovery or someone transmitting information to you from Datalab Recovery indicate to you that this connector was potentially the problem for why the device is now unreadable?

A. Not really. I think the reference that the president gave us, I didn't -- yeah, he was talking about the size of the millimeter of hair and components that I didn't understand what he was saying. But when I asked -- when I asked counsel to give me a layperson's understanding of what is wrong with the hard drive, it's basically the same thing what the ship was saying, that it's just not readable. So in order to extract anything from any hard drive, you have to have a talk to the computer, or the device that you're trying to extract the data from. So that's -- from a layperson's perspective, I

Page 28

would assume that's what they're focused on, but I don't know for sure. He said that there was dust and -- and particles within the entire device, which is why they took it apart, gave it some sterile alcohol bath, which I guess is standard in the industry, put it in a sterile environment, sterilize the parts, have that dry out, replace what we believe to be malfunctioning and see if you can recreate the hard drive while being very careful obviously not to touch the components where the data is actually written into the -- whatever, I guess it's a tiny little mother board, I don't know what you call it.

Q. And looking at what we've marked as Exhibit 2 and this is Bates number 3900, is this photograph intended to depict anything other than the serial number and identifying information specific to the device?

A. Right, we would just ask them to send it to us so that we would be able to give you the serial number and the identifying make, model, et cetera.

Q. The final page of this three page Composite Exhibit 2, is red on the front and it indicates, it looks like a piece of tape with defective Seagate written over it, and that is Bates 3901; first, do you know whose handwriting that is that reads

Page 29

defective Seagate?

A. I do not.

Q. Do you know who the last person to handle this was before it went to Datalab Entry?

A. Cooper Jarnagin.

Q. And based upon what you told me as far as chain of custody goes, it appears that it came from the security office at the Horizon into the hands of Mr. Jarnagin, who then delivered it directly to Datalab Entry; is that accurate?

A. The first time Cooper picked it up from the ship, he brought it to Carnival headquarters or Carnival IT experts to see if they could revive the drive, then when that proved -- they were unable to do it, we sent it back to Cooper, I believe by DHL or Fed-Ex, I'd have to track that, and then Cooper handed it off to Datalab Recovery.

Q. Did your understanding of what may or may not be wrong and what may or may not have been done to fix the device come directly from Datalab Entry or did it come through someone else?

A. It came through counsel.

Q. Did it come orally through counsel or do you have documents describing it?

A. I saw an e-mail where he explained to Mike

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
30(b)(6)                  Suzanne B. Vazquez on 02/22/2022                  Pages 30..33

Page 30

what he was doing, because we were like -- what's -- what's going on? Why don't we have an answer? We were very frustrated on Friday and more so this morning, so I think Mr. Drahos reached out, I think they weren't working yesterday because it was President's Day, so it sounded to me like they're on it now.

Q.  And that e-mail was part of what you reviewed in preparation for your testimony today?

A.  I didn't really have time to review it. I just spoke to Mr. Drahos about it because it was literally this morning.

Q.  So I want to attach that e-mail from Datalab Entry describing the problem that they found and what they're doing, as Exhibit 6 to this deposition.

MR. DRAHOS:  Give me one second, Deborah. Deborah, I'm going to e-mail it directly to you.

MS. GANDER:  Okay. Thank you.

Q.  Miss Vazquez, area of inquiry number nine, is who had access to the external drive used to store the subject CCTV video footage; that would be the list of individuals that's going to be Exhibit 4, correct?

A.  It would have been the security staff on

Page 31

board the Horizon from August 24th through March of 2020, correct. And then possibly the IT folks, obviously, that tried to recover the hard drive in March of 2020.

Q.  And those are the individuals who are being provided to me in a list that is Exhibit 4, correct?

A.  I don't know what exhibit you're making it, but, yes, we'll get you that list.

Q.  Was the external hard drive itself, password protected?

A.  The hard drive itself, I do not believe is password protected. The computer would be password protected. You could only get to the computer through a log-in and password. Each security officer, the CSO and the ACSO had a separate log-in and password to get onto the system.

Q.  Were security officers permitted to remove the hard drive from the security office and take it elsewhere on the ship?

A.  No, I mean, obviously only if, you know, maybe if IT was going to take a look at it, but, no, under normal circumstances, it stays in the security office. I think it's hooked up actually to the CCTV system, so that's how they can download and extract from it.

Page 32

Q.  And where is the CCTV system located; would that be in the actual security office?

A.  Yes, in the same place, in the security office, yes.

Q.  Do you know if there were any other hard drive failures on or around this time?

MR. DRAHOS:  Object to the form.

A.  I'm not aware of any on the Horizon. I'd have to look. In the answer to your, I think last area of inquiry you asked for us to try to figure out prior instances where there's been an issue with missing, lost or corrupt CCTV footage and there was another ship that had a hard drive malfunction and I don't know -- I don't know the exact date. It was definitely within the three years that was relevant to the scope of this deposition.

Q.  Okay. I've reviewed the e-mail from Mr. Drahos that we're going to mark as Exhibit 6 to this deposition and it's from James Gordon, president, Datalab, Inc. Give me one moment to read it, please.

Okay. The e-mail that I was provided and we have marked as Exhibit 6 to this deposition is dated February 22nd, 2022 and that is today, correct?

A.  Yes.

Q.  I'm going to save it as a PDF and then I

Page 33

can screen share it with you. Tell me when you can see the screen share, please.

A.  I can see it.

Q.  And it's from Datalab at Datalabrecovery.com dated today, correct?

A.  Yes.

Q.  At 9:31 a.m., right?

A.  Correct, yes.

Q.  And it reads, Mr. Drahos, here is an update on your hard drive. Your hard drive is still in the process of recovery. Period, next paragraph. This drive was presented to Datalab after having been opened by a technician that followed no data recovery requirement needed for this type of operation. Period. The surface of the discs are magnetized and when opened outside of a clean room, dust particles contaminate the disc surfaces, period. When we receive a drive which has been opened outside a clean room, we have to go through a meticulous cleaning process to ensure the read/write heads don't come in contact with any dust particles on the surface and then he goes through and describes that cleaning process, correct?

A.  Yes.

Q.  To your knowledge, who opened the hard

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
30(b)(6)         Suzanne B. Vazquez on 02/22/2022         Pages 34..37

Page 34

drive outside of a clean room as described in this e-mail?

A. I don't know that someone did, or whether that's an assumption by Mr. Gordon, but if it was opened at all, it would have been by our IT team shore side, which is Darryl Mosley, I assume.

Q. Could you spell his name, please.

A. Darryl, I believe is two Rs; D-a-r-r-y-l. Mosely is M-o-s-e-l-y or it might be l-e-y. Give me a second.

Q. Thank you.

A. Yeah, so it's D-a-r-r-y-l, M-o-s-l-e-y.

Q. And if the external hard drive was opened outside of a clean room, would it have been anyone other than a Carnival employee?

MR. DRAHOS: Object to the form.

A. I believe most of Daryl's team shore side are contractors.

Q. Are they contracted specifically for Carnival or does Carnival use them on an ad hoc basis?

A. That, I don't know, the structure of the independent contractor relationship; most of them are from India and I don't know what their parent company is or -- I don't know, I don't know the answer to

Page 35

that.

Q. Are they physically in India or are they physically in Miami?

A. We do have folks in India, I believe, but no, we have -- it would have been somebody in the Miami office, a contractor in the Miami office.

Q. And whether that person is a contractor or an employee, they would have received it directly from Carnival, correct?

MR. DRAHOS: Object to the form.

A. I believe that we asked Darryl to see if his team could access the hard drive.

Q. And his team is Carnival, correct?

A. His team are contractors that work for Carnival.

Q. Does he have anyone on his team who is an employee?

MR. DRAHOS: Object to form.

A. That, I don't know. I know he is an employee.

Q. And whoever he gave it to, he would be giving it on behalf of Carnival, correct?

A. He would have would have been asking them as an IT expert to see if they could recover it on behalf of Carnival, yes. Everyone -- this is not the

Page 36

only case that we want the data from this hard drive.

Q. How many other cases have people requested information from this hard drive?

A. We have about four that we're -- we need it for litigation purposes.

Q. And by "litigation purposes," all of those cases are currently filed?

A. Yes.

Q. What are the names of those cases?

A. Two are outside the time frame, so they're not on my list of cases to review. I'd have to -- I'd have to look. Bear with me one second. Mr. Drahos prepared sort of a cheat sheet while we were researching. One of them is Irma, Alleyne, A-l-l-e-y-n-e. The other one was Annie Cowen. I don't have the case number there. And the other one was Lisa Robinson.

Q. Are the Alleyne case and the Robinson case still active?

A. I don't think so. I think both of those settled. So I think -- well, let me ask -- let me see if Lisa Robinson. Bear with me, let me just look in my claims system to see if Lisa Robinson settled or not.

Q. Take your time.

Page 37

A. It settled, so Robinson and Cowen settled. So it was an issue when we were trying to find the videos obviously, and Alleyne, I believe is still pending.

Q. Who is the plaintiff's attorney for Miss Alleyne?

A. I don't know.

MR. DRAHOS: Alleyne resolved.

THE WITNESS: I'm sorry, who?

MR. DRAHOS: Sorry. You may want to look further down. The Alleyne case is resolved.

A. Oh, never mind. It settled too.

Q. Okay.

A. But do you want me to still look up who the lawyer was?

Q. If you could, I would appreciate it.

A. Actually, it's not in my journal notes. I'd have to look it up.

MR. DRAHOS: I think I have it, if it helps.

THE WITNESS: Thanks, Mike.

MR. DRAHOS: Yeah. The Alleyne matter was Stephanie Black.

MS. GANDER: Do you know what firm she's with or was?

Page 38

MR. DRAHOS: Lipcon Margulies.

Q. The 11th area of inquiry is whether the accident folder used to store investigation materials, including CCTV footage, was password protected, and if so, who had access to the password. And as I understand your testimony, the CCTV footage was never inside the accident folder for that investigation; is that accurate?

A. To my knowledge, that is accurate. They're supposed to save it on the external hard drive for legal needs, and due to size, it won't go into the accident reporting database even.

Q. When it is saved in the external hard drive, is it categorized by a folder system or some other type of organizational system?

A. It's by the Sea Event reporting number, I'm pretty sure.

Q. And the Sea Event reporting number that it is saved under would correspond back to the accident folder, Sea Event reporting number that includes the investigation, statements, photos and things such as that?

A. Yes.

Q. And is it your testimony that the photos are saved into the computer, but the videos are saved

Page 39

into the hard drive?

A. The photos are uploaded into Sea Event as an attachment. I don't know that they keep them after that. So they probably have a temporary working folder and then they upload everything. I don't know whether they save everything also on a hard drive. I doubt it, because once it goes into the cloud, then it's pretty secure, which is how we're doing all the videos and everything, in the cloud.

Q. Back in 2019 was Sea Event cloud based?

A. Sea Event was just transitioning, so they used to not be, they would have to push it manually Sea Event, we were just rolling it out and I believe Mrs. Perez-Sera's incident was in Sea Event. It was new and I believe it to be cloud based.

Q. You mean the photos, the report, the statements would have been uploaded to the cloud, but the video was put on an external hard drive because of size limitations?

A. Right, we didn't have an ability back then to do a share file, and we since then obviously through the pandemic, it helped us in many ways because we learned to get very -- everything is now in the cloud, so --

Page 40

Q. Okay.

A. It used to be very complicated on the ships just because they were working off a satellite and the internet wasn't great, and just to upload would take forever, and as technology has changed and as things advanced there society, we have better resources now and better choices, better options, so to speak.

Q. Okay. All right. Area of inquiry number 12 is provide the location of this computer and external hard drive that contained the CCTV footage for the subject incident from the date of the subject incident through present. So the computer never contained it, correct?

A. That is -- to my knowledge, that is correct, yes.

Q. So for the external hard drive, as I understand your prior testimony, it was attached to the CCTV system in the security office on board the Horizon on the date that it was first clipped, correct?

A. I am fairly certain that is accurate, yes.

Q. Do you have any reason to doubt that that is accurate?

A. I have no reason to doubt, that's sort of

Page 41

my knowledge being on the ships, seeing how they do it. We were actually rolling out these separate hard drives through 2020, so like they already had one on the Horizon because it was a newer ship, but I've been on the ships and that's how it's connected. So there's a big system for the CCTV camera, especially on a newer ship like the Horizon, many more on the newer ships, so to speak, so that system is pretty complicated and they need to be able to download directly from it and store it somewhere.

Q. When is the first time that hard drive left the security office?

A. To my knowledge, the first -- well, I can't say that the IT -- I assume IT came to the security office to see if he could access anything on the hard drive, but it's possible that they took it to the IT office. We have to ask. I would have -- way of knowing that without asking the IT officer and/or Mr. Thapa. The next time I know it -- it's my understanding the last time it left the security office is when Mr. Cooper Jarnagin picked it up on our behalf.

Q. So, in preparation for your deposition today, you did not find out if IT worked on it in the office or if he took it somewhere else, correct?

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
30(b)(6)                    Suzanne B. Vazquez on 02/22/2022                    Pages 42..45

Page 42

A. I did not speak to the IT officer to answer that very specific question. I'm not sure if it left -- I doubt it did, but it is an external hard drive that you could potentially hook it into another computer and try to access it from there.

Q. From the point that I believe you've advised me was March 2020 when the assistant security officer advised his superiors that there was a problem with the external hard drive and IT determined they could not salvage it, was it left connected to the CCTV system or was something done with it while a replacement that worked was then installed in the CCTV system?

A. So I don't think it was in use if they didn't -- they didn't disconnect it, stored and waiting for us to need it or pick it up. They didn't need a new one because we weren't operating at the time. So I don't know if they hooked up another hard drive, because the ships weren't operational, so there was no guests on board and no need to preserve CCTV footage. They didn't need it during the pandemic. It wasn't until the Horizon resumed operations in late 2021 probably that they needed a new hard drive.

Q. Do you know where it was stored when it was

Page 43

disconnected?

A. It's my understanding it just stayed in the security office until Mr. Cooper Jarnagin picked it up.

Q. And at the time Mr. Jarnagin picked it up, was that specifically to address issues that had arisen in Perez-Sera versus Carnival?

A. I think it was all the cases that were pending in November, December. So the Annie Cowen needing it for whatever was still pending.

Q. Then Mr. Jarnagin brought it to shore side IT to Mr. Mosley. Mr. Mosley had someone work on it within his team, whether it was an employee or a contractor. When that was not successful, it was returned by commercial carrier such as Fed-Ex or DHL to Mr. Jarnagin, correct?

A. Yes. Monica put it in a padded secure envelope and sent it, I believe it was DHL.

Q. And from that point, Mr. Jarnagin or someone on his behalf, delivered it to Datalab, Inc. recovery?

A. Correct.

Q. And to your knowledge, has it been anywhere else between August 24th, 2019 and today?

A. No.

Page 44

Q. Do you have documentation of when it was first provided to Datalab?

A. No, but I'm sure Cooper does. I'm sure the lawyers do.

MS. GANDER: Mr. Drahos, if you could provide me that, I would appreciate it.

Q. Area of inquiry number 13 is why Carnival Corporation gave an incomplete explanation when it said there was no video footage in its February 3rd, 2021 response to plaintiff's first request for production which requested a full and complete copy of any security camera or surveillance videos, indoor photographs taken of Miss Perez-Sera while on board the ship, including video of the actual collision, and/or photographs or footage of her cabin, her entering and exiting her cabin and Miss Perez-Sera approaching, entering or inside the ship's medical clinic and of Miss Perez-Sera boarding the ship the day it sailed and disembarking the ship after the cruise ended?

A. I don't really know how to answer that question. When I read the answers that were provided in her request for production, there were -- the photographs were, it says see attached and then it said not attached as to the surveillance videos and I

Page 45

do believe that to be accurate. I don't know why counsel answered it that way. I think it was inaccurate -- it was accurate then and it's still accurate, we don't have any videos to give you. So in our request for production you were asking what Carnival was in possession of, it can only give you what it has, and we don't have any surveillance videos, unfortunately. And I don't think he ever thought it was any big deal, because we don't dispute exactly what she said happened wouldn't have been depicted on the video. We know exactly what happened and everything she said in her deposition, we agree with. We know that another woman came from behind her and accidentally bumped her in the back and causing her to fall and her hitting her hand. And that's exactly what the security officer said the video showed when he looked at it and saved it. And he testified to that, so it's really no issue as to what was on the video. I just -- I don't think Mr. Drahos thought it was any big deal and quite frankly, it's an accurate answer.

Q. Well, at least as of the e-mail that I was provided this morning, Exhibit 6, that video may exist and it may be able to be pulled off of that hard drive, correct?

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**

30(b)(6)                  Suzanne B. Vazquez on 02/22/2022                  Pages 46..49

Page 46

A.   Absolutely.  And if we get it, you'll definitely -- you'll be the first person, after we get it, you'll be the very next person it gets sent to.

Q.   And do you know --

A.   But as of now we have no access to anything on that hard drive.

Q.   Do you know why when the request for production was answered, there was no explanation that the video existed, was preserved, but was on an external hard drive that had been deemed to be corrupted and that there was a recovery attempt in process?

MR. DRAHOS:  Object to the form.

A.   I -- you know, I will leave this to counsel for you guys to duke it out as to whether that is an appropriate response in request for production.  I believe that's the legal determination.  It is a request for production, and your obligation under the rules is to produce what you have.  So I'm not sure there's an obligation to go further in a request for production answer.  If it was a discovery context in an Interrogatory, if it was a deposition or something different and the specific question was asked, I would agree with you that he would have needed to

Page 47

explain everything.  But it's an accurate answer.  I know you don't like it, but there was nothing nefarious or untoward about it.  I don't think Mr. Drahos even thought this was ever going to be an issue because we don't dispute that another woman did exactly what she's claiming happened, happened.

Q.   So this is a 30(b)(6) deposition pursuant to Court order and your obligation to 30(b)(6) designate is to appear prepared -- prepared to answer the areas of inquiry, none of which were objected to. So if you know the answer to why it wasn't given a complete answer, let me know.  If you did not, ask Mr. Drahos and find out, tell me you don't know, but I need an answer to that area of inquiry.

MR. DRAHOS:  Object to the form.  She has answered that area of inquiry, Deborah.  She answered it twice now.

MS. GANDER:  She told me to ask you and you and I could duke it out together.  That's --

MR. DRAHOS:  You and I disputed whether or not that answer is accurate, but it's Carnival's position here today that we answered the question.  You asked us to produce it.  We indicated to you that we didn't have it.  That's what she said twice, that's our position here

Page 48

today in this deposition.

MS. GANDER:  And you understand that this language was pulled directly from Judge Goodman's order as the area of inquiry for which this entire deposition is going forward?

MR. DRAHOS:  We understand it to be an area of inquiry.  We were prepared to answer it and we did twice.  So if you dispute our answer, you can take that up with the Court, and that's when Miss Vazquez indicated you and I would debate it.  But our position here today is what we're obligated to provide, and we provided that.  We believe it's an accurate answer.

MS. GANDER:  Her answer was I don't know why Mr. Drahos answered it that way and her job was to find out before the deposition today why it was answered that way.

Q.   So do you have an answer, Miss Vazquez, yes or no?

A.   He believed it to be accurate.  It was accurate, it still is accurate, that's why.  And he did not believe the video to be of any significance or issue because we're not disputing anything that was depicted on the video, which is that another guest rounded the corner of the casino and

Page 49

accidentally bumped into the back of Miss Perez-Sera's legs and caused her to fall on her knee again.  That's exactly what the video showed.  That's exactly what Thapa wrote that it showed, and we hoped that if we can uncover it, we'll provide it to you, and that's what it showed, but that's not -- it's not anything that's actually in dispute in our litigation.  So I don't think that there was anything nefarious here.  It's just, we don't have the video.

Q.   Do you know if based upon looking at the video, an accident reconstructionist could reconstruct -- could reconstruct the speed of the scooter?

MR. DRAHOS:  Object to the form.

A.   I don't know.  I don't know that we have any of that listed in this litigation.

Q.   Do you understand that there may be factual information that can be gleaned from the video that would go above and beyond my client's understanding that she got blind sided by a scooter that hit her?

MR. DRAHOS:  Object to the form.

A.   Well, I don't think she used the word "blind sided" when I read her deposition, but nonetheless, we don't dispute that another passenger knocked her down, hit the back of her legs to the

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**

30(b)(6)  Suzanne B. Vazquez on 02/22/2022  Pages 50..53

Page 50

extent that it knocked her off her feet and onto the ground. We know the scooter make and model, we've produced those photos to you. I am quite sure any accident reconstruction expert, if you have retained one, can find out the make and model of that scooter and find out its maximum speed. And, you know, you can even assume that she was going at the maximum speed. We don't dispute that another guest ran into her. And the speed doesn't really matter to us. To you or to me, in this litigation because the -- the issue is whether Carnival would be responsible for another person operating her own personal motorized scooter. The video, we don't dispute that she hit her from behind and she had no ability to see because she doesn't have eyes in the back of her head. I think that can be stipulated to.

Q. And do you believe that an assumption that the scooter operator was operating at maximum speed would be acceptable in Court?

MR. DRAHOS: Object to the form. Miss Gander, we're going a little far astray from the areas of inquiry. Miss Vazquez isn't prepared to address those specific issues without an opportunity to confer. So at this point, I'm giving you as much latitude as I can, but I need

Page 51

to ask you to please stick within the areas of which she's prepared for to speak on behalf of the company.

MS. GANDER: I am doing direct follow-up to a very long answer she just gave, which is -- and that I can assume that the scooter operator was traveling maximum speed, that is a direct follow-up to an answer she just gave in response to my question of area of inquiry number 13.

Q. So having answered that, my question is, do you believe that assumption would be appropriate in Court?

MR. DRAHOS: Object to the form.

A. What do you mean "appropriate"? I don't know how to answer that question, Miss Gander.

Q. Then what was your basis for telling me that I or my accident reconstructionist could assume that the scooter driver was operating the scooter at maximum speed?

MR. DRAHOS: Object to the form.

A. I think that even if you don't know one way or the other, it doesn't change the liability analysis in the case. This is a -- to me it's a red herring, I know that you're very upset that this hard drive is corrupt. We are too, we would love to be

Page 52

able to give you this video. I just disagree that it's the end all be all to this particular case when what the video would have depicted is not really in dispute. So I guess if you got to that point in the litigation and you wanted to assume that she was really gunning it 10 miles, 15 miles however fast they go, that's something the Court will look at at that time.

Q. And without the actual video, I have no way to reconstruct the proper and exact speed that driver was traveling at the point of impact; can you agree to that?

MR. DRAHOS: Object to the form.

A. I don't know that I can agree to that. I have no -- your hypothetical expert, I don't know what he would need to reconstruct this accident, right. But I just think that it doesn't matter the speed that it was traveling to the liability analysis here, which is whether Carnival has any legal duty for what another passenger accidently does to another guest.

Q. On a Carnival ship?

A. Correct. Anywhere. Correct.

Q. In a Carnival passageway?

MR. DRAHOS: Object to the form.

Page 53

A. (Overlap) Correct.

Q. Area of inquiry number 14, Carnival's history of losing, destroying or not preserving CCTV footage in the three years preceding the filing of this lawsuit, including the case style, case number, and jurisdiction where allegations have been made against Carnival regarding it losing, destroying or not preserving CCTV footage surveillance, identification of any Court orders or arbitration orders that have been entered regarding same, and whether sanctions have been imposed against Carnival in the three years preceding the filing of this lawsuit for Carnival losing or destroying or not destroying CCTV footage slash surveillance and if so, in what cases. So going back to August 2020 and three years preceding that.

A. Yes.

Q. Please provide me the information.

A. Okay. The first one I have, I'm going alphabetically, is Irma Alleyne, which we already discussed, which is the same Horizon issue that we have here, the hard drive was corrupt and we're unable to view any of the video footage.

Q. And is that A-l-l-e-y-n-e?

A. That is correct, yes. The case number was

**Page 54**

20-CV-23180.  The judge was Alvaro.

Q.  Okay.

A.  And that matter resolved.  The second one was Noel Diaz; in that one, I only listed it because we just had this trial.  And I want to clarify something for you.  This was a very difficult thing to research because Carnival doesn't keep data this way.  It would have no database that it could go into to research this area, so what I had to do was literally ask my outside counsel and my inhouse lawyers to go through every single file and review it to, you know, think about whether there was any issue related to CCTV.  So Noel Diaz there -- there was no accident report done in that case.  It was another guest hit another guest and it didn't meet the accident reporting criteria, so no accident report was done.  And meaning, when there's no accident report, they don't go look at CCTV footage, they don't do any of those things because it's not generating an accident investigation.

The allegation from Plaintiff's counsel was, though, that we -- we should have -- that we should have still somehow known omnisciently that he was going to file a claim or lawsuit and pulled that video footage.  It was kind of a non-issue because

**Page 55**

the camera angle from the guest services desk probably wouldn't have captured it anyway, and the jury didn't buy any of it, it was a defense verdict in that case.  But nonetheless, it did become an issue at trial that said we should have preserved the video.

The next one was Amy Hindsman, the case number 19-CV-2- -- 23536.  The judge was --

Q.  I'm sorry, could you spell Hindsman?

A.  Absolutely.  H-i-n-d-s-m-a-n.

Q.  Okay.  And the number again?  Could you slow down when you read the numbers, you're reading them pretty quickly.

A.  Sorry.  19-CV-23536.  And the judge is Altonaga.

Q.  Okay.

A.  That one the incident report said that the CCTV was saved, but somehow it was not saved correctly and it automatically deleted by the time it was requested in discovery.  It did not become a big deal in the case.  There were no sanctions, motions or orders, but it was -- nonetheless, we could not access the video.

The next one was Julia Jent, J-e-n-t.  And the case number was 20-CV-20451.  And the judge was

**Page 56**

Judge Moore.  And that was a plaintiff that tripped and fell down some exterior stairs on the Dream.  And according to the accident report, the CCTV footage of the accident was reviewed, and that the plaintiff was observed falling down the stairs, however, the video was not saved and there was no further explanation that the CSO or a CSO could give us as to why it was accidentally not saved.

Q.  Were there sanctions imposed for that; do you know?

A.  No, no, it's not been an issue.

Q.  The next one?

A.  Is Julie Kent, so that's -- the first one was Julia Jent and this is Julie Kent, K-e-n-t.  And the case number was 19-CV-24201.  And Otazo Reyes is listed as the judge.  Okay.  So this is the other one I was referencing earlier.  So an incident report was prepared, the CCTV video was reviewed and saved as part of the accident on the hard drive on the Splendor, however, the CCT video after it was preserved, the data on the hard drive became corrupted due to weather or age of the hard drive, and Plaintiff's counsel was aware of it, but did not make an issue of it in the case.  Situation where it was just unreadable.

**Page 57**

Q.  Which ship was that on?

A.  The Splendor.

Q.  And that was a different physical external hard drive than the within that we've marked in the photographs that are in Exhibit 2, correct?

A.  Correct.

Q.  Go ahead.  Next.

A.  Next one is Koria Jordache, J-o-r-d-a-c-h-e.  That case number was 18-CV-24177.  And that's Judge Gayles.  And that one -- the incident report says that the CCTV video was reviewed by security on the Valor, but not preserved.  Plaintiff's counsel was aware, but never made an issue about it in the litigation.

Q.  Next one?

A.  Oh, Jane Doe.  I didn't realize that that was a Jane Doe case.  So I'm not going to give her name, but I'll give the number; 19-CV-24766.  The judge there is Williams.  In that case, there was no footage of -- there was no CCTV camera covering the area of the incident.  It happened on a different deck, and leading into a housekeeping closet and there are no cameras out there; however, there was footage that was reviewed of the plaintiff earlier running on a different deck where she slipped and

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
30(b)(6)   Suzanne B. Vazquez on 02/22/2022   Pages 58..61

---

Page 58

fell. That's not an issue in the litigation, but he noted it in the accident report and testified to it and then it became an issue in the litigation that the lawyer said, well, you should have preserved that and that issue, I think is still pending as to whether Carnival would have had an obligation to preserve video footage that happened at a different time not related to the litigation, because that's not Carnival's procedure and I think that matter is still pending.

Q. Were any sanctions imposed in that situation?

A. No. I think that he filed a motion -- Plaintiff's counsel filed a motion and it's not been ruled on yet.

Q. Who is Plaintiff's counsel?

A. I think it's Daniel Courtney. I'm not sure. I'd have to look it up. I'm pretty sure it's Daniel Courtney, though, you can pull up the pleadings though.

Q. Next?

A. Next one, Charlene Major. That's case number 18-CV-21914. And that's Judge Scola and Torres. I do have the magistrates on some of these. Carnival's -- oh, yeah, I remember this one.

Page 59

Carnival's initial discovery answer stated that there was no CCTV footage. The security office on board the -- what ship was that, I believe it was the Imagination, told us on two separate occasions that this particular area of the casino where there was a fight between two passengers was not covered by CCTV footage. We later learned after the plaintiff was deposed from a different security office that said there is video footage. We have it. It was very of favorable to Carnival. It discredited everything that plaintiff was saying, and the judge struck the video as too late disclosed and I think the case settled.

Q. And who were the attorneys on that?

A. I don't remember who the plaintiff's lawyer was, quite frankly, but Curtis Mayes was our lawyer, Carnival's lawyers.

Q. The next one?

A. The next one was Deborah Roberts and the case number is 19-CV-25281. The judge was Moore, and the magistrate was Sefara (ph). I remember this one, too. So this -- a plaintiff had two separate falls over two separate thresholds, like two days apart. Both of them were captured on video, both of the videos were preserved of each fall and provided to

Page 60

Plaintiff's counsel. Plaintiff's counsel tried to then argue, and I believe filed a motion to spoliation on the second angle of the first fall. So it was kind of hard to explain, but these two thresholds were in one long corridor with two cameras, one is pointed this way and one is pointed this. And so we have the first fall, we have the second fall. So I think she fell -- the second time she fell over a threshold while walking to the security officer to the first place.

Q. Say that again.

A. She fell over a threshold, and then later in conjunction with the accident investigation, she was walking with the security officer to show him where she fell the first time and she fell right with him. So both of those were captured and they were different thresholds, but in the same general corridor, but far, far away from each other with two cameras. The plaintiffs were trying to argue that we should have preserved the angle of this video to see if maybe we could have seen her fall there. And the judge looked through all the videos and disagreed and denied the motion.

Q. Okay. Next.

A. Because you couldn't really see it, plus we

Page 61

had a direct on point CCTV footage that showed exactly what happened, anyway...

The next one -- there's two more. So that was number nine is Sabrina Scott Wolf, case number is 19 --

Q. Is it hyphenated?

A. Well, it is on my list, but I've seen it in both ways. In our system I believe it was not hyphenated, so I'm not sure if in the litigation it is or not. Case Number is 19-CV-24262, and the judge was Hawke and McAliley. On this one the CCTV footage was automatically deleted because the security officer messed up and didn't transfer it to the proper folder in a timely manner. Plaintiff's counsel was aware of the issue, but didn't make an issue of it, never brought it before the court and the case was ultimately voluntarily dismissed as fraud.

Q. Who was that plaintiff's attorney?

A. I don't remember. But he said he voluntarily dismissed the case.

Do you want me to go to the next one?

Q. Okay.

A. The last one is Ruby Sosa, S-o-s-a, case number is 18-CV-20957. Judge was Altonaga and the

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**

30(b)(6)                    Suzanne B. Vazquez on 02/22/2022                    Pages 62..65

**Page 62**

magistrate was Goodman.  And there the plaintiff fell in a puddle of water in the buffet area on the Freedom, and according to the accident report, the area where the incident occurred was not visible because it was blocked by couch walls.  Nevertheless, the footage was reviewed and saved by the CSO in the F drive and noted that in the accident report, but he never transferred it, I guess to the proper folder or the external hard drive, I guess because he didn't think that it was relevant because it didn't show anything.  But nonetheless, the magistrate ruled that we should have -- we did not take reasonable steps to preserve the CCTV footage and I think Judge Goodman wrote in his order that the issue would be resolved by the jury, like whether that was done in bad faith or just a mistake would just be a question for the jury to decide.

Q.   Okay.  You just said that the security officer saved it in the F drive; what does that mean?

A.   I think -- I -- I think what happens is, when they download it, it goes into a folder that's automatically deleted.  I think the F drive actually is the CCTV footage folder.  So the CCTV is saved in a drive that it auto deletes after like 20 or 30 days unless you download it, extract it and save it on the

**Page 63**

external drive.  I think that was what the issue was. And he for whatever reason did not take that step and I can't recall if he testified and said that he didn't think it was relevant since it didn't show the actual incident, so what's the point in preserving it, but nonetheless, the judge said, well, if you looked at it, and, you know, you should have just stuck it in a folder, you should have preserved it or that he would leave that issue to be determined by a jury.

Q.   So let's go back.  Do you actually know without guessing what the F drive is?

MR. DRAHOS:  Object to the form.

A.   I don't.  I mean, this is in our little summary that came from counsel, I believe, so I guess that was the testimony at the time.  I don't know what that means, but I'm pretty sure the F drive is the drive that auto deletes after 20 or 30 or 40 days; it depends on which system they're using, because some of the older ships would hold the data up to 40 days and some of the newer ships, there's so much data that it auto deletes after 20 or 30.  It's, you know, a short window that you need to download, do your accident investigation, preserve the video footage either in an external hard drive or now into

**Page 64**

the Cloud so that legal will have it later when it needs it.

Q.   Was it your understanding that the videos had to be downloaded to the F drive to be viewed or that that was where they are automatically are located if someone goes to view them?

A.   I know that they're -- they are automatically accessible for a certain amount of time on the F drive, but then it auto deletes.  I'm pretty sure that's the correct answer, but if -- you know, it's not -- I didn't go into the weeds preparing on that issue.

Q.   Do you have any understanding why if they're automatically there and viewable the officer would have taken the steps to save them to the F drive if they're already there?

A.   I don't know how it works.  I think you probably have to -- I'm sorry, pardon me, my cat.  I don't know how that system works, so I'm just not super familiar with how they view it, and where they live, unless they download them and put them on an external drive.  I know that they will auto delete. Now, the IT functionality of where they live in that 20 or 30 days, I don't know.  But he probably has to go into the CCTV system, I'm guessing, and actually

**Page 65**

pull that -- the footage and it has to live somewhere, that somewhere auto deletes after a certain time.  So if you do not take the steps to put it on the external hard drive time for now to put it up into the Cloud, it will auto delete.  So if the security officer is not doing their job, doing that final step, the video can be lost, which is what basically happened here.  But I think the testimony was that he didn't think it was necessary because it didn't show the incident, but the Court said we'll leave that up to the jury to decide.

MR. DRAHOS:  What happened here meaning what happened in the Sosa case?

THE WITNESS:  The Sosa case, right, I'm sorry, the Sosa, right.  Because I believe Judge Goodman actually referenced in this order that he remembered a case regarding CCTV footage so he wanted, you know, I think that's the case, that's the only one I found that was Judge Goodman that there was that issue.

THE COURT REPORTER:  Excuse me.

THE WITNESS:  And I will say that there have been other -- I think you, yourself, Miss Gander, in the Caution case, at some point in my deposition, asked me why we didn't preserve video

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**

30(b)(6)                 Suzanne B. Vazquez on 02/22/2022                 Pages 66..69

Page 66

footage of the plaintiff going down to the medical center and whatnot, you know, so there's probably other, you know, cases that we don't really have records of, you know, where people said why didn't you save, you know, an hour before?  That's not Carnival's policy.  So they don't -- if it's just a slip and fall, they will preserve and take the video of the actual fall, they're not going to go and, you know, look at video footage of the plaintiff, you know, drunk an hour before.

Criminal matters, it depends on what the FBI wants, but in accident investigations that's not how it's done.  They just take the incident itself and a few minutes before and a few minutes after and that's what's saved.

Q.   Is that a written policy or procedure?

A.   We're actually in the process of making it more formal to make sure that we don't have these issues where, you know -- well, we couldn't help this case obviously, it was saved properly, it's a hard drive that became corrupt, but some of these others, luckily it's very few and far between, but if a security officer doesn't do that last step or do their job properly, it can cause, you know, real

Page 67

problems for us, so we are in the process of drafting a robust policy for security to follow.

They do have a criminal investigations, I think the policy says, each video clip can't be more than 500 megabytes, I'm not sure why.

THE COURT REPORTER:  Excuse me, I hate to interrupt, but I need to use the rest room. Could we take a break?

THE WITNESS:  Sure.  I do, too, actually. Should we take five minutes?

MS. GANDER:  Of course.

THE VIDEOGRAPHER:  The time is now 11:27 a.m., we're now off the record.

(Whereupon a break was taken.)

THE VIDEOGRAPHER:  The time is now 11:31 a.m., we're now back on the record.

Q.   Miss Vazquez, from the 11 cases that you provided me, it appears that in one of them there was actually a sanction imposed of CCTV footage being stricken and not available for use by Carnival and that was the Charlene Major case with Judge Scola and magistrate Judge Torres and then in the Sosa case, there was the penalty that the jury would be allowed to determine if it was a bad faith, withholding or destruction of the video; is that accurate?

Page 68

A.   I think that's accurate, yes.

Q.   Okay.  Based upon your researching this issue, were there any other sanctions or penalties imposed against Carnival in the period specified in inquiry number 14 for failure to preserve or destruction after preservation of CCTV footage?

A.   No, this is everything that we found and -- and what we did was, I went to all outside counsel and asked if the (inaudible) and the in-house lawyers and John Mitchell who does our crew arbitrations and said we need you to comb your file.  So they had to do a manual search of their claims file, basically, to see if it ever became an issue.  So there was only two where it really, you know, that were done in that order, of that order.  Most of them, it's very rare --

Q.   Miss Vazquez, we lost your video.

A.   Sorry.

Q.   That's okay.

A.   So it's very rare, luckily.  But nonetheless, we're -- we've now streamlined it, and hopefully this -- this particular issue with a corrupt hard drive won't happen again.

Q.   Okay.  When do you anticipate having a final answer from Datalab?

Page 69

A.   I think I already told you, they haven't let us know.  The latest information you have and then...

Q.   I am going to adjourn this deposition pending an answer to that question, because until I know what Datalab's final answer is to the hard drive, I cannot complete my questioning.

A.   Fair enough.

Q.   So we'll adjourn that and hopefully as soon as you have that information, you'll let me know and that may prompt further inquiry or that may end the inquiry we'll send.

MR. DRAHOS:  On that point, I'll just state on the record that as soon as I get that answer, I will notify your office, Miss Gander, accordingly and maybe even pick up the phone and call you personally to discuss it depending on what they say.

I just have one question I wanted to follow up with Miss Vazquez while we have her here.

CROSS-EXAMINATION

BY MR. DRAHOS:

Q.   Miss Vazquez, you were asked to look over a three-year time period as it relates to area of inquiry number 14 in this case to determine other

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**

30(b)(6)                    Suzanne B. Vazquez on 02/22/2022                    Pages 70..73

**Page 70**

matters wherein similar CCTV footage were lost or destroyed or not preserved properly and you did that in preparation for today, correct?

A.   Yes.

Q.   And after doing that search, as you had described it, you identified for us a total of 11 matters?

A.   11 as described, yes.  And then some of them were non-issues or red herrings, but I tried to give everything that were -- CCTV was made an issue by somebody.

Q.   Okay.  And can you give the Court an idea of how many litigated matters were involved over the scope of that three-year period wherein you identified 11 instances?

A.   Yeah, we had close to 750 lawsuits and arbitration.

Q.   So that means in over 750 lawsuits or arbitrations there was only 11 instances where similar issues like this came up?

A.   That is correct.

MS. GANDER:  Objection, leading.

MR. DRAHOS:  Thank you, those are all the questions I have.

THE COURT REPORTER:  Miss Gander?

**Page 71**

MS. GANDER:  Yes.

THE COURT REPORTER:  Do you want to forward me the exhibits, I can give you my e-mail?

MS. GANDER:  Yes.  I'm waiting for Exhibit 5 and 6 from Mr. Drahos.  I believe Exhibit 5 is going to be provided to me later today at which point I will provide you 1 through 5 and then we'll wait until -- so that you don't have to hold anything; I cannot give you Exhibit 6 until I get it from Mr. Drahos.

THE COURT REPORTER:  Sure.

MR. DRAHOS:  Yeah, we're going to get stuff done as quickly as possible so we can wrap this up.  So 5 is on its way today.  As soon as I get 6, you'll have it, Ms. Gander.

MS. GANDER:  And I have the other four ready to go, but I will hold those until I have Number 5 just so Lisa has the minimum number of e-mails going back and forth.

THE VIDEOGRAPHER:  Off the record?

MS. GANDER:  Yes, we can go off the video record.

THE VIDEOGRAPHER:  The time is now 11:36 a.m.  This concludes the deposition

**Page 72**

of Suzie Vazquez.  We are now off the record.

(Plaintiff's Exhibit Nos. 1 through 6 were marked subsequent to the deposition.)

(Whereupon the deposition concluded at 11:38 p.m.)

**Page 73**

ERRATA SHEET

PAGE:      LINE:      CORRECTION:      REASON:

_____

DATE

_____

SUZIE VAZQUEZ

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**

30(b)(6)                        Suzanne B. Vazquez on 02/22/2022                        Pages 74..75

**Page 74**

CERTIFICATE OF OATH

STATE OF FLORIDA  )

COUNTY OF ORANGE  )

    I, the undersigned authority, certify that SUZIE VAZQUEZ personally appeared before me and was duly sworn.

    WITNESS my hand and official seal this 7th day of March, 2022.

*Lisa Penkacik*

LISA K. PENKACIK, RMR
Notary Public - State Of Florida
My Commission expires 9/7/2022
Commission No.:  GG 239441

**Page 75**

CERTIFICATE OF REPORTER

STATE OF FLORIDA  )

COUNTY OF ORANGE  )

    I, LISA K. PENKACIK, Registered Merit Reporter, certify that I was authorized to and did stenographically report the deposition of SUZIE VAZQUEZ; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

    I, further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in this action.

    Dated this 7th day of March, 2022.

*Lisa Penkacik*

LISA K. PENKACIK, RMR

---

**Exhibits**

---

**VazquezS 1**
 3:9 5:10

**VazquezS 2**
 3:10 10:6,
 7 24:20
 26:12
 28:13,14,
 22 57:5

**VazquezS 3**
 3:10 10:6,
 11 18:3

**VazquezS 4**
 3:11 21:3,
 22 24:3
 30:23 31:6

**VazquezS 5**
 3:12
 23:10,12,
 22 71:5,6

**VazquezS 6**
 3:12 30:15
 32:18,22
 45:23
 71:10

---

**0**

---

**000223**
 24:17,22

---

**1**

---

**1** 5:10 71:8
 72:2

**10** 52:6

**10:02** 4:8

**11** 67:17
 70:6,8,15,
 19

**11:27** 67:12

**11:31** 67:16

**11:36** 71:25

**11:38** 72:5

**11th** 38:2

**12** 40:10

**13** 44:7
 51:9

**13th** 13:8

**14** 53:2
 68:5 69:25

**15** 52:6

**15th** 13:9
 21:9

**18-CV-20957**
 61:25

**18-CV-21914**
 58:23

**18-CV-24177**
 57:9

**19** 61:5

**19-CV-2-**
 55:8

**19-CV-23536**
 55:14

**19-CV-24201**

56:15

**19-CV-24262**
 61:10

**19-CV-24766**
 57:18

**19-CV-25281**
 59:20

**1:20-cv-23463-mgc** 4:6

---

**2**

---

**2** 10:6,7
 24:20
 26:12
 28:14,22
 57:5

**20** 12:21
 62:24
 63:18,22
 64:24

**20-CV-20451**
 55:25

**20-CV-23180**
 54:1

**2018** 26:2

**2019** 7:24
 8:3,17
 11:15
 12:1,16,19
 20:21
 21:18
 39:11
 43:24

**2020** 7:10
 8:25 10:11
 11:24
 13:1,8
 14:1 20:21
 21:9,18
 24:12 26:5
 31:2,4
 41:3 42:7
 53:15

**2021** 7:9
 9:14 14:9,
 20 42:23
 44:10

**2022** 4:7
 15:20
 32:23

**22nd** 4:7
 32:23

**23536** 55:8

**24** 8:16

**24th** 20:21
 21:18 31:1
 43:24

**25th** 8:16

**26th** 8:17

---

**3**

---

**3** 10:6,11
 18:3

**30** 62:24
 63:18,22
 64:24

**30(b)(6)**   4:3
  5:5  47:7,8

**38**  24:21

**3899**  24:21
  26:13

**3900**  24:22
  28:14

**3901**  24:22
  28:24

**3rd**  44:9

──────────
**4**
──────────

**4**  21:3,22
  24:3  30:23
  31:6

**40**  63:18,21

──────────
**5**
──────────

**5**  11:11
  23:10,12,
  22  71:6,8,
  15,19

**500**  11:10
  67:5

──────────
**6**
──────────

**6**  30:15
  32:18,22
  45:23
  71:6,10,16
  72:2

──────────
**7**
──────────

**750**  70:16,
  18

──────────
**9**
──────────

**9:31**  33:7

──────────
**A**
──────────

**A-L-L-E-Y-N-E**
  36:15
  53:24

**a.m.**  4:8
  33:7
  67:13,16
  71:25

**ability**
  39:21
  50:14

**aboard**  7:18

**Absolutely**
  46:1  55:10

**acceptable**
  50:19

**access**  9:7
  13:1,5,12,
  13,18
  14:1,8
  20:2,7,10,
  15  24:1
  30:21
  35:12  38:5
  41:15  42:5
  46:6  55:23

**accessible**
  64:8

**accident**
  8:15  9:17
  10:25  11:3
  12:14
  13:5,11,14
  20:12
  38:3,7,12,
  19  49:11
  50:4  51:17
  52:16
  54:14,16,
  17,20
  56:3,4,19
  58:2  60:13
  62:3,7
  63:24
  66:13

**accidentally**
  45:14  49:1
  56:8

**accidently**
  52:20

**accidents**
  20:13

**accurate**
  22:12,13
  29:10
  38:8,9
  40:22,24
  45:1,3,4,
  21  47:1,21
  48:13,20,
  21  67:25
  68:1

**ACSO**  23:19
  31:15

**activate**
  12:9

**active**  36:19

**actual**  6:20
  32:2  44:14
  52:9  63:5
  66:8

**ad**  34:20

**additional**
  6:3

**address**  43:6
  50:23

**adjourn**
  69:4,9

**advanced**
  40:6

**advised**  8:25
  42:7,8

**afternoon**
  21:1

**age**  56:22

**agree**  45:12
  46:25
  52:11,14

**ahead**  8:11
  57:7

**alcohol**
  15:10
  17:14  28:4

**allegation**
  54:21

**allegations**
  53:6

**Alleyne**
  36:14,18
  37:3,6,8,
  11,22
  53:20

**allowed**
  67:23

**alphabetically**
  53:20

**Altonaga**
  55:15
  61:25

**Alvaro** 54:1

**amount** 64:8

**Amy** 55:7

**analysis**
  51:23
  52:18

**and/or** 41:18
  44:15

**angle** 26:19
  55:1 60:3,
  20

**angles** 18:25
  19:5

**Annie** 36:15
  43:9

**answering**
  6:8

**answers** 5:18
  44:22

**anticipate**
  11:1 68:24

**anticipated**
  12:5

**anymore**
  11:22
  18:10

**appearing**
  5:11

**appears** 29:7
  67:18

**approaching**
  44:17

**arbitration**
  53:9 70:17

**arbitrations**
  68:10
  70:19

**area** 8:4
  13:21
  19:25 21:4
  22:6 23:23
  24:6 25:2
  30:20
  32:10 38:2
  40:9 44:7
  47:14,16
  48:4,6
  51:9 53:2
  54:9 57:21
  59:5 62:2,
  4 69:24

**areas** 5:6,
  18,22 6:4
  47:10

50:22 51:1

**argue** 60:2,
  19

**arisen** 43:7

**Arvind** 8:13
  9:18

**assist** 6:8

**assistant**
  8:23 11:6
  20:6 42:7

**assume** 21:15
  28:1 34:6
  41:14 50:7
  51:6,17
  52:5

**assumption**
  34:4 50:17
  51:11

**astray** 50:21

**attach** 10:5
  30:13

**attached**
  40:18
  44:24,25

**attaching**
  10:7

**attachment**
  10:3 12:21
  24:16 39:3

**attachments**
  12:15,20
  19:20

**attempt**

13:1,13
  46:12

**attorney**
  37:5 61:19

**attorneys**
  6:19,21
  59:14

**August** 8:16
  12:15
  20:21
  21:18 31:1
  43:24
  53:15

**authored**
  9:18

**auto** 62:24
  63:18,22
  64:9,22
  65:2,5

**automatically**
  8:20 55:19
  61:12
  62:22
  64:5,8,14

**aware** 32:8
  56:23
  57:13
  61:15

———————
**B**
———————

**back** 6:12
  7:11,23,24
  8:3 12:1
  14:21
  24:14 26:7

29:15
38:19
39:11,21
45:14
49:1,25
50:15
53:15
63:11
67:16
71:20

**backup** 18:4

**bad** 62:15
67:24

**based** 11:23
26:23 29:6
39:11,16
49:10 68:2

**basically**
15:13
17:19
27:20 65:8
68:12

**basis** 10:21
12:25
34:21
51:16

**Bates** 24:21
26:13
28:14,24

**bath** 15:11
17:14 28:5

**Bear** 36:12,
22

**beginning**
4:2

**behalf** 4:14,
16 17:8
35:22,25
41:22
43:20 51:2

**believed**
48:20

**big** 41:6
45:9,20
55:20

**Black** 37:23

**blind** 49:20,
23

**blocked** 62:5

**board** 7:8,9
8:24,25
9:6,7 11:2
13:5 14:15
20:7,15,20
21:11
22:22
28:12 31:1
40:19
42:20
44:13 59:2

**boarding**
44:18

**body** 7:22
12:8 18:20

**Borcegue**
6:24

**boss** 13:18

**break** 67:8,
14

**brought**
14:13,21
15:25
29:12
43:11
61:16

**Broward**
16:13

**Brown** 5:1

**buffet** 62:2

**built** 19:21

**bumped** 45:14
49:1

**buy** 55:3

**BWC** 18:6,19

---
### C
---

**cabin** 44:15,
16

**call** 14:14
18:21
20:14
28:12
69:17

**called** 9:6
12:18 15:6

**calls** 5:1

**cam** 7:22
12:8

**cam-** 18:22

**camera**
18:20,25

41:6 44:12
55:1 57:20

**cameras**
18:22
57:23
60:6,19

**captured**
55:2 59:24
60:16

**careful**
17:16 28:9

**Carnival**
4:3,4,17
6:2 8:9
10:9
19:18,21,
22,23
29:12,13
34:15,20
35:9,13,
15,22,25
43:7 44:7
45:6 50:11
52:19,22,
24 53:7,
11,13 54:7
58:6 59:10
67:20 68:4

**Carnival's**
5:4 19:7
47:21 53:2
58:9,25
59:1,17
66:6

**carrier**
43:15

case  4:5
  36:1,16,18
  37:11
  51:23 52:2
  53:5,25
  54:14
  55:4,7,21,
  25 56:15,
  24 57:9,
  17,19
  58:22
  59:12,20
  61:4,10,
  17,21,24
  65:13,14,
  17,18,24
  66:21
  67:21,22
  69:25

cases  36:2,
  7,9,11
  43:8 53:15
  66:3 67:17

casino  48:25
  59:5

cat  64:18

categorized
  38:14

caused  49:2

causing
  45:15

Caution
  65:24

CCT  56:20

CCTV  7:22

9:19 10:20
12:2 14:11
18:5,21
20:2 22:8
24:8 25:24
30:22
31:23
32:1,12
38:4,6
40:11,19
41:6
42:11,13,
21 53:3,8,
14 54:13,
18 55:18
56:3,18
57:11,20
59:2,6
61:1,11
62:13,23
64:25
65:17
67:19 68:6
70:1,10

center  66:2

cetera  28:20

chain  29:7

chance  22:16

change  19:5
  20:18
  21:12
  51:22

changed  19:1
  40:5

Charlene
  58:22

67:21

cheat  36:13

chief  8:23
  9:2 11:6
  20:5,6,17,
  19

chime  21:24

choices  40:7

chosen  5:4

circumstances
  20:16 24:5
  31:22

Civil  5:5

claim  11:1
  54:24

claiming
  47:6

claims  36:23
  68:12

clarify  54:5

clean  33:16,
  18 34:1,14

cleaned
  17:24

cleaning
  33:19,22

clear  13:3

client  11:14

client's
  49:19

clinic  44:18

clip  67:4

clipped
  40:20

clips  12:3
  25:24

close  70:16

closet  57:22

cloud  11:23
  39:8,10,
  11,16,18,
  25 64:1
  65:5

collision
  44:14

comb  68:11

commercial
  43:15

communicated
  7:10

communication
  16:20

company
  16:22
  34:24 51:3

complete
  5:18 44:11
  47:12 69:7

complicated
  10:23 40:2
  41:9

components
  27:17
  28:10

Composite
  28:21

computer 9:4
  14:18
  15:14 20:9
  22:7,8,11,
  15,19
  26:17
  27:23
  31:12,13
  38:25
  40:10,13
  42:5

computers
  23:6,12,
  16,18 24:1
  25:7

concluded
  72:4

concludes
  71:25

conducting
  8:17

confer 50:24

confirm 17:4

confirmed
  9:7 25:6,
  12

conjunction
  60:13

connect
  26:16

connected
  13:14 41:5

42:11

connection
  9:13 15:13
  17:18,20
  26:15,24

connector
  27:12

contact
  16:14,23
  33:21

contained
  24:10
  40:11,14

contaminate
  33:17

contemporaneou
s 8:15

context
  46:22

contracted
  34:19

contractor
  34:23
  35:6,7
  43:14

contractors
  34:18
  35:14

contracts
  21:15

controllable
  18:25

Cooper 16:2

21:25
  29:5,11,
  15,16
  41:21 43:3
  44:3

copy 9:16,
  22 44:11

corner 48:25

Corporation
  4:3,5,17
  44:8

correct 5:7,
  8,13 7:21
  16:4 30:24
  31:2,6
  32:23
  33:5,8,23
  35:9,13,22
  40:14,16,
  21 41:25
  43:16,22
  45:25
  52:23
  53:1,25
  57:5,6
  64:10
  70:3,21

correctly
  55:19

correspond
  38:19

corresponds
  24:22

corridor
  60:5,18

corrupt 6:16
  7:13,15
  9:3,11,21,
  25 14:17,
  23 15:4,7
  32:12
  51:25
  53:22
  66:22
  68:23

corrupted
  7:19 27:1
  46:12
  56:22

couch 62:5

counsel 4:11
  15:5,23,
  24,25
  16:10
  22:14
  27:18
  29:22,23
  45:2 46:15
  54:10,21
  56:23
  57:13
  58:14,16
  60:1 61:15
  63:15 68:8

County 16:13

couple 11:8,
  9 15:21

coupled
  15:12

court 4:9,12
  5:12 47:8

Case 1:20-cv-23463-MGC  Document 54-11  Entered on FLSD Docket 04/28/2022  Page 27 of 47
MARIA PEREZ-SERA vs CARNIVAL CORPORATION
30(b)(6)                    Suzanne B. Vazquez on 02/22/2022          Index: Courtney..deletes

48:9 50:19 51:12 52:7 53:9 61:16 65:10,21 67:6 70:12,25 71:2,12

**Courtney** 58:17,19

**covered** 59:6

**covering** 57:20

**Cowen** 36:15 37:1 43:9

**CPS** 22:2

**created** 20:3

**creating** 20:12

**crew** 7:3 9:23 21:14,16 68:10

**criminal** 12:10 66:12 67:3

**criteria** 11:4 54:16

**CROSS-EXAMINATION** 69:21

**cruise** 22:2 44:20

**cruises**

21:21

**CSO** 8:25 20:20 23:19 31:15 56:7 62:6

**current** 7:7 11:16

**Curtis** 59:16

**custody** 29:7

---

**D**

---

**D-A-R-R-Y-L** 34:8,12

**daily** 17:10

**Damon** 4:8

**Daniel** 58:17,19

**Darryl** 14:24 16:4 34:6,8 35:11

**Darryl's** 16:7

**Daryl's** 34:17

**data** 17:3 18:9 27:9,24 28:10 33:13 36:1 54:7 56:21 63:20,22

**database** 12:17,22

19:14,20 38:12 54:8

**Datalab** 15:6 16:12,14 17:1 27:10,11 29:4,10,17,20 30:14 32:20 33:4,12 43:20 44:2 68:25

**Datalab's** 69:6

**Datalabrecovery.com** 33:5

**date** 4:6 15:22 26:4 32:14 40:12,20

**dated** 13:9 32:23 33:5

**dates** 22:3

**day** 13:7 30:6 44:19

**days** 59:23 62:24 63:19,21 64:24

**deal** 45:9,20 55:21

**debate** 48:10

**Deborah** 4:14

10:15 30:17,18 47:16 59:19

**December** 7:9 43:9

**decide** 62:17 65:11

**decision** 19:18

**deck** 57:22,25

**dedicated** 19:16

**deemed** 46:11

**defective** 28:23 29:1

**defendant** 4:17

**defense** 55:3

**definitively** 17:4

**delete** 64:22 65:5

**deleted** 25:10 55:19 61:12 62:22

**deletes** 62:24 63:18,22 64:9 65:2

**30(b)(6)**

delivered
  29:9 43:20

Dell  23:18

denied  60:23

department
  11:25
  14:22
  20:15

departments
  7:2

depending
  69:17

depends
  63:19
  66:12

depict  26:14
  28:15

depicted
  45:11
  48:24 52:3

deposed  8:14
  59:8

deposition
  4:3 5:7,10
  10:7 18:4
  21:23
  23:11
  24:20
  30:16
  32:16,19,
  22 41:23
  45:12
  46:23 47:7
  48:1,5,16

49:23
65:25 69:4
71:25
72:3,4

describes
  33:22

describing
  29:24
  30:14

designate
  5:4,5 47:9

desk  55:1

desktop
  22:20 25:8

destination
  14:25

destroyed
  70:2

destroying
  53:3,7,13,
  14

destruction
  67:25 68:6

detected
  18:7,10

determination
  46:18

determine
  67:24
  69:25

determined
  42:10 63:9

device

26:19,21,
22,25
27:13,24
28:3,17
29:20

DHL  16:10
  29:15
  43:15,18

Diaz  54:4,
  13

differs
  11:16

difficult
  54:6

direct  4:22
  16:23
  51:4,7
  61:1

directly
  11:25
  29:9,20
  30:18 35:8
  41:10 48:3

director
  14:25 21:6

directors
  21:20

disagree
  52:1

disagreed
  60:22

disc  33:17

disclosed
  59:12

disconnect
  42:15

disconnected
  43:1

discovery
  6:25 9:15
  46:22
  55:20 59:1

discredited
  59:10

discs  33:15

discuss
  69:17

discussed
  9:23 53:21

discussing
  8:1

discussions
  6:22

disembarking
  44:19

dismissed
  61:17,21

dispute  45:9
  47:5 48:8
  49:7,24
  50:8,13
  52:4

disputed
  47:20

disputing
  48:23

documentation

30(b)(6)

44:1

**documents**
5:16 6:7
7:1 14:10
29:24

**Doe** 57:16, 17

**doubt** 39:7
40:23,25
42:3

**download**
31:24 41:9
62:21,25
63:23
64:21

**downloaded**
64:4

**drafting**
67:1

**Drahos** 4:16
6:9 8:10
10:17
16:3,19,22
22:4
23:15,21
24:17,23
30:4,11,17
32:7,18
33:9 34:16
35:10,18
36:13
37:8,10,
19,22 38:1
44:5 45:20
46:14

47:4,13,
15,20
48:6,15
49:14,21
50:20
51:13,20
52:13,25
63:13
65:12
69:13,22
70:23
71:6,11,13

**Dream** 56:2

**drive** 6:15
7:13,15,
18,23,25
8:13,19
9:2,8,10,
12,21,24
10:20
11:14,18,
19 12:1,2,
7,13 13:2,
12,13
14:1,5,17,
23 15:5,14
17:4,17
18:5,8
19:9 20:10
22:12,18
23:3 24:8,
13,15
25:4,12,
14,16,23
26:3,16
27:8,20,23
28:9 29:14

30:21
31:3,9,11,
18 32:6,13
33:10,12,
18 34:1,13
35:12
36:1,3
38:10,14
39:1,7,19
40:11,17
41:11,16
42:3,9,19,
24 45:25
46:7,11
51:25
53:22
56:19,21,
22 57:4
62:7,9,19,
22,24
63:1,12,
17,18,25
64:4,9,16,
22 65:4
66:22
68:23 69:7

**driver** 51:18
52:10

**drives** 11:21
15:7 19:16
25:18 41:3

**drunk** 66:10

**dry** 28:7

**due** 12:20
38:11
56:22

**duke** 46:16
47:19

**duly** 4:19

**dust** 17:16
28:2
33:16,21

**duties**
25:19,25

**duty** 52:19

———————

E

———————

**e-mail** 8:22
9:22 10:11
13:8,16
16:18
18:2,14,16
22:1 24:11
29:25
30:8,13,18
32:17,21
34:2 45:22
71:4

**e-mails** 6:12
7:11 71:20

**earlier**
18:13,15,
17 26:24
56:17
57:24

**easier** 10:16

**efforts**
13:21

**electronically**
5:17 6:10

employee
  34:15
  35:8,17,20
  43:13

end  52:2
  69:11

ended  44:20

ensure  21:20
  33:20

entered
  53:10

entering
  44:16,17

entire  28:3
  48:5

Entry  29:4,
  10,20
  30:14

envelope
  43:18

environment
  15:11
  17:14 28:6

estimated
  17:2

et al  4:5

event  7:20
  12:16
  19:14,17,
  19,21
  38:16,18,
  20 39:2,
  11,12,14,
  15

evidence
  19:8

exact  15:22
  32:14
  52:10

EXAMINATION
  4:22

exceed  19:13

exclusively
  22:11

Excuse  65:21
  67:6

exhibit  5:10
  10:6,7,11
  18:3 21:3,
  22 23:10,
  12,22
  24:3,20
  26:12
  28:13,22
  30:15,23
  31:6,7
  32:18,22
  45:23 57:5
  71:5,6,10
  72:2

exhibits
  71:3

exist  20:4
  25:7,12
  45:24

existed  23:2
  46:10

exiting

44:16

expert  14:15
  15:6 35:24
  50:4 52:15

experts  7:14
  14:12 27:7
  29:13

explain  47:1
  60:4

explained
  19:11
  29:25

explanation
  44:8 46:9
  56:6

extent  6:10
  50:1

exterior
  56:2

external
  7:22,24
  8:12,19
  10:20
  11:13,18
  22:18
  24:8,12
  25:23
  30:21 31:9
  34:13
  38:10,13
  39:19
  40:11,17
  42:3,9
  46:11 57:3
  62:9 63:1,

25 64:22
  65:4

extract
  27:22,24
  31:24
  62:25

eyes  50:15

F

factual
  49:17

failed  11:20

failure  68:5

failures
  32:6

fair  10:12
  69:8

fairly  40:22

faith  62:15
  67:24

fall  45:15
  49:2 59:25
  60:3,7,8,
  21 66:7,8

falling  56:5

falls  59:22

familiar
  64:20

fast  52:6

favorable
  59:10

FBI   66:13

February   4:7
  32:23  44:9

Fed-ex   16:10
  29:16
  43:15

Federal   5:4

feet   50:1

fell   56:2
  58:1  60:8,
  9,12,15
  62:1

field   15:6

fight   59:6

figure   6:13
  11:22
  32:10

file   6:9
  11:25
  19:10
  39:22
  54:11,24
  68:11,12

filed   36:7
  58:13,14
  60:2

files   19:12

filing   53:4,
  12

final   28:21
  65:7  68:25
  69:6

find   9:4

22:21  37:2
41:24
47:13
48:16
50:5,6

finish   13:4

finished
  13:10

firm   37:24

fix   17:21
  29:20

focused   27:6
  28:1

folder   38:3,
  7,14,20
  39:5  61:14
  62:8,21,23
  63:8

folks   7:10,
  12  21:19
  31:2  35:4

follow   67:2
  69:19

follow-up
  51:4,8

footage   8:5
  9:19
  10:20,21
  11:7  13:22
  14:11  20:2
  22:8  24:8
  25:5  30:22
  32:12
  38:4,6

40:11
42:21
44:9,15
53:4,8,14,
23  54:18,
25  56:3
57:20,24
58:7  59:2,
7,9  61:1,
11  62:6,
13,23
63:25
65:1,17
66:1,10
67:19  68:6
70:1

forever   40:5

forgive
  18:16
  24:21

form   8:10
  32:7  34:16
  35:10,18
  46:14
  47:15
  49:14,21
  50:20
  51:13,20
  52:13,25
  63:13

formal   66:19

forward   48:5
  71:3

found   8:22
  14:17
  30:14

65:19  68:7

frame   17:2,
  9,22  18:1
  36:10

frankly
  45:20
  59:16

fraud   61:18

Freedom   62:3

frequently
  21:13

Friday   15:9,
  12  30:3

front   26:10
  28:22

frustrated
  30:3

full   5:18
  44:11

fully   5:24

functionality
  64:23

―――――――――――

G

―――――――――――

G-O-R-D-O-N
  16:24

Gander   4:14,
  23  10:5
  20:18  21:2
  22:5  23:10
  30:19
  37:24  44:5
  47:18

48:2,14
50:21
51:4,15
65:24
67:11
69:15
70:22,25
71:1,5,16,
17,22

**gave** 6:19
15:11
16:9,12
27:15 28:4
35:21 44:8
51:5,8

**Gayles** 57:10

**general**
60:17

**generating**
54:20

**give** 4:24
17:2 27:19
28:19
30:17
32:20 34:9
45:4,6
52:1 56:7
57:17,18
70:10,12
71:3,10

**giving** 17:13
24:2 35:22
50:25

**gleaned**
49:18

**Global** 4:10

**Good** 4:24

**Goodman** 5:13
62:1,13
65:16,19

**Goodman's**
48:3

**Gordon**
16:21,24
17:1 32:19
34:4

**GR** 24:17,22

**great** 40:4

**ground** 50:2

**guess** 7:15
9:11 13:19
14:2,19
25:21
28:5,11
52:4 62:8,
9 63:15

**guessing**
63:12
64:25

**guest** 48:25
50:8 52:21
54:15 55:1

**guests** 42:20

**gunning** 52:6

**guys** 23:13
46:16

---

**H**

---

H-I-N-D-S-M-A-
N 55:10

**hair** 27:16

**hand** 45:15

**handed** 29:17

**handle** 29:3

**hands** 29:8

**handwriting**
28:25

**happen** 68:23

**happened**
45:10,11
47:6 57:21
58:7 61:2
65:8,12,13

**hard** 6:15
7:13,15,
17,23,25
8:13,19
9:2,7,10,
12,21,24
10:20
11:13,18,
19,21
12:1,2,7,
13 13:2,
12,13
14:1,5,17,
23 15:4,7,
14 17:4,17
18:8 19:9,
16 20:10

22:12 23:2
24:8,13,15
25:4,11,
14,16,18,
23 26:3,16
27:8,20,23
28:8 31:3,
9,11,18
32:5,13
33:10,25
34:13
35:12
36:1,3
38:10,13
39:1,7,19
40:11,17
41:2,11,15
42:3,9,18,
24 45:25
46:7,11
51:24
53:22
56:19,21,
22 57:4
60:4 62:9
63:25 65:4
66:21
68:23 69:6

**hate** 67:6

**Hawke** 61:11

**head** 50:15

**headquarters**
29:12

**heads** 33:20

**heavy** 6:25

Case 1:20-cv-23463-MGC   Document 54-11   Entered on FLSD Docket 04/28/2022   Page 33 of 47
MARIA PEREZ-SERA vs CARNIVAL CORPORATION
30(b)(6)                    Suzanne B. Vazquez on 02/22/2022                Index: helped..inquiry

helped  39:23

helps  37:20

herring
  51:24

herrings
  70:9

Hindsman
  55:7,9

historically
  8:22

history  53:3

hit  49:20,
  25 50:13
  54:15

hitting
  45:15

hoc  34:20

hold  63:20
  71:10,18

home  9:10

hook  42:4

hooked  31:23
  42:18

hope  17:22

hoped  49:4

hopeful  17:6
  22:20

Horizon  8:2,
  24 12:16
  18:6 19:4
  26:1,6
  29:8 31:1

32:8 40:20
41:4,7
42:22
53:21

hour  66:5,
  11

housekeeping
  57:22

Huseby  4:10

hyphenated
  61:6,9

hypothetical
  52:15

─────────
        I
─────────

idea  70:12

identification
  53:9

identified
  70:6,15

identifying
  28:16,20

Imagination
  59:4

impact  52:11

imposed
  53:11 56:9
  58:11
  67:19 68:4

in-house
  68:9

inaccurate

45:3

inaudible
  68:9

incident
  8:6,18
  11:7,8
  12:4,11,12
  13:22
  14:11 20:3
  22:9 24:9
  39:15
  40:12,13
  55:17
  56:17
  57:11,21
  62:4 63:5
  65:10
  66:14

incidents
  10:21
  20:12

included
  21:22

includes
  38:20

including
  5:16 8:6
  12:4 13:23
  14:11 38:4
  44:14 53:5

incomplete
  44:8

independent
  34:23

India  34:24

35:2,4

individual
  7:3

individuals
  6:19 7:4
  21:4 30:23
  31:5

indoor  44:12

industry
  28:5

Info  12:18

information
  5:17 6:4,
  20 7:5 8:9
  15:9 17:12
  20:24
  24:10
  27:10
  28:16 36:3
  49:18
  53:18
  69:2,10

informed
  18:8

inhouse
  54:10

initial  8:6
  59:1

initially
  8:12

injury  11:2

inquiry  5:6,
  18,22 6:5
  8:4 13:21

**MARIA PEREZ-SERA vs CARNIVAL CORPORATION**
**Suzanne B. Vazquez on 02/22/2022**

30(b)(6)                                                    Index: inside..keeping

19:25 21:4 22:6 23:23 24:6 25:2 30:20 32:10 38:2 40:9 44:7 47:10,14, 16 48:4,7 50:22 51:9 53:2 68:5 69:11,12, 25

**inside** 38:7 44:17

**installed** 42:13

**instances** 32:11 70:15,19

**intact** 19:9

**intended** 26:14 28:15

**interested** 13:20 23:6

**internal** 6:12

**internet** 40:4

**Interrogatory** 46:23

**interrupt** 67:7

**introduce**

4:11

**investigating** 11:4 12:10

**investigation** 8:15,18 38:3,8,21 54:20 60:13 63:24

**investigations** 66:13 67:3

**investigative** 19:10

**involved** 14:22 70:13

**Irma** 36:14 53:20

**irrelevant** 23:1

**issue** 7:11, 16 20:13 32:11 37:2 45:18 47:5 48:23 50:11 53:21 54:12 55:5 56:11,24 57:14 58:1,3,5 61:15,16 62:14 63:1,9 64:12

65:20 68:3,13,22 70:10

**issues** 5:25 6:23 43:6 50:23 66:20 70:20

**items** 6:7

---

**J**

**J-E-N-T** 55:24

**J-O-R-D-A-C-H-E** 57:9

**James** 16:21, 24 32:19

**Jane** 57:16, 17

**January** 9:14 14:9 15:19

**Jarnagin** 16:2 18:2 29:5,9 41:21 43:3,5,11, 16,19

**Jent** 55:24 56:14

**job** 13:11, 17 14:15 20:11 25:25 48:15 65:6

66:25

**John** 68:10

**Jordache** 57:8

**journal** 37:17

**judge** 5:12 48:3 54:1 55:8,14,25 56:1,16 57:10,19 58:23 59:11,20 60:22 61:10,25 62:13 63:6 65:15,19 67:21,22

**Julia** 55:24 56:14

**Julie** 56:13, 14

**jurisdiction** 53:6

**jury** 55:3 62:15,17 63:10 65:11 67:23

---

**K**

**K-E-N-T** 56:14

**keeping** 19:9

Kent 56:13, 14

kind 18:11 54:25 60:4

knee 49:2

knew 5:15

knocked 49:25 50:1

knowing 41:18

knowledge 14:8 33:25 38:9 40:15 41:1,13 43:23

Koria 57:8

---

**L**

---

l-e-y 34:9

la- 8:21

labeled 24:21

Lagas 8:14 9:18

language 48:3

laptop 22:15

large 19:12

late 42:23 59:12

latest 69:2

latitude 50:25

launched 26:4

lawsuit 53:5,13 54:24

lawsuits 70:16,18

lawyer 37:15 58:4 59:15,16

lawyers 14:20 44:4 54:11 59:17 68:9

layperson's 27:3,19,25

lead 12:5

leading 57:22 70:22

learned 39:24 59:7

leave 27:7 46:15 63:9 65:11

left 41:11, 20 42:2,10

legal 25:16 38:11 46:18 52:19 64:1

legs 49:2, 25

liability 51:22 52:18

lifting 6:25

limit 19:13, 20

limitation 19:17,19

limitations 12:20 39:20

limited 8:6 12:22 20:15 24:5

Lipcon 38:1

Lisa 4:9 36:17,22, 23 71:19

list 13:19 20:19 21:3,19,22 23:7,11,15 24:2 30:23 31:6,8 36:11 61:7

listed 49:16 54:4 56:16

literally 30:12 54:10

litigated 70:13

litigation 4:10 6:23 8:14 9:14, 16 10:22 12:6 23:1 36:5,6 49:8,16 50:10 52:5 57:14 58:1,3,8 61:9

live 64:21, 23 65:1

locate 13:22

located 32:1 64:6

location 40:10

locations 18:23

log-in 20:8 31:14,15

long 51:5 60:5

longer 18:6

looked 45:17 60:22 63:7

losing 53:3, 7,13

lost 32:12 65:7 68:17 70:1

lot 7:15

love   51:25

luckily
  66:23
  68:20

————————————
            M
————————————

M-A-Y-A-N-K
  18:11

M-O-S-E-L-Y
  34:9

M-O-S-L-E-Y
  34:12

made   13:21,
  23 53:6
  57:13
  70:10

magistrate
  5:12 59:21
  62:1,11
  67:22

magistrates
  58:24

magnetized
  33:15

Major   58:22
  67:21

make   22:6
  24:7 28:20
  50:2,5
  56:24
  61:15
  66:19

making   31:7
  66:18

malfunction
  32:13

malfunctioning
  28:8

manager
  14:16,22

manner   61:14

manual   68:12

manually
  19:1 39:13

March   8:24
  10:11
  13:1,8,9
  20:21
  21:9,18
  24:12
  26:2,5
  31:1,4
  42:7

Margulies
  38:1

Maria   4:4,15

mark   21:2
  32:18

marked   18:3
  24:20
  28:13
  32:22 57:4
  72:3

marking   5:9
  21:22

materials
  6:9 38:4

matter   4:4
  12:10
  37:22 50:9
  52:17 54:3
  58:9

matters
  66:12
  70:1,7,13

maximum
  50:6,7,18
  51:7,19

Mayank   18:11

Mayes   59:16

Mcaliley
  61:11

meaning   19:3
  54:17
  65:12

means   63:17
  70:18

mechanism
  17:17

medical
  44:17 66:2

meet   54:15

meets   11:3

megabytes
  11:10
  12:21 67:5

member   9:23

members   7:3
  21:14,16

memorialize
  12:3

mentioned
  24:23

messed   61:13

meticulous
  33:19

Miami   26:7
  35:3,6

Michael   4:16

mid   13:9
  15:19

Mike   10:14
  16:17
  21:25
  23:13
  29:25
  37:21

miles   52:6

millimeter
  27:16

mind   37:12

minimum
  71:19

Minok   8:23
  9:23

minutes
  11:8,9,11
  66:15
  67:10

missing
  32:12

Case 1:20-cv-23463-MGC  Document 54-11  Entered on FLSD Docket 04/28/2022  Page 37 of 47
MARIA PEREZ-SERA vs CARNIVAL CORPORATION
30(b)(6)                      Suzanne B. Vazquez on 02/22/2022          Index: mistake..obligation

mistake
  62:16

Mitchell
  68:10

model  22:7
  24:7 28:20
  50:2,5

moment  14:13
  32:20

moments
  12:3,4

Monica  6:24
  9:14 14:9,
  19 22:1,14
  43:17

monitor  4:7

month  21:15

months  20:19

Moore  56:1
  59:20

morning  4:24
  15:9 17:13
  30:4,12
  45:23

Mosely  34:9

Mosley  16:4
  34:6 43:12

Mosley's
  14:24

mother  28:12

motion
  58:13,14
  60:2,23

motions
  55:21

motorized
  50:12

——————————
         N
——————————

N-A-L-A-W-A-D-
E  9:1

Nalawade  9:1

names  36:9

needed  11:22
  15:12
  33:14
  42:23
  46:25

needing  14:5
  43:10

nefarious
  47:3 49:9

network  7:19

newer  19:4
  41:4,7,8
  63:21

Noel  54:4,
  13

non-issue
  54:25

non-issues
  70:9

nonetheless
  49:24
  55:4,22
  62:11 63:6

68:21

normal
  25:11,19
  31:22

Nos  72:2

noted  9:18
  58:2 62:7

notes  23:14
  37:17

notice  5:6,9

notification
  9:10,13

notify  69:15

notifying
  9:24

November
  43:9

number  4:5
  20:1 21:4
  22:6,7
  23:19,24,
  25 24:2,6,
  7,13 25:1,
  2 26:13
  28:14,16,
  20 30:20
  36:16
  38:16,18,
  20 40:9
  44:7 51:9
  53:2,5,25
  55:8,11,25
  56:15
  57:9,18

58:23
59:20
61:4,10,25
68:5 69:25
71:19

numbers
  22:25
  23:5,11,
  16,25
  24:15
  55:12

——————————
         O
——————————

oath  4:20

Object  32:7
  34:16
  35:10,18
  46:14
  47:15
  49:14,21
  50:20
  51:13,20
  52:13,25
  63:13

objected
  47:10

objecting
  8:10

Objection
  70:22

obligated
  48:11

obligation
  46:19,21
  47:8 58:6

**observed**
  56:5

**obsolete**
  11:17

**occasions**
  59:4

**occurred**
  62:4

**offhand**
  16:16

**office** 9:10
  19:6 20:8,
  9 22:16,
  22,23,24
  26:13 29:8
  31:18,23
  32:2,4
  35:6 40:19
  41:12,15,
  17,21,25
  43:3 59:2,
  8 69:15

**officer** 8:24
  9:2,6
  11:5,6
  14:15 18:7
  20:6,7,17,
  20 21:11,
  12 22:18
  31:15
  41:18
  42:1,8
  45:16
  60:10,14
  61:13
  62:19

  64:14 65:6
  66:24

**officers** 7:7
  12:9 21:13
  31:17

**Okoro** 4:8

**older** 63:20

**omnisciently**
  54:23

**opened** 17:24
  33:13,16,
  18,25
  34:5,13

**operate** 8:2

**operated** 8:3

**operating**
  42:17
  50:12,18
  51:18

**operation**
  14:4 33:14

**operational**
  42:19

**operations**
  13:7 42:23

**operator**
  50:18 51:6

**opportunity**
  50:24

**opposed** 7:19
  19:9

**options** 40:7

**Optiplexes**
  23:18

**orally** 29:23

**order** 5:12
  25:9 27:22
  47:8 48:4
  62:14
  65:16
  68:15

**orders** 53:9,
  10 55:22

**organizational**
  38:15

**Otazo** 56:15

**Overlap** 53:1

**oversees**
  15:1

**owner** 16:22

———————

P

———————

**p.m.** 72:5

**padded** 43:17

**Palm** 16:11

**pandemic**
  13:6 39:23
  42:22

**paper** 12:11

**paragraph**
  33:11

**parameter**
  21:17

**pardon** 64:18

**parent** 34:24

**part** 17:25
  25:24 30:8
  56:19

**particle**
  17:16

**particles**
  28:3
  33:16,21

**parts** 15:12
  17:13 28:6

**passageway**
  52:24

**passenger**
  49:24
  52:20

**passengers**
  59:6

**password**
  20:9
  31:10,12,
  14,16
  38:4,5

**PC** 22:24

**PDF** 32:25

**penalties**
  68:3

**penalty**
  67:23

**pending** 37:4
  43:9,10
  58:5,10

69:5

**Penkacik**
  4:10

**people**  7:13,
  16 24:2
  36:2 66:4

**Perez-sera**
  4:4,15
  24:21 43:7
  44:13,16,
  18

**Perez-sera's**
  13:14
  39:15 49:2

**period**  11:14
  21:21
  33:11,15,
  17 68:4
  69:24
  70:14

**permitted**
  31:17

**person**  5:21
  7:1 16:5
  27:3 29:3
  35:7 46:2,
  3 50:12

**personal**
  50:12

**personally**
  69:17

**perspective**
  15:2 27:4,
  25

**ph**  8:23
  59:21

**phased**  12:18

**phone**  69:16

**photograph**
  26:14,19
  28:14

**photographs**
  10:8
  44:13,15,
  24 57:5

**photos**
  38:21,24
  39:2,17
  50:3

**phrased**
  10:24

**physical**
  57:3

**physically**
  35:2,3

**pick**  42:16
  69:16

**picked**  14:20
  15:24
  29:11
  41:21
  43:3,5

**pictures**
  24:14
  26:21,22

**piece**  28:23

**place**  10:25

25:24 32:3
  60:10

**plaintiff**
  4:15 56:1,
  4 57:24
  59:7,11,22
  62:1 66:1,
  10

**plaintiff's**
  37:5 44:10
  54:21
  56:23
  57:13
  58:14,16
  59:15 60:1
  61:14,19
  72:2

**plaintiffs**
  60:19

**pleadings**
  58:20

**plug**  9:5
  17:19

**plugged**  18:7

**point**  14:12,
  20 42:6
  43:19
  50:24
  52:4,11
  61:1 63:5
  65:24
  69:13 71:8

**pointed**  60:6

**policy**  19:7
  66:6,17

67:2,4

**portable**
  18:5

**portion**
  26:25

**position**
  47:22,25
  48:11

**positioned**
  18:23

**possession**
  15:8 45:6

**possibly**
  15:10 31:2

**potentially**
  12:5 26:25
  27:12 42:4

**preceding**
  53:4,12,16

**preparation**
  6:17 30:9
  41:23 70:3

**prepare**  5:15

**prepared**
  5:24 36:13
  47:9 48:7
  50:22 51:2
  56:18

**preparing**
  64:11

**present**
  40:13

**presented**

33:12

**preservation**
8:7 68:6

**preserve**
42:20 58:7
62:13
63:24
65:25 66:8
68:5

**preserved**
46:10 55:5
56:21
57:12 58:4
59:25
60:20 63:8
70:2

**preserving**
19:8 20:11
53:3,8
63:5

**president**
27:15
32:19

**President's**
30:6

**pretty** 38:17
39:8 41:8
55:13
58:18
63:17 64:9

**printout**
22:2

**prior** 22:10
32:11
40:18

**problem**
27:5,12
30:14 42:9

**problems**
67:1

**procedure**
5:5 8:13,
19 10:19
19:8 22:17
25:11 58:9
66:17

**procedures**
25:22

**process** 6:25
33:11,20,
23 46:13
66:18 67:1

**produce**
46:20
47:23

**produced** 5:3
50:3

**production**
44:11,23
45:5 46:9,
17,19,22

**project**
16:15

**prompt** 69:11

**proper** 52:10
61:14 62:8

**properly**
66:21,25
70:2

**protected**
31:10,12,
13 38:5

**protocol**
11:16,17

**protocols**
10:25 11:3

**proved** 29:14

**provide** 5:17
8:8 40:10
44:6 48:12
49:5 53:18
71:8

**provided** 7:5
10:8 31:6
32:21
44:2,22
45:23
48:12
59:25
67:18 71:7

**puddle** 62:2

**pull** 10:14
21:1,8,10
58:19 65:1

**pulled** 45:24
48:3 54:24

**pulls** 7:1

**purchased**
19:22,24

**purpose**
19:7,16
26:18

**purposes**
25:17
36:5,6

**pursuant**
5:12 47:7

**push** 39:13

**put** 10:24
12:15,23
22:18
24:13
25:11 28:5
39:19
43:17
64:21
65:3,4

---

**Q**

---

**question** 8:4
42:2 44:22
46:24
47:23
51:9,10,15
62:16
69:5,19

**questioning**
69:7

**questions**
6:8 70:24

**quickly**
55:13
71:14

---

**R**

---

**Rajesh** 9:1

| | | | |
|---|---|---|---|
| **ran**  50:8 | 63:2 | **recovering** 15:7 | **relying**  7:5 |
| **rare**  68:16, 20 | **reasonable** 62:12 | **recovery** 15:6  16:14 17:2  27:9, 10,11 29:17 33:11,13 43:21 46:12 | **remember** 58:25 59:15,21 61:20 |
| **reached**  9:16 14:19  15:5 30:4 | **recall**  16:16 63:3 | | **remembered** 65:17 |
| **reaching** 14:9 | **receive** 15:18 33:18 | | **reminded** 9:20 |
| **read**  13:16 16:9  32:20 44:22 49:23 55:12 | **received** 16:20  35:8 | **recreate** 28:8 | **remotely** 19:1,3 |
| | **recognized** 11:21 | **red**  28:22 51:23  70:9 | **remove**  31:17 |
| **read/write** 17:17 33:20 | **reconstruct** 49:12 52:10,16 | **refer**  6:12 | **replace** 17:18  18:1 28:7 |
| **readable**  9:5 15:15 27:22 | **reconstruction** 50:4 | **reference** 27:14 | **replacement** 42:12 |
| | **reconstructionist**  49:11 51:17 | **referenced** 9:17  21:7 65:16 | **report**  9:18 12:12 13:5,11 39:17 54:14,16, 18  55:17 56:3,17 57:11  58:2 62:3,7 |
| **reading** 17:20 55:12 | | **referencing** 18:13,15, 17  56:17 | |
| **reads**  18:4 28:25  33:9 | **record**  24:18 67:13,16 69:14 71:21,23 72:1 | | |
| **ready**  71:18 | | **referring** 6:18,19 | |
| **real**  9:13 66:25 | **records**  66:4 | **related** 54:13  58:8 | |
| | **recover**  6:15 7:14 14:16,23 15:2,16 16:8  31:3 35:24 | | **reporter** 4:9,12,19 65:21  67:6 70:25 71:2,12 |
| **realize** 57:16 | | **relates** 69:24 | |
| **realized** 13:17  21:9 | | **relationship** 34:23 | |
| | | | **reporting** 10:25  11:4 38:12,16, |
| **reason** 40:23,25 | **Recoveries** 16:12 | **relevant** 32:15 62:10  63:4 | |

18,20
54:16

**reports**
12:14
20:12

**represent**
26:14

**representative**
6:24

**request**
44:10,23
45:5 46:8,
17,19,21

**requested**
36:2 44:11
55:20

**requests**
9:15

**requirement**
33:14

**research**
54:7,9

**researching**
36:14 68:2

**resolved**
37:8,11
54:3 62:14

**resources**
40:7

**respond** 5:6
6:4 9:15

**response**
44:10

46:17 51:8

**responsible**
50:11

**responsive**
21:4 25:2

**rest** 19:10
67:7

**restore** 6:15
7:14 14:23
15:13 17:3
27:8

**restored**
17:5

**resumed**
42:22

**retained**
50:4

**retrieved**
18:9

**returned**
43:15

**review** 11:7
30:10
36:11
54:11

**reviewed**
30:9 32:17
56:4,18
57:11,24
62:6

**reviewing**
5:16

**revive** 15:4

23:3 29:13

**Reyes** 56:15

**Roberts**
59:19

**Robinson**
36:17,18,
22,23 37:1

**robust** 67:2

**rolling**
39:14 41:2

**room** 33:16,
19 34:1,14
67:7

**rotate** 21:12

**rounded**
48:25

**Rs** 34:8

**Ruby** 61:24

**Rule** 5:4

**ruled** 58:15
62:11

**rules** 46:20

**running**
57:25

---
**S**
---

**S-O-S-A**
61:24

**Sabrina** 61:4

**sailed** 11:15
44:19

**salvage**
42:10

**sanction**
67:19

**sanctions**
53:11
55:21 56:9
58:11 68:3

**sat** 9:14

**satellite**
40:3

**save** 8:20
10:19
11:8,12,13
13:11 14:5
25:9 32:25
38:10 39:6
62:25
64:15 66:5

**saved** 8:18
9:19 12:2
22:17,19
25:10
38:13,19,
25 45:17
55:18
56:6,8,18
62:6,19,23
66:16,21

**saving** 11:18

**Scola** 58:23
67:21

**scooter**
49:13,20
50:2,5,13,

18 51:6,18

**scope** 32:16
70:14

**Scott** 61:4

**screen**
24:19,24
26:9 33:1,
2

**Sea** 12:16
19:14,17,
19,21
38:16,18,
20 39:2,
11,12,14,
15

**Seagate** 18:4
24:12
28:23 29:1

**search** 6:14
22:15
68:12 70:5

**secure** 39:8
43:17

**security** 7:7
8:24 9:2
11:5,6
12:8 19:5
20:5,6,7,
8,9,17,20
21:13
22:23 24:4
25:22 29:8
30:25
31:14,17,
18,22

32:2,3
40:19
41:12,14,
20 42:7
43:3 44:12
45:16
57:12
59:2,8
60:10,14
61:12
62:18 65:6
66:24 67:2

**Sefara** 59:21

**send** 16:18
21:1 23:8
28:18
69:12

**separate**
7:14 31:15
41:2 59:4,
22,23

**separately**
12:24
19:15

**serial** 22:7,
25 23:5,
11,15,19,
25 24:7,
13,15 25:1
28:15,19

**serve** 5:5

**served** 5:7

**service**
26:1,6,7

**services**

55:1

**set** 23:19

**sets** 21:16

**settled**
36:21,23
37:1,12
59:13

**severity**
11:2

**share** 11:25
24:19 26:9
33:1,2
39:22

**sheet** 36:13

**ship** 8:22
9:16 11:20
12:18
14:10,25
15:25
18:23
19:3,4
22:22
25:23
27:21
29:12
31:19
32:13
41:4,7
44:14,18,
19 52:22
57:1 59:3

**ship's** 7:21
9:23 44:17

**shipboard**
6:22 8:13

14:10,16
15:1

**shipped**
16:10

**ships** 8:2
12:19 40:2
41:1,5,8
42:19
63:20,21

**shore** 7:12
13:19
14:21
15:1,25
34:6,17
43:11

**short** 63:23

**show** 60:14
62:10 63:4
65:10

**showed** 45:17
49:3,4,6
61:1

**shows** 10:21

**shut** 13:7

**side** 7:12
13:19
14:21
15:1,25
34:6,17
43:11

**sided** 49:20,
23

**significance**
48:22

**similar**
  70:1,20

**single**  54:11

**situation**
  56:24
  58:12

**size**  11:10
  12:20,21
  19:13,20
  27:16
  38:11
  39:20

**skip**  23:24

**slash**  53:14

**slip**  66:7

**slipped**
  57:25

**slow**  55:12

**society**  40:6

**software**
  19:22

**Soppa**  8:23
  9:24

**Soppa's**
  12:25

**sort**  36:13
  40:25

**Sosa**  61:24
  65:13,14,
  15 67:22

**sounded**  30:6

**source**  27:5

**speak**  5:24
  6:17 14:17
  21:17 40:8
  41:8 42:1
  51:2

**speaking**
  5:16 11:12

**specific**
  16:15
  28:16 42:2
  46:24
  50:23

**specifically**
  34:19 43:6

**speculate**
  25:21

**speed**  49:12
  50:6,8,9,
  18 51:7,19
  52:10,18

**spell**  34:7
  55:9

**Splendor**
  56:20 57:2

**spoke**  6:23
  30:11

**spoken**  7:4,8

**spoliation**
  60:3

**SSTV**  8:5

**staff**  6:22
  22:2,3
  24:4 30:25

**stage**  17:23

**stairs**  56:2,
  5

**standard**
  10:19 28:5

**state**  69:13

**stated**  59:1

**statements**
  38:21
  39:18

**stationary**
  18:22

**stayed**  43:2

**stays**  31:22

**step**  63:2
  65:7 66:24

**Stephanie**
  37:23

**steps**  62:12
  64:15 65:3

**sterile**
  15:11
  17:14
  28:4,6

**sterilize**
  28:6

**stick**  51:1

**stipulated**
  50:16

**store**  7:22
  12:24
  19:15 22:8

**24:8 30:21
  38:3 41:10

**stored**  5:17
  7:24 8:12
  12:13
  22:10,11
  25:5
  42:15,25

**streamlined**
  68:21

**stricken**
  67:20

**struck**  59:11

**structure**
  34:22

**stuck**  63:8

**stuff**  71:13

**style**  53:5

**subject**  8:5
  13:22 20:2
  22:9 24:9
  30:22
  40:12

**subsequent**
  72:3

**success**  15:4

**successful**
  43:14

**summary**
  63:15

**super**  64:20

**superiors**
  42:8

**supervisor**
9:24

**supposed**
25:10
38:10

**surface**
33:15,21

**surfaces**
33:17

**surveillance**
18:22
44:12,25
45:7 53:8,
14

**Suzanne** 4:18
5:1

**Suzie** 5:2
72:1

**swear** 4:12

**sworn** 4:19

**system** 11:23
19:12
31:16,24
32:1 36:23
38:14,15
40:19
41:6,8
42:11,13
61:8 63:19
64:19,25

**systems**
14:25

———————
**T**
———————

**T-H-A-P-A**
18:12

**T.B.** 18:5

**taking** 23:13
26:18

**talk** 27:23

**talked** 24:11

**talking**
21:17
27:15

**tape** 28:23

**team** 14:24
15:2 16:6,
7 34:5,17
35:12,13,
14,16
43:13

**technical**
17:15

**technician**
33:13

**technology**
40:5

**telling**
11:17
51:16

**temporary**
39:4

**terabyte**
24:12 26:3

**testified**
4:20 10:12
45:18 58:2
63:3

**testimony**
6:18 22:10
30:9 38:6,
24 40:18
63:16 65:8

**Thapa** 18:11
41:19 49:4

**themself**
11:7

**thing** 8:21
12:7 17:12
27:20 54:6

**things** 25:18
38:21 40:6
54:19

**thought**
45:9,20
47:4

**three-year**
69:24
70:14

**threshold**
60:9,12

**thresholds**
59:23
60:5,17

**time** 4:7
11:14
12:18 13:6
14:7 17:2,

9,21 18:1,
6 20:3
21:11,17,
21 25:15,
17 29:11
30:10 32:6
36:10,25
41:11,19,
20 42:18
43:5 52:8
55:19 58:8
60:8,15
63:16 64:8
65:3,4
67:12,15
69:24
71:24

**timeline**
6:13 7:12

**timely** 61:14

**tiny** 28:11

**today** 5:3,
11,25 6:8
7:6 10:2
15:16 17:7
26:6 30:9
32:23 33:5
41:24
43:24
47:22
48:1,11,16
70:3 71:7,
15

**Today's** 4:6

**told** 12:8
13:18

14:13
26:2,20,24
29:6 47:18
59:4 69:1

**Tonya** 22:1

**Torres** 58:24
67:22

**total** 70:6

**touch** 28:9

**track** 29:16

**transfer**
61:13

**transferred**
25:8 62:8

**transferring**
22:20

**transitioning**
39:12

**transmitting**
27:10

**traveling**
51:7
52:11,18

**trial** 54:5
55:5

**triggered**
11:1,3

**tripped** 56:1

**type** 20:14
33:14
38:15

**typically**

11:12

---
**U**
---

**ultimately**
61:17

**unable** 15:16
16:9 29:14
53:23

**unavailable**
8:7,8

**uncover** 49:5

**underlying**
22:8

**understand**
5:11 22:9
27:17 38:6
40:18
48:2,6
49:17

**understanding**
7:17 26:23
27:3,19
29:18
41:20 43:2
49:19
64:3,13

**unreadable**
9:3,11,21,
25 14:2,18
15:3 20:22
27:4,13
56:25

**untoward**
47:3

**unusable**
18:9

**update** 33:9

**updates**
17:11

**upload** 39:5
40:4

**uploaded**
11:24
19:12
39:2,18

**uploading**
19:14

**upset** 51:24

**USB** 17:19

---
**V**
---

**Valor** 57:12

**Vazquez** 4:18
5:1,3 8:11
30:20
48:10,18
50:22
67:17
68:17
69:20,23
72:1

**vendor** 19:23

**verdict** 55:3

**versus** 4:4
43:7

**vessel** 7:18
8:1

**video** 5:7,9
6:14 8:5
9:17 12:12
13:1,12,22
14:9
18:12,19,
22 19:8
20:2 23:2
25:5 30:22
39:19
44:9,14
45:11,17,
19,23
46:10
48:22,24
49:3,9,11,
18 50:13
52:1,3,9
53:23
54:25
55:6,23
56:5,18,20
57:11 58:7
59:9,12,24
60:20
63:24
65:7,25
66:8,10
67:4,25
68:17
71:22

**videos** 7:22
8:21 12:8,
23 18:6
19:13
20:11
25:17 26:4
37:3 38:25

39:9
44:12,25
45:4,8
59:25
60:22 64:3

**view** 53:23
64:6,20

**viewable**
64:14

**viewed** 9:19
64:4

**visible**
24:15 62:4

**voluntarily**
61:17,21

———————

**W**

**wait** 71:9

**waiting**
42:16 71:5

**walking**
60:9,14

**walls** 62:5

**wanted** 52:5
65:18
69:19

**water** 62:2

**ways** 39:23
61:8

**weather**
56:22

**weeds** 64:11

**week** 17:23

**weeks** 15:22

**West** 16:11

**whatnot** 66:2

**wide** 7:19

**Williams**
57:19

**window** 63:23

**withholding**
67:24

**Wolf** 61:4

**woman** 45:13
47:5

**word** 49:22

**work** 35:14
43:12

**worked** 41:24
42:12

**working** 7:16
15:17
16:15
22:4,19
30:5 39:5
40:3

**works** 16:2
64:17,19

**worn** 18:20

**wrap** 71:14

**written** 23:7
28:10,24
66:17

**wrong** 27:19
29:19

**wrote** 49:4
62:14

———————

**Y**

**years** 32:15
53:4,12,16

**yesterday**
10:9 30:5