UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 20-23463-Civ-COOKE/GOODMAN**

MARIA PEREZ-SERA,

Plaintiff,

v.

CARNIVAL CORPORATION, a Panamanian
Corporation, the owner and operator of the
Trademark CARNIVAL CRUISE LINE,

Defendant.

_____/

### PLAINTIFF'S RESPONSE TO CARNIVAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Maria Perez-Sera, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and Local Rule 56.1 of the Southern District of Florida, responds in opposition to Defendant Carnival Corporation's Motion for Summary Judgment [ECF No. 43].

### INTRODUCTION

When Plaintiff boarded the Carnival *Horizon* to enjoy a vacation with her family, she never anticipated that her trip would lead to surgery, three months of in-patient rehabilitation, and lifelong pain. Unfortunately, that is what happened when another passenger operating a motorized scooter was funneled into the *Horizon's* crowded atrium walkway and ran into Plaintiff, knocking her to the ground and fracturing her right knee and left ankle. As one of the busier areas on the *Horizon*, the atrium attracts both window shoppers and music listeners who gather along its perimeter. It also serves as a central gateway to the ship's casino. And therein lies the problem.

1

Colson Hicks Eidson
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

The hallway that connects the casino to the atrium's circular walkway has a blind corner: passengers exiting the casino cannot see what is on the other side, and vice versa. When passengers gather along the inner railing of the atrium's narrow walkway, guests exiting the casino are forced to take a sharp right (or left) turn, putting unsuspecting window-shoppers directly in their path. If the *Horizon's* passengers were all pedestrians, incidents at this corner could probably be resolved with a polite "excuse me." But because Carnival allows passengers with mobility limitations to use motorized scooters (some up to 32 inches in width), the foreseeable injuries take on a different dimension.

This case illustrates the point. When Eileen Smith rounded the atrium's corner on her scooter, she immediately collided with Plaintiff, who was in front of the Invicta gift shop. Because she was struck from behind, Plaintiff had no knowledge of Smith's advance. Likewise, because of the blind corner, Smith could not see Plaintiff on the other side. But for precisely this reason, Carnival should have taken steps – including the use of signs or other warnings – to ensure that passengers driving motorized scooters slowly exited the casino's hallway when merging into the atrium's walkway. It failed to do so.

The dangerousness of this condition (and the length of time Carnival allowed it to persist) could easily be shown through video footage captured by the *Horizon's* surveillance cameras. In fact, Arvind Lagas, a Carnival security officer, testified that he reviewed and *saved* video of the collision on an external hard drive as part of his investigation. But the hard drive was destroyed when a senior Carnival IT technician opened it in a "dirty" room, allowing dust particles to contaminate it. More than mere negligence, this was a violation of basic data recovery protocols that warrants sanctions under the Court's inherent authority and Federal Rule of Civil Procedure 37(e). Accordingly, Plaintiff should be entitled to an adverse inference

Colson Hicks Eidson
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

that Carnival had notice of the dangerous condition caused by motorized scooters entering the crowded atrium walkway.

**STATEMENT OF THE FACTS**

### The Incident

On Deck 4 of the *Horizon*, a multi-level atrium is ringed by a circular walkway. Home to the ship's shopping district and live musicians, passengers gather to window shop and enjoy the music. The area also serves a bridge between an entertainment venue (foreship) and the "Horizon Casino" (aft). The layout looks like this:



(Plaintiff's Resp. to Carnival's Stmt. of Undisputed Facts [ECF No. 54] ("SOF" at ¶ 18.)

After dinner on the first night of their cruise, Plaintiff and her family – along with a crowd of fellow dining-mates – entered the atrium. (*Id.* at ¶ 28.) As one of the ship's busier areas, passengers were standing around listening to live music. (*Id.* at ¶¶ 20, 30). Plaintiff and her family briefly stopped in one of the shops and then exited back to the starboard portion of the walkway surrounding the atrium. (*Id.* at ¶¶ 29-30.)

3

At the same time, Eileen Smith was leaving the ship's casino on her motorized scooter. (*Id.* at ¶ 31.) As reflected in the diagram above, she exited through the hallway connecting the casino to the atrium. At the end of that hallway, passengers can turn left or right; but their visibility is obstructed by the exterior walls of the gift shops on either side of the hallway's exit. Because guests had gathered along the walkway's inner perimeter, Smith had to take a sharp right at the end of the hallway; she did, and immediately drove her scooter into an unsuspecting Plaintiff. (*Id.* at ¶ 33.)

Smith's path, and her collision with Plaintiff, are shown in the following photograph:



(*Id.* at ¶ 34.)

**Plaintiff's Injuries**

Smith ran into Plaintiff from behind, throwing her to the floor. (*Id.* at ¶ 36.) Though x-rays were taken that evening, the shoreside radiologist didn't complete his review – indicating a fracture – for two more days. (*Id.* at ¶¶ 38-39.) And though Plaintiff was provided with a wheelchair, she wasn't given a wheelchair accessible cabin. For the remainder of the trip, she was forced to stand and bear weight on her injuries every time she entered or exited her cabin. (*Id.* at 42). Worse still, because she couldn't fit the wheelchair in her room – let alone her

Colson Hicks Eidson
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

bathroom – her family had to bathe her with bottled water while she sat on a toilet in the public handicapped-accessible bathroom.

As soon as the ship returned to Miami, Plaintiff was admitted local hospital where she underwent surgery for the right tibial fracture. (*Id*. at ¶¶ 44). The surgery required hardware and was followed by three months of in-patient rehabilitation (and four more months of home healthcare). (*Id.* at ¶¶ 46, 48.) She remains in pain to this day. (*Id.* at ¶ 49.)

**The Lost Video Surveillance**

Early in this action, Plaintiff requested a copy of any video surveillance of the collision. (*Id*. at ¶ 50.) Carnival responded that there was none. (*Id*.) Months later, however, security officer Lagas testified that he reviewed video of the incident as a part of his of his investigation and promptly saved it on an external hard drive – all per standard investigation protocol. (*Id*. at ¶¶ 51-52). Apparently, that hard drive was never backed up, and sometime in March 2020, Carnival security officers reported that it could not be "detected" when plugged into a computer. (*Id*. at ¶ 54.) Instead of immediately sending the hard drive to a data recovery specialist, Carnival opened it at its in-house IT department. In so doing, Carnival violated basic data recovery requirements by opening the hard drive outside of a "clean room." (*Id*. at ¶ 57). By allowing dust particles to contaminate the inner discs, Carnival corrupted the hard drive beyond recovery. (*Id.* at ¶ 59).

**LEGAL STANDARDS**

**Summary Judgment**

Summary judgment is inappropriate where genuine issues of material fact exist, or where the undisputed facts do not entitle the moving party to judgment as a matter of law. Fed. R. Civ. P. 56. A fact is material if it "might affect the outcome of the suit under the

5

governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts are to view the facts in the light most favorable to, and draw all reasonable inferences in favor of, the non-moving party. *See Crocker v. Beatty*, 886 F. 3d 1132, 1134 (11th Cir. 2018).

In resolving a motion for summary judgment, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, No. 08-80113-CIV, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment.") (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913 (11th Cir. 1993)). Even "where the parties agree on the basic facts but disagree about the factual inferences that should be drawn from these facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

**Principles of Maritime Law**

Maritime law governs torts committed aboard a ship traveling in navigable waters. *See Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 719, 720 (11th Cir. 2019). Because courts rely on general principles of negligence law when analyzing a maritime tort, the same four elements must be established: (1) a duty to protect the plaintiff from a particular injury; (2) a breach of that duty; (3) which actually and proximately caused the plaintiff's injury; and (4) actual harm. *See Chaparro v. Carnival Corp.*, 693 F. 3d 1333, 1336 (11th Cir. 2012) (citation omitted).

Insofar as duty is concerned, shipowners must exercise "reasonable care towards those lawfully aboard the vessel who are not members of the crew." *Kermarec v. Compagnie Genrale Transatlantique*, 358 U.S. 625, 630 (1958). Generally, this requires a shipowner to "have had

6

actual or constructive notice of the risk-creating condition." *Keefe v. Bahamas Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989). Stated differently, "a cruise ship operator's duty is to shield passengers from known dangers (and from dangers that should be known), whether by eliminating the risk or warning of it." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1178 (11th Cir. 2020). A plaintiff satisfies this element if it shows that "(1) a dangerous condition existed; [and] (2) the vessel's operator had actual notice of the dangerous condition; or (3) if there was no actual notice, that [d]efendant had constructive notice of the dangerous condition[.]" *Stewart v. Carnival Corp.*, 365 F. Supp. 3d 1272, 1275 (S.D. Fla. 2019) (citation omitted).

### Spoliation

Spoliation is "the destruction of evidence or the significant and meaningful alteration of a document or instrument." *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1291, 1308 (11th Cir. 2003). "Spoliation of critical evidence may warrant the imposition of sanctions[,]" including adverse inferences. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005). To make that decision, courts look to (1) whether the party seeking sanctions was prejudiced; (2) the practical importance of the evidence; (3) whether the spoliating party acted in bad faith; (4) the potential for abuse if sanctions are not imposed. *Id.* at 943.

If the evidence is ESI, Federal Rule of Civil Procedure 37(e) is also at play. *See ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018) (recognizing, but not deciding, the issue of whether the *Flury* test applies given the 2015 amendments to Rule 37). Where Rule 37(e) applies, harsher sanctions – such as an adverse inference – are available only if the court finds the spoliating party "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).

Colson Hicks Eidson
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

## ARGUMENT

I.     **Carnival Is Not Entitled to Summary Judgment on Plaintiff's Negligence or Failure to Warn Claims.**

Carnival contends that summary judgment is warranted on Plaintiff's negligence and failure to warn claims (Counts 1 and 2) because there is no evidence that it had any actual or constructive notice of the risk posed by motorized scooters and because any such risk is open and obvious. (*See* ECF No. 43 at 5.) Carnival's first argument is unavailing as the dangerous condition – a crowded atrium walkway into which scooters were funneled into standing passengers – was one it created. Moreover, Carnival's spoliation of the video surveillance warrants an adverse inference establishing notice. And as far as Carnival's "open and obvious" argument goes, though a passenger may expect motorized scooters to be used on a ship, no reasonable passenger would imagine having to jump out of harm's way while window shopping.

For all three reasons, Carnival's motion for summary judgment on Plaintiff's negligence and failure to warn claims should be denied.

A.     **Carnival had constructive knowledge of the dangerous condition that could result when motorized scooters enter the crowded atrium walkway.**

To hold a cruise ship liable for negligence, "there must be a finding of actual or constructive notice of a dangerous condition." *Wieters v. Carnival Corp.*, No. 16-25284-Civ, 2018 WL 4682217, at *3 (S.D. Fla. Sep. 28, 2018) (citing *Pizzino v. NCL (Bahamas) Ltd.*, 709 F. App'x 563, 565 (11th Cir. 2017). "[C]onstructive notice can be established by showing that 'the shipowner ought to have known of the peril to its passengers, the hazard having been present for a period of time so lengthy as to invite corrective measures." *Id.* (quoting *Keefe*, 867 F.2d 1318 at 1322); *accord Guevara*, 920 F.3d at 720.

8

Here, Carnival had knowledge of the various elements that, when combined, created the dangerous condition leading to Plaintiff's injuries. For one, Carnival certainly knew of the *Horizon's* design, including the atrium's narrow, circular walkway; the location of the gift shops along the walkway's perimeter (which, with their large windows, encouraged passengers to stop and browse); and the hallway connecting the casino to the atrium (including its blind corners that funnel traffic into the congested atrium walkway). (SOF at ¶ 18.) For another, Carnival should have known that allowing musicians to play in the atrium would cause passengers to stop and gather along the walkway – something guests were doing on Plaintiff's cruise. (*Id.* at ¶¶ 20, 30). In addition, Carnival should have known that some of its passengers using motorized scooters would exit the casino toward the atrium and then navigate the blind corner at the hallway's end. Finally, Carnival should have known that some its passengers would operate their scooters too fast (as one gentleman did in this case prior to the incident). (*Id.* at ¶ 3.)

In three words, Carnival's duty boils down to this: crowd flow control. *See Diaz v. Carnival Corp.*, 555 F. Supp. 3d 1302, 1306 n.4 (S.D. Fla. 2021) (recognizing that cruise ships owe a duty to properly undertake crowd control under maritime law); *see also Lancaster v. Carnival Corp.*, 85 F. Supp. 3d 1341, 1345 (S.D. Fla. 2015) (recognizing cruise ships have duty to control crowds in corridors). By encouraging some passengers to stop and window shop or listen to music, while simultaneously routing other passengers directly into their path (including guests on motorized scooters), Carnival failed to control the flow of passenger traffic on board the *Horizon*.[1] As a result, Carnival fell short in its duty to maintain a safe

---

[1] This same evidence also raises an issue of fact regarding breach. *See Diaz*, 555 F. Supp. 3d at 1306 (denying summary judgment because there was an issue of fact as to whether

9

pedestrian walkway for Plaintiff's benefit. *See Carroll v. Carnival Corp.*, 955 F.3d 1260 (11th Cir. 2020) (recognizing a claim for the negligent failure to maintain a safe walkway).

The sum of Carnival's argument to the contrary is that it did not know Eileen Smith posed a risk operating her scooter and there is no evidence of any prior incidents. (ECF No. 43 at 5). Although the latter may be true, the former misapprehends the salient issue: If it wasn't Smith, it would have been another driver who – because of the atrium's crowded condition and the casino hallway's blind corner – was funneled into an unsuspecting pedestrian. These conditions were not new; instead, they were part and parcel of the *Horizon's* layout and the passenger flow that Carnival encouraged. Put another way, Carnival had ample time to correct the very conditions it created, the hallmark of constructive notice. *See Guevara*, 920 F. 3d at 720. Accordingly, to the extent Carnival contends that there is no evidence of its constructive notice, its motion should be denied.

**B.      Plaintiff is entitled to an adverse inference that Carnival had notice of this dangerous condition.[2]**

Though video evidence of the collision was saved on a security office hard drive, Carnival destroyed it by exposing the hard drive's sensitive discs to dust and particulates. (SOF at ¶ 59.) Because this was done by Carnival's IT professionals without regard for basic data recovery protocols, (*id.* at ¶ 57), the destruction was not merely negligent; Carnival's actions rise to the level of both bad faith and an intent to deprive Plaintiff of the video's use.

---

Carnival's failure to control a crowd led to a scooter striking a passenger). While *Diaz* analyzed crowd control in the context of angry, disruptive passengers, the logic applies equally here. The underlying question in both circumstances is whether the movement or actions of a crowd (which the ship owner failed to control) caused a passenger's injury.

[2] Contemporaneously, Plaintiff is filing a Motion for Sanctions seeking this relief.

Colson Hicks Eidson
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

Accordingly, Carnival's spoliation warrants an adverse inference that it had notice of the dangerous condition posed by motorized scooters entering the atrium's crowed walkway at a blind corner.

When contemplating sanctions for the spoilation of physical evidence, the inquiry focuses on the prejudice to the movant; the importance of the evidence; whether the spoliating party acted in bad faith; and the potential for abuse if sanctions are not imposed. *See ML Healthcare Servs.*, 881 F.3d at 1307 (citing *Flury*, 427, F.3d at 954). "Spoliation sanctions – and in particular adverse inferences – cannot be imposed for negligently losing or destroying evidence." *Tesoriero*, 965 F.3d at 1184. Rather, bad faith is required, which means "destruction for the purpose of hiding adverse evidence." *Id.* (quoting *Guzman v. Jones*, 804 F.3d 707, 712 (5th Cir. 2015).

For electronically stored information (ESI), Federal Rule of Evidence 37(e) provides additional conditions. Under Rule 37(e), the first question is whether ESI was lost. *See Hoover v. NCL (Bahamas) Ltd.*, No. 19-22906-CIV, 2020 WL 4505634, at *8 (S.D. Fla. Aug. 5, 2020). If so, three additional questions follow: First, should the spoliated ESI have been preserved? Second, is the loss due to a party's failure to take reasonable steps to preserve the ESI? And, third, is the lost ESI evidence that cannot be restored or replaced through additional discovery. *Id.* To warrant sanctions, all questions three must be answered in the affirmative. *Id.*

Here, although the destroyed evidence may have initially been ESI, it became tangible evidence once it was saved to a physical hard drive. Indeed, the footage wasn't destroyed because of a virus, system corruption, or a regularly scheduled "overwrite"– the type of events that afflict ESI. Instead, it was destroyed by Carnival's own IT personnel who

11

recklessly exposed the hard drive's physical components to dust and contaminates. As such, Carnival's spoliation should be analyzed under *Flury's* four factors, all of which are satisfied.

First, because the hard drive contained video that was the best evidence of the incident and the underlying condition, its loss has prejudiced Plaintiff's ability to establish the element of notice. Further, because Carnival's IT technicians recklessly opened the hard drive in a manner that is contrary to basic recovery protocols (effectively ensuring the discs' destruction), its actions evidence bad faith. *See Long v. Celebrity Cruises, Inc.*, No. 12-22807-CIV, 2013 WL 12092088, at *7 (S.D. Fla. Jul. 31, 2013) ("[B]ad faith [can be] deemed to exist in either a case of intentional misconduct or *reckless disregard of the consequences*.") (emphasis added). The loss of the hard drive – by experienced IT personnel – "cannot be credibly explained" any other way. *Tesoriero*, 965 F.3d 1185. Finally, this is not an isolated instance. *See, e.g.*, *id.* at 1193 (Rosenbaum, J., dissenting) (discussing several instances in which "Carnival has destroyed material evidence" and observing that "[a]t some point, adherence to policies Carnival knows from past litigation result in the destruction of material evidence … constitutes bad faith."); *Sosa v. Carnival Corp.*, No. 18-20957-CIV, 2018 WL 6335178, at *1 (S.D. Fla. Dec. 4 2018) (describing Carnival's reaction to a sanctions motion for losing CCTV footage as "[c]'est la vie"). Sanctions are necessary to curb further abuse.

To the extent Rule 37(e) applies, the result is no different. As explained by Carnival's corporate representative, when litigation is anticipated, security officers review and save the video of an incident on an external hard drive (including time before and after the incident). (SOF at ¶ 52.) Here, notwithstanding an anticipated claim, the electronically stored video of Plaintiff's incident was destroyed by Carnival's actions. And this loss did not occur because Carnival was trying to take reasonable steps to preserve the evidence. Although the onboard

Colson Hicks Eidson
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

security officers had reported the hard drive could not be detected when plugged in, opening the hard drive's case in a dirty room was a surefire way to lose the data forever. As Carnival's own data recovery vendor explained, the hard drive "was presented to Datalab after having been opened by a technician *that followed no data recovery requirements needed for this type of operation.*" (SOF at ¶ 57.) The technician who did so was part of Carnival's IT team, (SOF at ¶ 56), and surely must have known of these basic protocols. Thus, to the extent Rule 37(e)'s "intent to deprive" condition is analyzed in line with bad-faith, Carnival's intentional actions fit the bill. *See Long*, 2013 WL 12092088, at *7. Finally, as Carnival's Counsel made clear in a recent email, the hard drive is now officially unrecoverable; no additional discovery can replace what has been lost. (SOF at ¶ 59.) As a result, Plaintiff has been prejudiced by the inability to marshal critical evidence of the walkway's dangerous condition leading up to (and including) the time of the collision.

Turning to sanctions, both the common law and Rule 37(e) contemplate: (1) dismissal (or default against the defendant); (2) a presumption that the lost information was unfavorable to the spoliator; or (3) a jury instruction which raises a presumption against the spoliator. *See* Fed. R. Civ. P. 37(e)(2); *In Matter of Compliant of Boston Boat III, L.L.C.*, 310 F.R.D. 510, 514-15 (S.D. Fla. 2015) (quoting *Flury*, 427 F.3d at 945). Here, at a minimum, the jury should be instructed that the video evidence would be favorable to Plaintiff, "[t]he least-harsh type of adverse inference[.]" *In Matter of Compliant of Boston Boat III*, 310 F.R.D. at 514-15. But given the record evidence documenting the dangerous condition of the atrium's walkway, there should, in all fairness, be an adverse inference that Carnival had notice.

The Eleventh Circuit considered, but stopped short of granting such relief, in *Tesoriero*. But its reluctance stemmed, in part, from the disconnect between the destroyed evidence and

Colson Hicks Eidson
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

the issue of notice. *Tesoriero,* 965 F.3d 1187 ("[W]e are unpersuaded that [plaintiff's] ability to inspect the broken chair would have been so important to the notice issue as to warrant sanctions."). Here, however, video evidence demonstrating the dangerousness of the condition and its *duration* are critical to establishing Carnival's constructive notice. Though Judge Rosenbaum's position in *Tesoriero* did not carry the day, her observation is instructive:

> [T]he defective chair that Carnival destroyed may well have proven that Carnival had notice of the chair's dangerous condition, had Carnival not discarded the piece of furniture. So given an opportunity to evaluate the witnesses and other evidence at trial, a jury reasonably could have concluded, upon a sanctions-based presumption instruction, that an inspection of the chair would have revealed that Carnival knew or should have known of its dangerous condition.

965 F.3d at 1197 (Rosenbaum, J., dissenting).

Unlike the chair in *Tesoriero,* there is a strong likelihood that the video of the collision (and, crucially, video from the time *before* the collision) would provide evidence of notice. Although Plaintiff maintains that there is a genuine dispute regarding Carnival's notice even without an adverse inference, the video is the best evidence. Accordingly, Plaintiff requests an inference that Carnival had notice of the dangerous condition.

## C. The risk of being struck from behind by a scooter without warning is not open and obvious.

With respect to Plaintiff's failure to warn claim, Carnival argues that encountering motorized scooters onboard a ship is an open and obvious risk. (ECF No. 43 at 5.) But there is a crucial distinction between "com[ing] into contact" with motorized scooters, (*id.*), and being forcibly thrown to the ground when one is struck from behind – blindsided – by a motorized scooter. (SOF at ¶ 37.) Because no reasonable person would anticipate the latter, the risk is not open and obvious.

Colson Hicks Eidson
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

In assessing whether a danger is open and obvious, courts "are guided – as in general tort law – by the 'reasonable person' standard." *Carroll*, 955 F.3d at 1264 (citation omitted). Here, as in *Carroll*, the question is whether "a reasonable person would have observed the [condition] and appreciated the risk of walking through the narrow passageway under the circumstances." *Id.* (evaluating whether a reasonable person would have observed a deck chair leg protruding into her path).

Though Carnival points to Plaintiff's testimony that she saw another passenger operating a scooter prior to the incident, (ECF No. 43 at 5-6), it does not follow that Plaintiff appreciated the risk of being struck from behind while navigating the atrium's walkway. As Plaintiff testified, she did not see or hear the scooter before it struck her. (Perez-Sera Dep., Vol. I [ECF No 42-1] at 64:6–12). And when asked if there was anything she could have done to avoid the scooter, her answer was straightforward – move away, "*[i] I would have seen it*." (*Id.* at 67:10–14) (emphasis added). As reflected in the following photograph, no person standing near the red circle (where Plaintiff was located) could have seen a scooter advancing from left of the blind corner (especially if she were facing in the opposite direction):



(SOF at ¶ 35.)

Colson Hicks Eidson
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

Because a reasonable person could not have observed the scooter's approach (from behind) or appreciate the danger that it posed, the risk is not open and obvious. *See Malley v. Royal Caribbean Cruises, Ltd.*, 713 F. App'x 905, 908 (11th Cir. 2017) ("To determine whether a condition is open and obvious, this Court asks whether a reasonable person would have observed the condition and appreciated the nature of the condition."); *accord Carroll*, 955 F.3d at 1265 (passenger "could not see the foot of the lounge chair that she tripped on nor around the curve of the walkway," thus supporting an inference that the condition was not open and obvious).

Finally, although the structure of Carnival's motion seems to suggest that an open and obvious danger would be fatal to both Counts I and II, that is not the case. An open and obvious danger only negates liability for failure to warn. *Id.* at 1267 (citing *Guevara*, 920 F.3d at 720 n.5) (the duty to warn only applies to "dangers that are not open and obvious."). Even if this dangerous condition were found to be open and obvious, Plaintiff's negligence claim may proceed. *Id.* at 1267-69 (adopting the Third Restatement of Torts' distinction between failure to warn claims and negligent maintenance claims as a maritime tort principle).

At bottom, there is record evidence upon which a reasonable juror could conclude that (1) Carnival had constructive notice that the flow of traffic around the atrium's blind corner created a dangerous condition (made worse by encouraging people – through shops and musicians – to gather in the walkway); and  (2) the risk this condition posed was not open and obvious. As a result, it had a duty to control the crowds of passengers traversing the atrium and provide Plaintiff with a safe walkway or give her adequate warning. The collision itself is evidence of the breach of these duties, and Plaintiff's treating physician has testified to causation. (SOF at ¶ 45) (indicating that Plaintiff's injuries are consistent with being struck

Colson Hicks Eidson
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

from behind by a scooter and falling forward). Accordingly, Plaintiff's negligence and failure to warn claims should proceed on their merits.[3]

## II. Carnival Is Not Entitled to Summary Judgment on Plaintiff's Medical Negligence Claims.

Carnival also seeks summary judgment on Plaintiff's medical negligence claims (Counts 4 and 5) because there is no expert testimony opining that Carnival breached its standard of care or that its shipboard medical personnel worsened Plaintiff's injuries. (ECF No 43 at 11.) As explained below, neither argument entitles Carnival to complete summary judgment on Plaintiff's claims.

### A. The applicable standard of care turns on disputed facts.

With respect to Carnival's first argument, its expert opinion regarding the standard of care comes in the form of two terse paragraphs in its shipboard medical expert's declaration. (*See* Dr. John Bradberry Declaration [ECF No. 42-11] ¶¶ 2-3.) On the topic of seeking out specialist care, Dr. Bradberry concludes that the "referral of the Plaintiff to a shoreside hospital for follow up imaging *at the conclusion of the cruise* was correct … and met the standard of care." (*Id.* at ¶ 3) (emphasis added). This opinion, however, doesn't match up with the medical care the shipboard doctor claims she provided.

During her deposition, Dr. Chagin explained that she advised Plaintiff to seek specialized care *immediately*:

> And I explained her, "There is a suspicious of a fracture, because the radiologist report say it may be possible to be a fracture because there is something that is

---

[3] Plaintiff is not pursuing certain theories alleged in the Amended Complaint, namely, the Pennsylvania Rule or a negligent mode of operation theory. Additionally, Plaintiff does not intend to pursue at trial claims based on negligent training or supervision (Count 3). Accordingly, partial summary judgment based on these theories is appropriate.

Colson Hicks Eidson
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

not right, and you have to see the orthopedist as soon as possible and you cannot bear weight and you cannot walk and you have to –" as I explain to her before – "and you have to – *to see the doctor as soon as possible*."

(Dr. Chagin Dep. [ECF No. 42-7] at 17-18) (emphasis added).[4]

On this point, Dr. Chagin doubled down:

Q:     Okay. So it's your testimony that when [Plaintiff] was in the clinic with you, that you medically advised her to fly home as soon as she could to see her own doctor there. Is that your testimony?

A:     Yes.

(*Id.* at 18.)

In fact, when Plaintiff briefly left the ship in her wheelchair in Curacao, (*see* ECF No. 42-9 at 114:7–11, 116:5–7), Dr. Chagin testified that she assumed Plaintiff had heeded her advice and flown back to Miami. (ECF No. 42-7 at 18) (explaining that the ship's nurses "were informed that the patient left the ship and she's no longer on the ship. Then I guess the patient fly back home, as per my recommendation, to see the orthopedist there.").[5]

The reason Dr. Chagin was so adamant that Plaintiff receive immediate specialized care was because, in her words, "I know[] orthopedic fractures need surgery."[6] (*Id.* at 33.) Put differently, Dr. Chagin's testimony acknowledges that the standard of care for a suspected fracture like Plaintiff's is *immediate* care rendered by an orthopedic surgeon (shoreside or in Miami).

---

[4] The deposition transcript Carnival filed is a condensed version. Citations here are to the CM/ECF pagination, not the transcript's internal pagination.

[5] How Dr. Chagin could have reasonably concluded that Plaintiff had flown back to the United States for treatment is not clear.

[6] Despite knowing this, Dr. Chagin decided not to tell Plaintiff that surgery was likely. (ECF No. 42-7 at 33.)

18

But there is evidence that Dr. Chagin failed to provide Plaintiff with the very care she claimed was necessary. For example, Plaintiff testified that she could only recall being told to see an orthopedist at the *conclusion* of the cruise. (*See* ECF No. 42-1 at 97:20–25.) She had no recollection of being told to see a specialist as soon as possible. (*Id.* at 98:9–20.) And though the medical notes indicate that Plaintiff was told to "request a follow-up visit *with her orthopedist* as soon as possible, (ECF No. 42-6 at 15), Plaintiff's doctors were in Miami, thousands of miles (and days) away. In fact, Dr. Chagin admitted that in her August 27, 2019 note, she did not document her advice to Plaintiff to disembark at the next port of call and return home. (*See* ECF No. 42-7 at 99-100) ("Q: And nowhere in here does it say, "I advised her to leave the ship at the next port and fly home for medical care, correct? [Objection] A: It's not right in there.").

As a result, determining the applicable standard of care – and whether Dr. Chagin breached it – requires the resolution of disputed issues of fact.

**B.      Plaintiff can testify to the readily observable aggravation of her injuries.**

Carnival's second argument is that Plaintiff cannot prove her injuries were aggravated by her onboard medical treatment because she has no expert testimony. But her damages claims are not strictly limited to claims requiring expert testimony. To the extent Carnival seeks complete summary judgment on all claimed damages, its request is over broad.

In *Aponte v. Royal Caribbean Cruises, Ltd.*, like here, a cruise line moved for summary judgment arguing that "[a]bsent support from any medical expert, … there is no record evidence to establish medical causation in this case." No. 15-21854-Civ, 2019 WL 943267, at *2 (S.D. Fla. Feb. 26, 2019) (citation omitted). Also, like here, the plaintiff in *Aponte* alleged he had suffered bodily injury, pain and suffering, physical and mental pain and anguish,

19

disability, loss of capacity for the enjoyment of life, and loss of earnings. *Id.* at \*6. Focusing on the "link between [the plaintiff's] immediate pain, need for a wheelchair and morphine, and incurring various expenses" and the negligent act, the court concluded that some of the claims "[did] not appear to be beyond a factfinder's common knowledge and experience[.]" *Id.*

Here, although Dr. Chagin advised Plaintiff "not to bear weight" and to "remain in the wheelchair[,]" (ECF No. 42-7 at 78), neither she nor anyone else on the medical staff made sure that Plaintiff had access to a wheelchair accessible cabin.[7] That failure forced Plaintiff to stand, bear weight, rotate her full body weight (258 pounds) over the injured knee every time she got up or sat down to enter through her cabin door *for the rest of the cruise*. (SOF at ¶ 42). As she testified, this left her in "unbearable" pain. (ECF No. 42-9 at 118:18–21.) Similarly, to the extent the applicable standard of care required immediate treatment with an orthopedist (which the medical staff failed to convey), Plaintiff can testify to pain and suffering she endured through the remainder of the cruise.

To be sure, *Plaintiff* cannot say that her surgical course became necessary (or was complicated) because of the medical staff's negligence. But damage claims that require no such testimony – and are instead based on lay observations – remain fair game.

---

[7] Dr. Chagin's explanation for this failure rings hollow. She testified that it was up to *Plaintiff* to contact guest services to request an accessible room (and so carry out medical orders). (*See* ECF No. 42-7 at 20.) Alternatively, she claimed that because Plaintiff was traveling with a companion, it was up to that individual to contact guest services. (*Id.* at 21.) However, had Plaintiff been traveling alone, Dr. Chagin may have requested an accessible room from guest services herself, as she had done in the past. (*Id.* at 22.) But considering that Plaintiff's companion was her 90-year-old father, (*see* ECF No 42-1 at 22:12–20, 42:18–43:7), this justification also comes up short.

Colson Hicks Eidson
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing document was e-filed with the Clerk of Court through the CM/ECF on this 28[h] day of April 2022 and is to be e-served by the CM/ECF system to: Michael J. Drahos, Esq., W. Cooper Jarnagin, Esq., GRAY ROBINSON, P.A., 515 North Flagler Drive, Suite 1425, West Palm Beach, Florida 33401, T: (561) 268-5727, F: (561) 268-5745, michael.drahos@gray-robinson.com; lilia.parker@gray-robinson.coml Cooper.Jarnagin@Gray-Robinson.com.

COLSON HICKS EIDSON
Attorneys for Plaintiff
255 Alhambra Circle, PH
Coral Gables, Florida  33134
(305) 476-7400

By ___*Deborah J. Gander*___
    Deborah J. Gander
    Florida Bar No. 34363
    Deborah@colson.com
    Eservice@colson.com
    Lina@colson.com